**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 23-1096

---

CHEROKEE CONCERNED CITIZENS,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL REGAN, Administrator, United States Environmental Protection
Agency,

*Respondents.*

---

PETITION FOR REVIEW OF FINAL ADMINISTRATIVE ACTION OF
THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

---

**PETITIONER'S PROOF OPENING BRIEF**

---

KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

TOSH SAGAR
Earthjustice
1001 G St., NW, Ste. 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

JONATHAN KALMUSS-KATZ
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
jkalmusskatz@earthjustice.org

*Counsel for Petitioner*

**DATED: May 10, 2024**

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CHEROKEE CONCERNED CITIZENS,

*Petitioner*,

v.

No. 23-1096

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL
REGAN, Administrator, United States
Environmental Protection Agency,

*Respondents*.

**PETITIONER'S CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner Cherokee Concerned

Citizens submits the following Certificate as to Parties, Rulings, and Related

Cases.

**A. Parties and *Amici***

Petitioner in this proceeding is Cherokee Concerned Citizens. Cherokee Concerned Citizens' Rule 26.1 disclosure is filed herewith.

Respondents in this proceeding are the United States Environmental Protection Agency ("EPA") and its Administrator, Michael Regan.

There are no *amici* at present.

## B.  Ruling Under Review

Cherokee Concerned Citizens petitions for review of the TSCA Section 5 Order for a New Chemical Substance signed by Respondent EPA on August 11, 2022, authorizing Chevron U.S.A. Inc. to manufacture, process, distribute in commerce, use, and dispose of new chemical substances associated with Premanufacture Notice ("PMN") Numbers P-21-0144–0147, P-21-0148–0150, P-21-0152–0154, P-21-0155–0158, and P-21-0160–0163 (att. to Pet. for Review, Doc. 1994141, JA_____).

## C.  Related Cases

This case has not previously been before this or any other court. Counsel for Petitioner is not aware of any related cases.

**DATED:** May 10, 2024                 Respectfully submitted,

/s/Katherine K. O'Brien
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

TOSH SAGAR
Earthjustice
1001 G St., NW, Ste. 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

JONATHAN KALMUSS-KATZ
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
(212) 823-4989
jkalmusskatz@earthjustice.org

*Counsel for Petitioner*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CHEROKEE CONCERNED CITIZENS,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL
REGAN, Administrator, United States
Environmental Protection Agency,

*Respondents*.

No. 23-1096

**RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Cherokee Concerned Citizens states that it is a nonprofit corporation based in Pascagoula, MS, that is dedicated to protecting the health and well-being of residents in Pascagoula's Cherokee Forest neighborhood from exposure to industrial pollution. Cherokee Concerned Citizens has no parent corporation and no publicly held corporation owns 10% or more of its stock.

**DATED:** May 10, 2024

Respectfully submitted,

/s/Katherine K. O'Brien
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

TOSH SAGAR
Earthjustice
1001 G St., NW, Ste. 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

JONATHAN KALMUSS-KATZ
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
(212) 823-4989
jkalmusskatz@earthjustice.org

*Counsel for Petitioner*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................... viii

GLOSSARY ........................................................................................................ xiii

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION ........................................................................3

STATEMENT OF THE ISSUES .............................................................................4

PERTINENT STATUTES AND REGULATIONS....................................................5

STATEMENT OF THE CASE..................................................................................5

     I.   TSCA REQUIRES EPA TO RESTRICT PRODUCTION OF
         NEW CHEMICALS TO THE EXTENT NECESSARY TO
         PREVENT UNREASONABLE RISKS TO HEALTH OR THE
         ENVIRONMENT..................................................................................5

     II.  EPA AUTHORIZED PRODUCTION OF THE WASTE PLASTIC
         CHEMICALS WITHOUT ESTABLISHING ANY RESTRICTIONS
         TO MITIGATE THE EXTREME HEALTH RISKS EPA
         CALCULATED AND WITHOUT REQUIRING ANY TESTING
         TO FILL DATA GAPS ......................................................................10

     III. EPA PROVIDED NO PUBLIC NOTICE OF THE ORDER .............15

SUMMARY OF ARGUMENT................................................................................17

STANDING............................................................................................................19

ARGUMENT ........................................................................................................22

     I.   STANDARD OF REVIEW...................................................................22

     II.  CHEROKEE CONCERNED CITIZENS' PETITION FOR
         REVIEW IS TIMELY .........................................................................23

         A. Cherokee Concerned Citizens Timely Filed Within
            Sixty Days of When the Order and its Effects First
            Became Reasonably Ascertainable to the Public ...................24

            1.  To trigger the statute of limitations, EPA had
                to provide reasonable public notice of the Order ...........25

            2.  The passage of two weeks after Chevron signed
                 the Order did not trigger the statute of limitations .........27

3. EPA's unannounced uploading of the Order to ChemView did not trigger the statute of limitations ........................29

B. Even if the Petition Were Untimely, Equitable Tolling is Justified ...................................................................................42

1. TSCA's statute of limitations is subject to equitable tolling.............................................................................42

2. Tolling is justified ..........................................................44

III. THE ORDER VIOLATES TSCA BECAUSE IT DOES NOT LIMIT PRODUCTION AND USE OF THE WASTE PLASTIC CHEMICALS TO THE EXTENT NECESSARY TO PROTECT AGAINST THE UNREASONABLE HEALTH RISKS EPA IDENTIFIED ........................................................................................48

IV. THE ORDER VIOLATES TSCA BECAUSE IT DOES NOT PROTECT AGAINST ADDITIONAL HEALTH RISKS THAT EPA ACKNOWLEDGED BUT COULD NOT CHARACTERIZE ..55

A. EPA Failed to Address the Risks from Exposure to the Waste Plastic Chemicals' Toxic Degradation Products ...................................................................................55

B. EPA Failed to Address the Potential Cancer Risks Associated with Multiple Waste Plastic Chemicals Under Multiple Exposure Scenarios .......................................57

V. EPA UNLAWFULLY FAILED TO EVALUATE AND ADDRESS THE RISKS TO PEOPLE WHO WILL BE EXPOSED TO THE WASTE PLASTIC CHEMICALS IN MULTIPLE WAYS ................59

CONCLUSION ........................................................................................62

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................64

# TABLE OF AUTHORITIES

## Cases

*Avia Dynamics, Inc. v. FAA,*
641 F.3d 515 (D.C. Cir. 2011)......................................................... 25, 27, 28, 31

*Boechler, P.C. v. Comm'r of Internal Revenue,*
596 U.S. 199 (2022)................................................................. 42, 43–44

*Chem. Mfrs. Ass'n v. EPA,*
859 F.2d 977 (D.C. Cir. 1988)........................................................ 22–23, 54–55

*Citizens Ass'n of Georgetown v. FAA,*
896 F.3d 425 (D.C. Cir. 2018)...............................................................27

*Ctr. for Sustainable Econ. v. Jewell,*
779 F.3d 588 (D.C. Cir. 2015).................................................................. 21–22

*Eagle-Picher Indus. Inc. v. EPA,*
759 F.2d 905 (D.C. Cir. 1985)................................................................ 26, 39

*Fla. Manufactured Hous. Ass'n v. Cisneros,*
53 F.3d 1565 (11th Cir. 1995) ...............................................................25

*Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000)...............................................................19

*Gibbs v. Legrand,*
767 F.3d 879 (9th Cir. 2014)................................................................ 46, 47

*Holland v. Florida,*
560 U.S. 631 (2010).......................................................... 45, 45–46

*Interstate Nat. Gas Ass'n of Am. v. FERC,*
285 F.3d 18 (D.C. Cir. 2002)...............................................................54

*JEM Broad. Co. v. FCC,*

22 F.3d 320 (D.C. Cir. 1994) ...............................................26

*Lab. Council for Latin Am. Advancement v. EPA,*
12 F.4th 234 (2d Cir. 2021) ................................. 6, 23

*Lattisaw v. Dist. of Columbia,*
118 F. Supp. 3d 142 (D.D.C. 2015) ....................................45

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992).......................................................20

*Matar v. Transp. Sec. Admin.,*
910 F.3d 538 (D.C. Cir. 2018)..........................................24

*Menominee Indian Tribe of Wis. v. United States,*
764 F.3d 51 (D.C. Cir. 2014)................................ 44–45

*Nat. Res. Def. Council v. EPA,*
755 F.3d 1010 (D.C. Cir. 2014)........................................52

*Nat'l Air Transp. Ass'n v. McArtor,*
866 F.2d 483 (D.C. Cir. 1989)................... 30, 34, 38, 40, 41

*Pace v. DiGuglielmo,*
544 U.S. 408 (2005).......................................................44

*Pub. Citizen Inc. v. Mineta,*
343 F.3d 1159 (9th Cir. 2003) ................................. 25, 41

*Pub. Citizen v. Nuclear Regul. Comm'n,*
901 F.2d 147 (D.C. Cir. 1990).............................. 26, 30, 31

*Pub. Emps. for Env't Resp. v. EPA,*
77 F.4th 899 (D.C. Cir. 2023) ........................................19

*RCA Glob. Commc'ns, Inc. v. FCC,*
758 F.2d 722 (D.C. Cir. 1985)................... 25–26, 28, 30, 31

ix

*Recreation Vehicle Indus. Ass'n v. EPA*,
 653 F.2d 562 (D.C. Cir. 1981)...............................................................41

*Robinson v. Dep't of Homeland Sec.*,
 71 F.4th 51 (D.C. Cir. 2023) ................................................................44

*Sierra Club v. EPA*,
 755 F.3d 968 (D.C. Cir. 2014)........................................................ 20, 21

*Sierra Club v. EPA*,
 895 F.3d 1 (D.C. Cir. 2018)........................................................... 57, 59

*Spirit Airlines, Inc. v. United States Dep't of Transp. & Fed. Aviation Admin.*,
 997 F.3d 1247 (D.C. Cir. 2021)............................................ 57, 59, 62

*Texas v. EPA*,
 726 F.3d 180 (D.C. Cir. 2013)................................................................28

*United States v. Wong*,
 575 U.S. 402 (2015) ........................................................................ 43, 44

*Wilkins v. United States*,
 143 S. Ct. 870 (2023)..............................................................................43

*Young v. SEC*,
 956 F.3d 650 (D.C. Cir. 2020).................................................................45

**Statutes**

15 U.S.C. § 2602(12) ........................................................................ 8, 62

15 U.S.C. § 2602(4) ..................................................................................7

15 U.S.C. § 2604 .......................................................................................6

15 U.S.C. § 2604(a)(1) .............................................................................6

15 U.S.C. § 2604(a)(3)...................................................................... 4, 7, 8, 9

15 U.S.C. § 2604(a)(3)(B)(i)....................................................................2

15 U.S.C. § 2604(a)(3)(B)(i)–(ii)(I)........................................................9

15 U.S.C. § 2604(a)(3)(B)(ii)(I) ........................................... 2, 10, 18, 53

15 U.S.C. § 2604(d)................................................................................6

15 U.S.C. § 2604(e) ........................... 1, 2, 4, 5, 9, 10, 53, 55, 56, 57, 58, 59, 60, 62

15 U.S.C. § 2604(e)(1)(A) ..................................................... 18, 49, 54

15 U.S.C. § 2604(e)(1)(A)(ii)(I) .................................................. 10, 49

15 U.S.C. § 2618 ....................................................................... 3, 4, 22

15 U.S.C. § 2618(a)(1)(A) ......................................... 23, 25, 28, 42, 43

15 U.S.C. § 2618(c)(1)(B) .....................................................................18

15 U.S.C. § 2618(c)(1)(B)(i)(II) .......................................................22, 59

5 U.S.C. § 706......................................................................................22

5 U.S.C. § 706(2) .................................................................................22

## Regulations

40 C.F.R. § 1090.1 ...............................................................................51

40 C.F.R. § 23.5 .............................................................................. 28, 29

40 C.F.R. Part 79 ..................................................................................51

40 C.F.R. Part 1090 ........................................................50

50 Fed. Reg. 7,268 (Feb. 21, 1985) ........................................29

86 Fed. Reg. 31,710 (June 15, 2021) ......................................36

86 Fed. Reg. 38,475 (July 21, 2021)................................... 35, 36

88 Fed. Reg. 74,712 (Oct. 31, 2023)......................................7, 8

89 Fed. Reg. 37,028 (May 3, 2024) .........................................8

**Other Authorities**

Black's Law Dictionary (10th rev. ed. 2014)..........................25

S. Rep. No. 94-698 (1976) ...............................................5–6

# GLOSSARY

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

**AR**   Administrative Record

**EPA**   Respondent U.S. Environmental Protection Agency

**JA**   Joint Appendix

**PMN**   Premanufacture notice

**TSCA**   Toxic Substances Control Act

**INTRODUCTION**

This case challenges EPA's order under section 5(e) of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2604(e), authorizing Chevron USA to produce eighteen new chemicals derived from plastic waste despite their extreme health risks. EPA, *TSCA Section 5 Order for a New Chemical Substance* (the "Order") (att. to Pet. for Review, Doc. 1994141), JA_____. Chevron intends to produce millions of tons of these waste plastic chemicals each year at its Pascagoula, Mississippi refinery for use "as fuels, fuel components, and chemical intermediates [in the production of other chemicals] or refinery feedstocks." Decl. of Katherine K. O'Brien 10, Doc. 2031734 (redacted EPA risk assessment), JA_____.

According to EPA's own assessment, the waste plastic chemicals threaten serious harm to human health and the environment—including cancer risks as much as *250,000 times* higher than the level EPA consistently has found unacceptable under TSCA. Yet EPA approved Chevron's production of the chemicals without developing any safeguards to limit releases of the chemicals into the air and water and without requiring Chevron to develop any information to fill acknowledged data gaps that prevented EPA from fully determining the chemicals' risks.

EPA's Order turns TSCA's mandate for health-protective regulation of new chemicals on its head. Where, as here, EPA determines that it lacks sufficient information to complete "a reasoned evaluation of the health and environmental effects" of new chemicals but the information available indicates that the chemicals "may present an unreasonable risk of injury to health or the environment," EPA must issue an order "pending development of [needed] information" that "prohibit[s] or limit[s]" the new chemicals' production and use "to the extent necessary to protect against … unreasonable risk." 15 U.S.C. § 2604(a)(3)(B)(i), (a)(3)(B)(ii)(I), (e). Here, EPA did not even attempt to demonstrate that its Order contains restrictions that satisfy this standard, and it is clear from the face of the Order that it does not. Petitioner Cherokee Concerned Citizens therefore seeks relief from this Court to protect its members—who live approximately one mile from Chevron's Pascagoula refinery—from the profound health risks EPA's unlawful Order will unleash.

EPA insists that its TSCA violations are beyond this Court's power to remedy because this petition for review supposedly was filed too late. EPA concedes that it provided no public notice of the Order when it took effect. Yet EPA still claims this petition is untimely because it was not filed within 60 days of either of two events that EPA claims triggered the statute of limitations: (1) the

passage of two weeks after Chevron privately transmitted a countersigned copy of the Order to EPA; or (2) EPA staff uploading the Order, months after it was signed and without any announcement, to an online database. EPA's position is irreconcilable with the plain language of TSCA's judicial review provision, 15 U.S.C. § 2618, and this Court's precedent, which dictate that the period for judicial review of EPA's Order could not begin before EPA provided reasonable public notice of its decision. Here, EPA provided no notice of the Order, and Cherokee Concerned Citizens petitioned for review within 60 days of when the Order and its effects on Pascagoula first became reasonably ascertainable to the public through reporting by an investigative journalist published on February 23, 2023.

This Court should reject EPA's bid to manipulate this Court's jurisdiction over the agency's orders and deprive the people whom EPA has put in harm's way of the judicial review that Congress guaranteed them. Instead, the Court should reach the merits, vacate EPA's unlawful Order, and thereby prevent production and use of the highly toxic waste plastic chemicals pending EPA's compliance with TSCA.

## STATEMENT OF JURISDICTION

EPA had jurisdiction to issue the Order under TSCA section 5, which requires EPA to review manufacturers' applications to produce new chemicals and

to issue orders that "prohibit or limit" such production "to the extent necessary to protect against an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2604(a)(3), (e). EPA concluded its review of Chevron's applications to produce the waste plastic chemicals by executing the Order on August 11, 2022, Pet. for Review 7, JA_____, ██████████████████████████████ ████████████████████████████████████ ███████; ████████████████.

On April 7, 2023, Petitioners petitioned for review of EPA's Order under TSCA section 19, 15 U.S.C. § 2618, which confers jurisdiction on this Court. As explained *infra*, pp. 23–41, the petition was timely filed within sixty days of when the Order, which was not publicly announced by EPA, first became reasonably ascertainable to the public through a February 23, 2023, news article.

## STATEMENT OF THE ISSUES

I.      Whether Cherokee Concerned Citizens timely filed this petition for review within sixty days of when the public first had reasonable notice of the Order's existence and effects, or, if not, whether equitable tolling of the filing deadline is warranted.

II.     Whether the Order violates TSCA section 5(e), 15 U.S.C. § 2604(e), and is not supported by substantial evidence because it does not limit production

and use of the waste plastic chemicals to the extent necessary to protect against the unreasonable health risks to the general population that EPA identified.

III.     Whether the Order violates TSCA section 5(e), *id.*, and is not supported by substantial evidence because EPA failed to protect against additional health risks presented by the waste plastic chemicals that EPA acknowledged but lacked sufficient information to characterize.

IV.     Whether the Order violates TSCA section 5(e), *id.*, and is not supported by substantial evidence because EPA failed to evaluate and address the risks to people who will be exposed to the waste plastic chemicals in multiple ways.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.     TSCA REQUIRES EPA TO RESTRICT PRODUCTION OF NEW CHEMICALS TO THE EXTENT NECESSARY TO PREVENT UNREASONABLE RISKS TO HEALTH OR THE ENVIRONMENT

Congress enacted TSCA in 1976 to "prevent unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use, or disposal of chemical substances." S. Rep. No. 94-698, at 1

(1976). Congress charged EPA with addressing risks from existing chemicals in commerce and new chemicals that manufacturers want to bring to market. As to new chemicals, Congress intended to "assure that chemicals receive careful premarket scrutiny before they are manufactured," ending the status quo in which new chemicals "c[ould] be marketed without notification of any governmental body and without any requirement that they be tested for safety." *Id.* at 3. TSCA "would no longer allow the public or the environment to be used as a testing ground for the safety of" new chemicals. *Id.*[1]

Accordingly, TSCA section 5, 15 U.S.C. § 2604, requires chemical manufacturers to obtain EPA's approval before producing new chemicals that have not previously been manufactured in the United States. *Id.* § 2604(a)(1). The manufacturer's application for this approval—known as a premanufacture notice, or "PMN"—must include, among other information, the chemicals' proposed uses, expected production volume, and effects on human health and the environment. *Id.* § 2604(d).

---

[1] While the premarket review mandate for new chemicals remains, major amendments to TSCA in 2016 "substantially increased EPA's obligation to evaluate and regulate dangerous chemicals." *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 243 (2d Cir. 2021).

EPA must review this information and determine whether the manufacturing, processing, distribution, use, or disposal of the chemicals may present "an unreasonable risk of injury to health or the environment." *Id*. § 2604(a)(3).[2] TSCA does not define what risk level is "unreasonable." But EPA generally uses a 1-in-1,000,000 risk of cancer from chemical exposure (sometimes expressed as $1 \times 10^{-6}$ or 1E-06) as a benchmark for determining whether chemicals present unreasonable cancer risks to the general population—including "fenceline community" residents living near polluting facilities and others exposed to chemicals in non-occupational settings.[3] Although EPA asserts that it does not apply this benchmark as a bright line, it has explained that cancer risks of "1 in 10,000 ($1 \times 10^{-4}$ [or 1E-04]) … generally represent[] the upper bound of acceptability for estimated excess cancer

---

[2] TSCA refers to these stages of a chemical's life cycle as the chemical's "conditions of use." 15 U.S.C. § 2602(4).

[3] *See*, *e.g.*, Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act, 88 Fed. Reg. 74,712, 74,768 (proposed Oct. 31, 2023) (explaining that, to determine whether trichloroethylene presents unreasonable cancer risks to fenceline communities, "[e]stimates of cancer risk to fenceline communities were calculated and compared to $1 \times 10^{-6}$ as a benchmark value"); EPA, *Draft TSCA Screening Level Approach for Assessing Ambient Air and Water Exposures to Fenceline Communities Version 1.0*, at 54 (Jan. 2022), https://www.epa.gov/system/files/documents/2022-01/draft-fenceline-report_sacc.pdf (adopting a 1-in-1,000,000 benchmark "for cancer risk in fenceline communities … consistent with the cancer benchmark used for general population cancer risk in several other EPA programs and in previous risk evaluations").

risk." 88 Fed. Reg. at 74,769. For non-cancer health harms, EPA determines whether risks are unreasonable by comparing the "margin of exposure," or "MOE"—which is calculated by dividing the chemical's hazard value for a specific health effect by the estimated exposure concentration—to a benchmark margin of exposure. *Id.* at 74,762. "A[] [margin of exposure] lower than the benchmark supports a determination of unreasonable risk of injury to health." *Id.*

In addition to evaluating risks to the general population, EPA must determine whether new chemicals present unreasonable risk to subpopulations who face greater risks because they will be more exposed to the chemical than the population at large or because they are more susceptible to harm due to their vulnerable life stage or other traits. *See* 15 U.S.C. § 2604(a)(3) (mandating specific consideration of risks to such "potentially exposed or susceptible subpopulation[s]"); *id.* § 2602(12) (defining "potentially exposed or susceptible subpopulation"). As EPA recognizes, such higher-risk subpopulations include "fenceline communities in close proximity to facilities emitting air pollutants or living near effluent releases to water." Procedures for Chemical Risk Evaluation Under the Toxic Substances Control Act (TSCA), 89 Fed. Reg. 37,028, 37,039–40 (May 3, 2024). In determining whether a chemical presents unreasonable risk, EPA may not consider "costs or other nonrisk factors." 15 U.S.C. § 2604(a)(3).

TSCA section 5 prescribes the specific determinations EPA may make, and the regulatory actions it must take, upon completing its review of a new chemical application. The permissible determination and action depend on the nature and extent of evidence EPA possesses for a specific new chemical, but in all cases, EPA must ensure that new chemicals coming to market will not present any unreasonable risk to health or the environment. *See id.* § 2604(a)(3), (e).

Where, as in the challenged Order, EPA determines that "the information available … is insufficient to permit a reasoned evaluation of the health and environmental effects of the relevant chemical substance[s]" but the available information indicates that the chemicals "*may* present an unreasonable risk of injury to health or the environment," *id.* § 2604(a)(3)(B)(i)–(ii)(I) (emphasis added), EPA must issue an order under TSCA section 5(e) that regulates the chemical "pending development of information" needed to rationally determine its full health and environmental risks, *id.* § 2604(e). EPA's section 5(e) order must impose restrictions on the chemical's production and other conditions of use that are sufficiently stringent "to protect against an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation …." *Id.*

In other words, Congress placed the burden on chemical manufacturers either to (1) provide EPA with information that supports a reasoned determination that their new chemicals pose no unreasonable risks, or (2) submit to restrictions on the chemicals' production—including, where necessary, a ban—until the manufacturer develops information that supports a reasoned determination that the chemicals pose no unreasonable risks. *See id.* This approach is essential to ensure that manufacturers cannot expose people and wildlife to novel chemicals before their risks are understood and appropriate safeguards established.

## II.  EPA AUTHORIZED PRODUCTION OF THE WASTE PLASTIC CHEMICALS WITHOUT ESTABLISHING ANY RESTRICTIONS TO MITIGATE THE EXTREME HEALTH RISKS EPA CALCULATED AND WITHOUT REQUIRING ANY TESTING TO FILL DATA GAPS

The challenged Order turns this congressional mandate on its head. EPA concluded that it lacked sufficient information to rationally determine the full risks Chevron's waste plastic chemicals present but found from the information available that the chemicals "may present an unreasonable risk of injury to health or the environment." Pet. for Review 14, JA_____; *see* 15 U.S.C. § 2604(a)(3)(B)(ii)(I), (e)(1)(A)(ii)(I). Indeed, based on the information before it, EPA calculated levels of human health risk from exposure to the waste plastic chemicals that can only be described as shocking—including risks *thousands of*

*times* higher than the agency's unreasonable risk benchmarks. Yet EPA authorized Chevron to commence large-scale production of the chemicals at its Pascagoula refinery without imposing any restrictions to protect people living nearby and without requiring Chevron to develop any information to fill data gaps that prevented EPA from determining the full extent of the chemicals' risks.

As EPA explained in its risk assessment, the most relevant information for evaluating new chemicals' hazards are data from experiments conducted on the new chemicals. O'Brien Decl. 25, JA_____. But Chevron "did not provide any experimentally derived hazard … information" for its waste plastic chemicals. *Id*. Moreover, the information Chevron provided "included only a few physical/chemical properties and general chemical composition information. The constituents of the new chemical substance mixtures were not reported," which "introduce[d] uncertainties in [EPA's] understanding of the chemical composition." *Id.* at 14, JA_____. As a result, EPA's risk assessment relied on data available for existing chemicals that EPA determined are valid analogues for the waste plastic chemicals as well as data for chemicals that EPA expects will be constituents of the waste plastic chemicals. *Id*.

Based on its analysis of the waste plastic chemicals' anticipated constituents and analogues, EPA concluded that the chemicals present numerous health hazards. These include cancer; neurotoxicity; adverse effects on the liver, kidney, blood, spleen, and "other organ[s]"; genetic toxicity; skin and eye irritation; "hydrocarbon pneumonia/aspiration hazard"; and "respiratory tract irritation." *Id.* at 12, JA_____. To determine the risks of experiencing these health harms for Chevron's workers, fenceline community residents, and others who may be exposed to the waste plastic chemicals, EPA analyzed scenarios in which it expects the chemicals will be released into the workplace or the environment, including during activities at Chevron's refinery such as the chemicals' manufacturing and processing and their use as chemical intermediates and refinery feedstocks. *Id.*

Due to insufficient information, EPA failed to determine the health risks that several of the waste plastic chemicals pose to certain exposed populations. *See*, *e.g.*, *id*. at 13, JA_____ ("For [chemical number] P-21-0153, there is insufficient information to assess hazard … EPA cannot make a risk determination for the general population exposed via fugitive air inhalation."); *id.* at 86, JA_____ (no determination of general population cancer risks from exposure to chemicals P-21-0145 or P-21-0149 under any exposure scenario). This does not signal that these chemicals' risks are low, but rather that EPA does not know what the risks will be.

For most of the waste plastic chemicals, however, EPA quantified the human health risks. And EPA calculated risks to the general population that substantially exceed the agency's benchmarks for "unreasonable risk" that must be mitigated through regulatory controls under TSCA. For example:

- EPA calculated cancer risks from air pollution associated with six of the waste plastic chemicals that exceed EPA's 1-in-1,000,000 unreasonable risk benchmark. *Id.* at 86–87, JA_____–__. These include cancer risks greater than 1-in-10 from exposure to stack air pollution associated with two of the chemicals—a risk level that is *more than 100,000 times higher* than EPA's unreasonable risk benchmark.[4] *Id.* EPA also calculated cancer risks from exposure to fugitive air pollution from multiple waste plastic chemicals that exceed EPA's unreasonable risk benchmark. *See id.* (estimating cancer risks from fugitive air pollution exceeding 1-in-1,000,000 for six

_____

[4] "Stack" air pollution refers to chemical releases into the air from a facility's chimneys, smokestacks, or similar structures designed to convey emissions to ambient air, whereas "fugitive" air pollution comes from other sources, such as vents and leaks.

chemicals, including risks of 120-in-1,000,000 for chemical P-21-0150).

- EPA calculated cancer risks of 7 in 100—*70,000 times higher* than EPA's 1-in-1,000,000 unreasonable risk benchmark—from eating fish contaminated by chemical P-21-0152. *Id.* at 86, JA_____.

- 

In total, EPA calculated risks exceeding its benchmarks for unreasonable risk to human health or the environment—and in many cases for both—for fourteen of the eighteen waste plastic chemicals. O'Brien Decl. 81–88, JA_____–__; *see also id.* at 11, JA_____ (classifying eleven of the eighteen chemicals as "high environmental hazard").

Despite calculating numerous risks from exposure to the waste plastic chemicals that vastly exceed EPA's unreasonable risk benchmarks, EPA did not use its authority under TSCA section 5(e) to establish *any* restrictions on the

14

manufacturing, processing, or use of the chemicals at Chevron's Pascagoula refinery to mitigate the risks to people living nearby, such as limits on Chevron's air emissions or wastewater discharges. *See* Pet. for Review 15–16, JA _____–__.

Further, despite identifying numerous data gaps, EPA did not require the development of *any* information about the chemicals' effects before allowing Chevron to commence production. *See id.* at 23–24, JA_____–__ (identifying ten categories of "Potentially Useful Information" that "would assist in evaluating the potential effects caused by these New Chemical Substances" but stating that "[t]he Company is not required to submit the 'Potentially Useful Information.'").

## III. EPA PROVIDED NO PUBLIC NOTICE OF THE ORDER

EPA signed the Order on August 11, 2022. *Id.* at 7, JA_____. ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ By letter dated August 25, 2022, Chevron advised EPA that the Order "has been signed by Chevron U.S.A. Inc." AR0001783, JA_____. EPA provided no public notice of the Order at that time.

15

Sixty-five days after Chevron signed the Order, on October 29, 2022, EPA staff uploaded a heavily redacted version of the Order to an online database called ChemView, https://chemview.epa.gov/chemview/#, at which point EPA asserts that the Order "was publicly available." Decl. of Jeffrey Santacroce ¶¶ 4–6, Doc. 2026024; *see* Pet. for Review 7–53 (redacted Order), JA_____–__. EPA still provided no public notice of the Order or its "availability" in ChemView.

On February 23, 2023, *ProPublica* published an article by an investigative reporter titled, "This 'Climate-Friendly' Fuel Comes With an Astronomical Cancer Risk," which broke the news that EPA had authorized Chevron to produce fuel chemicals derived from plastic waste at its Pascagoula refinery that "could emit air pollution that is so toxic, 1 out of 4 people exposed to it over a lifetime could get cancer." Second Decl. of Barbara Weckesser, Ex. 2.

As part of their ongoing efforts to monitor developments at Chevron's Pascagoula refinery, members of Petitioner Cherokee Concerned Citizens located the *ProPublica* article the day it was published and shared it with the organization's leadership. *Id.* ¶¶ 15, 19. To the best of their knowledge, "there was no public notice of EPA's decision [approving Chevron's new chemical production]

from EPA or Chevron at the time the decision was made or at any other point prior to the ProPublica article's publication." *Id.* ¶ 16.

## SUMMARY OF ARGUMENT

Cherokee Concerned Citizens timely filed this petition for review within sixty days of when the Order and its effects on Pascagoula first became reasonably ascertainable to the public. EPA's bid to insulate its Order from judicial review on the theory that the petition was filed too late cannot be reconciled with the plain language of TSCA's judicial review provision and this Court's precedent, which require EPA to provide reasonable public notice of its decisions before the judicial review period begins. Even if EPA could demonstrate that it provided such notice more than sixty days before Cherokee Concerned Citizens filed suit, which it cannot, the Court should equitably toll the statute of limitations so the people whose health is imperiled by EPA's Order may obtain judicial review as Congress intended.

This Court should vacate the Order, first, because it imposes no limits on production or use of the waste plastic chemicals to protect against the extreme health risks EPA identified for people living beyond the fenceline of Chevron's refinery. Indeed, EPA made no attempt to demonstrate in the record that its Order contains restrictions sufficient to prevent the unreasonable health risks EPA

calculated and it is apparent from the face of the Order that it does not. Accordingly, the Order violates TSCA section 5, 15 U.S.C. § 2604(a)(3)(B)(ii)(I), (e)(1)(A), is not supported by substantial evidence, and should be set aside, *id.* § 2618(c)(1)(B).

The Order also violates TSCA section 5 and is not supported by substantial evidence because EPA failed to protect against additional health risks that EPA acknowledged but lacked sufficient information to characterize. Despite expressing concern that the waste plastic chemicals will degrade in the environment into even more toxic substances, EPA failed to assess or address those degradation products' risks. EPA also failed to address cancer risks for multiple waste plastic chemicals and exposure scenarios that EPA could not quantify.

Finally, the Order violates TSCA section 5 and is not supported by substantial evidence because EPA failed to evaluate or address the aggregate risks to people living near Chevron's refinery who will be exposed to the waste plastic chemicals in multiple ways—from the chemical's manufacturing, processing, and use and through contaminated air, water, and fish. Instead, EPA irrationally considered each condition of use and exposure pathway in isolation, understating and failing to address the real-world risks the waste plastic chemicals present.

**STANDING**

Cherokee Concerned Citizens is a volunteer-run non-profit organization established by residents of the Cherokee Forest neighborhood in Pascagoula, Mississippi, in 2013. Second Weckesser Decl. ¶¶ 1, 3. The organization exists to advocate for protection from the persistent toxic pollution that its members experience from more than half a dozen industrial sites near their neighborhood— including the Chevron refinery located approximately one mile from their homes. *Id.* ¶ 3. These facilities release millions of pounds of toxic chemicals into the surrounding environment every year, including nearly half a million pounds of hazardous air pollutants. *Id.* ¶ 4.

Cherokee Concerned Citizens has standing to sue on behalf of its members because "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Pub. Emps. for Env't Resp. v. EPA*, 77 F.4th 899, 912 (D.C. Cir. 2023) (quoting *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

Cherokee Concerned Citizens' members would have standing to sue in their own right because they suffer a "concrete and particularized injury in fact, … that was caused by or is fairly traceable to the actions of the defendant, … and is capable of resolution and likely to be redressed by judicial decision." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The Order authorizes Chevron to produce and use the waste plastic chemicals at its Pascagoula refinery approximately one mile from where Cherokee Concerned Citizens' members live—activities that EPA itself found pose extremely high risks of cancer and other health harms. *See supra*, pp. 12–14. Cherokee Concerned Citizens' members suffer from acute and chronic health problems—including rashes, burning eyes, asthma, and cancer—that are associated with the toxic chemical exposures they already experience in their neighborhood. Second Weckesser Decl. ¶¶ 5–10. They are deeply concerned and anxious that Chevron's production and use of the waste plastic chemicals will exacerbate the toxic pollution and associated health harms they suffer—fears that are substantiated by EPA's own Order and risk assessment. As described by Cherokee Concerned Citizens member Barbara Weckesser, "[g]iven the unbearable pollution we already experience in our neighborhood, we cannot take the

additional pollution and health threats that would come with the new chemical production at Chevron that EPA approved." *Id.* ¶ 18.

The close proximity of Cherokee Concerned Citizens' members to Chevron's refinery and their "particularized fears of serious health and environmental consequences" establish the "substantial and concrete risk of harm" required for standing. *See Sierra Club*, 755 F.3d at 973–76 (holding that organization's members would have standing to challenge EPA's decision deregulating production of fuel derived from hazardous waste where members "live or work in close proximity to … specific refineries" that intended to produce the waste-derived fuel). EPA's Order authorizing Chevron to produce and use the waste plastic chemicals in Pascagoula is the cause of that harm, and vacating the Order would eliminate the risk that Cherokee Concerned Citizens' members face by invalidating Chevron's authorization to produce the chemicals.

Further, the interests of Cherokee Concerned Citizens' members in avoiding exposure to chemicals that EPA found pose grave health risks is central to the organization's purpose. Second Weckesser Decl. ¶¶ 3, 9, 11–14. Finally, this case does not require individual members' participation because it "turns entirely on whether [EPA] complied with its statutory obligations, and the relief it seeks is

invalidation of agency action." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

## ARGUMENT

## I. STANDARD OF REVIEW

TSCA generally provides for judicial review of EPA's section 5(e) orders according to the Administrative Procedure Act's judicial review provision, 5 U.S.C. § 706, which directs reviewing courts to "hold unlawful and set aside agency action … found to be," as relevant here, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2); *see* 15 U.S.C. § 2618. TSCA provides one exception to the application of 5 U.S.C. § 706, however, stating that "the standard for review prescribed by paragraph (2)(E) of [5 U.S.C.] section 706 shall not apply and the court shall hold unlawful and set aside [a TSCA section 5(e) order] if the court finds that the order is not supported by substantial evidence in the record taken as a whole." 15 U.S.C. § 2618(c)(1)(B)(i)(II).

This Court has interpreted TSCA's substantial evidence standard as distinct from "the APA's arbitrary-and-capricious standard" and "particularly demanding," requiring "that the reviewing court engage in a *searching review* of the Administrator's reasons and explanations for the Administrator's conclusions."

*Chem. Mfrs. Ass'n v. EPA*, 859 F.2d 977, 991–92 (D.C. Cir. 1988) (quotations omitted); *accord Lab. Council for Latin Am. Advancement*, 12 F.4th at 245.

## II.   CHEROKEE CONCERNED CITIZENS' PETITION FOR REVIEW IS TIMELY

TSCA provides that "any person may file a petition for judicial review" of EPA's section 5(e) orders "not later than 60 days after the date on which … an order is issued." 15 U.S.C. § 2618(a)(1)(A). Under the plain meaning of that provision and this Court's precedent, the period for judicial review could not begin before EPA provided reasonable public notice of the Order. EPA never provided such notice. Because Cherokee Concerned Citizens filed this petition for review within sixty days of when the Order and its effects on Pascagoula first became reasonably ascertainable to the public, the petition is timely.

Even assuming for the sake of argument that EPA could identify an action by which it provided public notice of the Order more than sixty days before Cherokee Concerned Citizens filed suit—which EPA cannot—this Court should hold that the filing deadline was equitably tolled. Accepting EPA's position—that it may run out the clock for judicial review without providing any public notice of its decision—is contrary to TSCA, this Court's precedent, and fundamental fairness.

At the outset, this Court directed the parties to address "whether equitable tolling is a threshold issue that can be resolved prior to jurisdiction." Ord., Doc. No. 2041659. The *timeliness* of Cherokee Concerned Citizens' petition for review "is a nonjurisdictional, threshold requirement" that the Court could address before establishing its jurisdiction because resolving that issue adversely to Cherokee Concerned Citizens could resolve this proceeding before reaching the merits. *Matar v. Transp. Sec. Admin.*, 910 F.3d 538, 541 (D.C. Cir. 2018). However, to evaluate the petition's timeliness the first question the Court must address is not whether the statute of limitations should be equitably tolled, but rather whether EPA provided reasonable public notice of the Order as required for the statute of limitations to run. *See infra*, pp. 24–27. Only if the Court were to conclude that EPA provided the requisite public notice to trigger the statute of limitations more than sixty days before Cherokee Concerned Citizens filed suit would the Court need to address equitable tolling at all.

## A. Cherokee Concerned Citizens Timely Filed Within Sixty Days of When the Order and its Effects First Became Reasonably Ascertainable to the Public

Cherokee Concerned Citizens timely filed this petition for review on April 7, 2023, within sixty days of when the challenged Order and its effects on Pascagoula first became reasonably ascertainable to the public through publication of the

February 23, 2023, *ProPublica* article. Second Weckesser Decl. ¶¶ 15–17 & Ex. 2. As of that date, EPA had provided no public notice of the Order.

1. <u>To Trigger the Statute of Limitations, EPA Had to Provide Reasonable Public Notice of the Order</u>

By its terms, TSCA's statute of limitations begins to run when a section 5(e) order is "issued" by EPA. 15 U.S.C. § 2618(a)(1)(A). "The verb 'issue' clearly refers to an act of public announcement." *Avia Dynamics v. FAA*, 641 F.3d 515, 519 (D.C. Cir. 2011) (quoting *Fla. Manufactured Hous. Ass'n v. Cisneros*, 53 F.3d 1565, 1574 (11th Cir. 1995)); *see also Issue*, Black's Law Dictionary (10th rev. ed. 2014) (the verb "issue" means "[t]o be put forth officially," "[t]o send out or distribute officially"). Accordingly, under TSCA's plain language, for EPA to issue a section 5(e) order and trigger the statute of limitations requires "some form of public notice." *Pub. Citizen v. Mineta*, 343 F.3d 1159, 1167 (9th Cir. 2003) (rejecting as unreasonable the agency's interpretation of when its decision "issued" because it "fails to provide for or require any form of notice before the time period for seeking judicial review commences").

Further, this Court repeatedly has held that the limitations period "does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the [decision's] content"—or, by logical implication,

25

its existence. *RCA Glob. Commc'ns v. FCC*, 758 F.2d 722, 730 (D.C. Cir. 1985);

*see also, e.g.*, *Pub. Citizen v. Nuclear Regul. Comm'n*, 901 F.2d 147, 153 (D.C. Cir.

1990) ("Before any litigant reasonably can be expected to present a petition for

review of an agency rule, he first must be put on fair notice that the rule in question

is applicable to him.") (quotation omitted). Accordingly, this Court "ha[s]

recognized exceptions to the limitations period when agency action fails to put

aggrieved parties on reasonable notice of the [action's] content." *JEM Broad. v.

FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994); *see also*, *e.g.*, *Eagle-Picher Indus. v. EPA*,

759 F.2d 905, 911–12 (D.C. Cir. 1985) (affirming that this Court will entertain

claims assertedly outside the statutory review period "where the petitioner lacked a

meaningful opportunity to challenge the agency action during the review period

due to, for example, inadequate notice that the petitioner would be affected by the

action").

EPA's theory that it ran out the clock for judicial review of its Order without

ever providing public notice of the Order cannot be reconciled with these

authorities. EPA argues that this Court's long line of precedent requiring reasonable

public notice of agency decisions to trigger the statute of limitations is irrelevant

because "[n]one of the cases … interpreted TSCA." Resp'ts' Reply in Supp. of

Mot. to Dismiss 5, Doc. 2035556 ("EPA Reply"). But EPA fails to explain what

about TSCA's statute of limitations meaningfully differentiates it from the multiple statutory contexts in which this Court has held reasonable public notice is required to trigger the statute of limitations.

EPA also mischaracterizes Cherokee Concerned Citizens' position as arguing "that actual notice must be provided to a potential petitioner before Section [19's] clock begins to run for that specific entity." *Id.* at 8. To the contrary, this Court's "cases make clear that lack of 'actual notice'" does not "delay the start of the sixty-day filing period," and Cherokee Concerned Citizens does not argue otherwise. *Citizens Ass'n of Georgetown v. FAA*, 896 F.3d 425, 435 (D.C. Cir. 2018) (quoting *Avia Dynamics*, 641 F.3d at 520). "Of course, this is not to say that the [agency] has no duty to … make the final order public in an appropriate manner" to trigger the statute of limitations. *Id.* As explained below, neither of the two events by which EPA claims it triggered the statute of limitations in this case provided reasonable public notice of the Order, which is fatal to EPA's timeliness argument.

    2.  <u>The Passage of Two Weeks After Chevron Signed the Order Did Not Trigger the Statute of Limitations</u>

EPA first argues that the limitations period began on September 8, 2022, a date on which EPA does not claim it took any action respecting the Order, but which marks two weeks after Chevron signed the Order. Resp't's Mot. to Dismiss

10–11, Doc. 2026024 ("EPA Mot."). EPA does not claim this event provided public notice of the Order or, indeed, that anyone other than Chevron had any way to discover the Order at that time. Instead, EPA's argument depends on its regulation at 40 C.F.R. § 23.5, which states that, for TSCA orders that are not published in the Federal Register, "the time and date of … issuance for purposes of section 19(a)(1) shall be 1:00 p.m. eastern time … two weeks after it is signed."

This argument fails because the passage of two weeks after Chevron privately transmitted the countersigned Order to EPA did not provide any "public announcement" of the Order, as required to trigger TSCA's statute of limitations under that provision's plain language. *Avia Dynamics*, 641 F.3d at 519 (quotation omitted); *see* 15 U.S.C. § 2618(a)(1)(A). EPA's reliance on its regulation is unavailing because "a regulation can never trump the plain meaning of a statute." *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013) (quotation omitted). EPA's theory also is irreconcilable with this Court's precedent, as EPA does not even attempt to argue that Chevron's privately sending the countersigned Order to EPA, or the passage of two weeks thereafter, "reasonably put[] aggrieved parties on notice" of EPA's decision. *RCA Glob. Commc'ns*, 758 F.2d at 730.

Moreover, EPA concedes that 40 C.F.R. § 23.5 does not determine the availability of judicial review for "a person … who received no notice of the agency action." EPA Reply 6 n.2. Rather than categorically establishing the date on which the limitations period commences irrespective of whether EPA provides public notice of its decision, the purpose of section 23.5 is "to bring greater fairness to 'races to the courthouse,'" by which litigants challenging EPA actions "seek by various means… to be the first to file a petition for review" in the hope of controlling the venue. Judicial Review Under EPA-Administered Statutes; Races to the Courthouse, 50 Fed. Reg. 7,268, 7,268 (Feb. 21, 1985). Accordingly, EPA acknowledged when promulgating that regulation—and does not dispute now—that section 23.5 does not preclude "someone … who has no notice of the action[] … from obtaining [judicial] review." *Id.* at 7,269. The timeliness of such claims is "not within the scope of" section 23.5 and therefore must be raised and resolved in litigation. *Id.*; *see* EPA Reply 6 n.2. Thus, even assuming EPA's argument could be reconciled with TSCA's plain language and this Court's precedent, which it cannot, 40 C.F.R. § 23.5 does not address the question presented here.

3. EPA's Unannounced Uploading of the Order to ChemView Did Not Trigger the Statute of Limitations

Alternatively, EPA argues that the statute of limitations began running when, sixty-five days after Chevron signed the Order, EPA staff uploaded it to EPA's

ChemView database. EPA Mot. 11. This fallback argument also is irreconcilable with this Court's precedent requiring reasonable public notice to trigger the statute of limitations. Just as "[p]otential petitioners cannot be expected to squirrel through [an agency's] public document room in search of papers that might reflect final agency action," they are not required to perpetually scour EPA's online database for unannounced agency orders that might affect their interests. *Public Citizen v. Nuclear Regul. Comm'n*, 901 F.2d at 153. Moreover, reasonably diligent members of the public could not be expected to locate EPA's Order in ChemView given the design and dysfunctions of that database and EPA's misleading directions for where to locate section 5 orders. *See Nat'l Air Transp. Ass'n v. McArtor*, 866 F.2d 483, 485 (D.C. Cir. 1989) ("An agency may not put up signs inducing" members of the public "to turn aside and then claim they had constructive notice of what they would have found at the end of the road.").

First, EPA's fallback argument fails because EPA did not provide any public notice when it uploaded the Order to ChemView. *See* Santacroce Decl. ¶¶ 4–6, appx. A–B (EPA declaration relying on private email communications and internal EPA version of ChemView to establish upload date); *see also, e.g.*, *RCA Glob. Commc'ns*, 758 F.2d at 730 (holding that statute of limitations "does not run until the agency has decided a question in a manner that reasonably puts aggrieved

30

parties on notice"). This Court has rejected as "border[ing] on the frivolous" the very argument EPA advances here—namely, that "mere placement of a decision in [the] agency's public files, without any other announcement, can start the clock running for review." *Public Citizen v. Nuclear Regul. Comm'n*, 901 F.2d at 153.

Second, even assuming for the sake of argument that EPA could trigger the statute of limitations by uploading its Order, without any announcement, to an online database, the limitations and dysfunctions of ChemView belie EPA's contention that putting the Order in ChemView made it readily available to "anyone anywhere in the world with an internet connection" and the benefit of EPA's "user tutorial for searching the site." EPA Reply 7. For this reason too, uploading the Order to ChemView did not "reasonably put[] aggrieved parties on notice." *RCA Glob. Commc'ns*, 758 F.2d at 730.

It is important to understand that ChemView is not a website where EPA publishes information, such as tables or lists of section 5 orders, that the public can access by navigating to and reading the site. *Cf. Avia Dynamics*, 641 F.3d at 519 (accepting agency's argument that it "issued" notification to industry party by posting it on a website dedicated to such notifications, where prior agency order had advised that it would disseminate such notifications via that website and there

31

was no dispute that posting the notification there made it readily discoverable to interested parties). Instead, ChemView is a vast database containing varied categories of documents pertaining to thousands of chemicals. To retrieve records from ChemView, users must supply and enter specific search terms into various search fields, as shown on the ChemView homepage reproduced below. *See* ChemView, https://chemview.epa.gov/chemview/.



Supplying appropriate search terms requires specialized knowledge of how information is organized in ChemView—and, as explained below, there are numerous flaws in ChemView's search functions. *See* Second Decl. of Maria J. Doa, Ph.D. ¶¶ 12–13, 18–19, 20.

ChemView's design reflects the fact that it was not created to provide public notice of EPA actions on new chemicals. Instead, as explained in the accompanying declaration of Dr. Maria Doa, who led ChemView's development during her twenty-two-year career in EPA leadership, ChemView was created to help commercial chemical users "make more informed decisions about the chemicals they use" by comparing information about different chemical choices. *Id*. ¶¶ 7–8.

For example, users cannot search ChemView for EPA decisions authorizing chemical production in specific locations, such as Pascagoula or Jackson County, Mississippi. *See id.* ¶ 11. ChemView does have an "Advanced Search" tool that invites users to search for orders by company name, *see id.* ¶ 12, which theoretically would permit users concerned about new chemical production at a facility near their home to retrieve any EPA orders authorizing that activity. But that tool is dysfunctional. If a user searches for "TSCA § 5 orders" associated with

Chevron's Pascagoula refinery—identified in ChemView as "Chevron Products Co Pascagoula Refinery"—ChemView returns *no results. Id.* ¶ 13. Searching for "TSCA § 5 orders" associated with the more general company name "Chevron" also returns *no results. Id.*

Thus, even if users concerned about chemical production at Chevron's Pascagoula refinery knew that ChemView is a repository for EPA orders authorizing such activity—a dubious proposition, as explained below—they would reasonably conclude from searching ChemView for TSCA section 5 orders associated with that facility—or its parent company—that no such orders exist. This is fatal to EPA's argument. "An agency may not put up signs inducing" members of the public "to turn aside and then claim they had constructive notice of what they would have found at the end of the road." *McArtor*, 866 F.2d at 485.[5]

---

[5] EPA misleadingly states that ChemView users "may narrow a search by company name *for ChemView outputs that include company name data*," [Second] Decl. of Jeffrey Santacroce ¶ 8.b, Doc. 2035556 (emphasis added), without acknowledging that many files in ChemView—including the challenged Order—are not searchable by company name "because EPA does not systematically link a company name to the documents in ChemView," Second Doa Decl. ¶ 12. As such, whether users can retrieve section 5(e) orders for a facility of concern by inputting the facility or parent company name, either as the initial search input or to narrow broader results, appears to turn on random chance.

EPA does not dispute that ChemView incorrectly indicates that EPA has never issued a section 5(e) order for Chevron or its Pascagoula refinery. Instead, EPA suggests that reasonably diligent members of the public could circumvent this problem by coming to ChemView armed with the unique PMN numbers EPA assigned to Chevron's waste plastic chemicals, which could be used to retrieve the Order. EPA Reply 11–12. But this argument also founders on the reality of EPA's own systems.

EPA asserts that the public could have obtained the PMN numbers for Chevron's waste plastic chemicals in July 2021, when EPA published in the Federal Register a notice that it had received PMNs from Chevron. *Id.*[6] But EPA's Federal Register notice did not mention Pascagoula; it merely identified

---

[6] EPA incorrectly asserts that "[a]ll 18 PMNs that were approved in the Order were published in the Federal Register." EPA Reply 16–17. Only the PMN *numbers*, not the applications, were published, along with the date EPA received the PMNs, the submitter name (identified only as "Chevron"), and the chemicals' uses and generic names. Certain New Chemicals; Receipt and Status Information for June 2021, 86 Fed. Reg. 38,475, 38,478 (July 21, 2021).

"Chevron"—a Fortune 10 company with facilities across the United States—as the submitter. 86 Fed. Reg. at 38,478.[7]

Further, even if a concerned Pascagoula resident attempted to track EPA's decision-making process based on the generic reference to Chevron, the Federal Register notice would lead them astray. The notice does not mention ChemView and instead instructs readers that "the final EPA determination on the [premanufacture] notice[s]" will be posted on a different EPA website: https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/status-pre-manufacture-notices. 86 Fed. Reg. at 38,476. But neither that website nor the PMN table linked there contains the Order, and neither discloses the existence of another site called ChemView where the Order eventually could be obtained. Instead, they refer the public to another government website—regulations.gov—which also does not contain the Order. *See* EPA, *Premanufacture*

---

[7] In contrast, a Federal Register notice published the prior month identified "Chevron E[l] Segundo Refinery" as the submitter of 12 PMNs, indicating the relevant location was Chevron's El Segundo refinery in Los Angeles County. Certain New Chemicals; Receipt and Status Information for May 2021, 86 Fed. Reg. 31,710, 31,713–14 (June 15, 2021). As explained below, in this case Chevron purposefully withheld the waste plastic chemicals' production location from the public with EPA's approval. *Infra*, pp. 39–40.

*Notices (PMNs) and Significant New Use Notices (SNUNs) Table*,

https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/premanufacture-notices-pmns-and (last visited May 4, 2024) ("**Please note**:

Access to documents relating to TSCA Section 5 Actions is available at

regulations.gov") (emphasis in original); *but see Certain New Chemicals: Receipt*

*and Status Information for June 2021*, https://www.regulations.gov/docket/EPA-HQ-OPPT-2021-0068/document (last visited May 4, 2024) (regulations.gov docket

for Chevron PMNs, which does not contain the Order).[8]

As such, it is unclear what trail of breadcrumbs EPA believes a reader of its

Federal Register notice could follow to arrive at ChemView and successfully

search for the Order by the PMN numbers. An announcement that provides only

misdirection for how to monitor EPA's decision-making process is not reasonable

---

[8] Moreover, even if members of the public entered into ChemView the PMN numbers as they appear in the Federal Register, as EPA argues they could have, that still would not yield the Order. EPA formats PMN numbers differently in the Federal Register than in ChemView, using en dashes in the former and hyphens in the latter. Second Decl. of Katherine K. O'Brien ¶ 4. As a result, if a user copies the Chevron PMN numbers from the Federal Register and pastes them into ChemView's search field, ChemView returns no results. *Id.* ¶ 5.

notice. To the contrary, it is a "sign[] inducing … readers to turn aside." *McArtor*, 866 F.2d at 485.

EPA fares no better in suggesting that members of the public could have promptly discovered the Order after it was uploaded to ChemView by continuously searching ChemView for *all* Section 5 orders, sorted by date posted, and then reviewing each order to determine whether any have local impacts. EPA Reply 12. Indeed, the search that EPA proposes requires sophisticated knowledge of ChemView's "Advanced Search" function, going far beyond the instructions in EPA's ChemView tutorial or User's Guide. Second Doa Decl. ¶ 17. And EPA fails to explain how users would know to pursue that particular search in lieu of the more intuitive approach of using ChemView's company search tool to focus on orders for the specific facility or company of interest, which, as explained, would incorrectly inform users that EPA has not issued any section 5 orders to Chevron. In short, EPA has not identified any authority holding that an agency can trigger the statute of limitations for challenges to its orders by silently placing the order in a database where members of the public theoretically could search for it—let alone in a database that renders the chance of successfully retrieving the order so vanishingly small.

Further, even if members of the public could have somehow ferreted out the

Order within sixty days of when EPA uploaded it to ChemView, the Order itself

provided "inadequate notice that the petitioner would be affected by the action" to

trigger the statute of limitations. *Eagle-Picher Indus.*, 759 F.2d at 911–12. Contrary

to EPA's assertion, the fact that Chevron intends to manufacture the waste plastic

chemicals in Pascagoula was not "made public in the redacted version of the order"

uploaded to ChemView, EPA Mot. 6–7, nor, for that matter, in the unredacted

order.

Indeed, ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ EPA acceded to

Chevron's request to "use the parent company name in our consent order rather

than the site name," AR0014878, JA_____, and the Order accordingly does not

disclose the production location. EPA now attempts an about-face, claiming that

the Order did effectively disclose the production location because it was signed by

a Pascagoula-based Chevron employee. EPA Mot. 15; Pet. for Review 7, JA_____.

But clearly neither EPA nor Chevron believed that having a Pascagoula-based

Chevron employee sign the Order would disclose the production location, which

EPA had committed to withhold from the public. This Court should reject EPA's

turnabout in service of its timeliness argument.[9]

Consistent with EPA's and Chevron's interpretation at the time they executed

the Order, the employment location of the signing employee does not establish the

chemicals' production location. *See* Second Doa Decl. ¶ 15 (describing multiple

PMNs signed by corporate officials located hundreds or thousands of miles from

chemical production location). And this Court does not require aspiring petitioners

to preserve their rights through surmise from ambiguous agency decision

documents. Rather, "when an agency leaves room for genuine and reasonable

---

[9] Consistent with its assertion that the waste plastic chemicals' production location
is confidential business information, Chevron also redacted that information in
most of its PMN application forms for the waste plastic chemicals—including in
the first consolidated PMN application covered by the Order (concerning
chemicals P-21-0144–P-21-0147). *See* O'Brien Decl. 236, 242, 278, 292, 330, 337,
345, 387, 394, 401, JA____, JA_____, JA_____, JA_____, JA_____, JA_____,
JA_____, JA_____, JA_____, JA_____. Although Chevron failed to consistently
redact this information in two subsequent consolidated PMNs, *e.g.*, *id.* at 285,
JA_____, these apparently inadvertent disclosures were buried in hundreds of
pages of forms and followed multiple forms in which the production location was
marked confidential and redacted. Therefore, even if members of the public
somehow located the Order and PMNs in ChemView, they would reasonably
conclude that this information was not disclosed in the PMNs. *See McArtor*, 866
F.2d at 485 (holding agency may not put up "signs inducing [members of the
public] to turn aside and then claim they had constructive notice of what they
would have found at the end of the road").

doubt as to the applicability of its orders or regulations, the statutory period for filing a petition [for] review is tolled until that doubt is eliminated." *Recreation Vehicle Indus. Ass'n v. EPA*, 653 F.2d 562, 569 (D.C. Cir. 1981); *see also McArtor*, 866 F.2d at 485 (holding agency failed to provide notice of action sufficient to trigger statute of limitations even where a "thorough and alert reader" could have ascertained action's scope and effect from poorly structured decision).

In sum, under TSCA's plain language and this Court's precedent, EPA could not trigger the statute of limitations by privately exchanging the Order with Chevron and letting two weeks pass, nor by silently uploading the Order to a database that returns false search results and presents numerous barriers to the public's ability to locate orders of interest. Validating EPA's position that either of these events triggered the statute of limitations would enable EPA to shield from judicial review its authorizations for large-scale production of novel chemicals— regardless of the risks those chemicals pose and regardless of the severity of EPA's statutory violations. Although EPA possesses discretion to determine when and how it issues orders, it "should not have the power to manipulate the jurisdiction of the federal courts." *Pub. Citizen v. Mineta*, 343 F.3d at 1166 (quotation omitted).

**B.   Even if the Petition Were Untimely, Equitable Tolling is Justified**

For the reasons discussed above, EPA cannot identify any event more than sixty days before Cherokee Concerned Citizens petitioned for review that triggered TSCA's statute of limitations under that provision's plain language and this Court's precedent. Even assuming EPA could do so, the Court should hold that the filing deadline was equitably tolled until the existence and effects of EPA's Order were publicized by *ProPublica* on February 23, 2023.

1.   TSCA's Statute of Limitations is Subject to Equitable Tolling

"[N]onjurisdictional limitations periods are presumptively subject to equitable tolling," *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 209 (2022) (citation omitted), and courts may "treat a procedural requirement as jurisdictional only if Congress clearly states that it is," *id.* at 203 (quotation omitted). Equitable tolling is available because TSCA's statute of limitations, 15 U.S.C. § 2618(a)(1)(A), is a nonjurisdictional filing deadline and nothing in the provision indicates congressional intent to preclude tolling.[10]

---

[10] *Boechler* precludes reasoning by analogy to past Circuit decisions that held filing deadlines to be jurisdictional without engaging in a clear statement analysis. *See* 596 U.S. at 203, 208 (rejecting reliance on lower court decisions holding analogous filing deadline is jurisdictional).

"Under this clear statement rule," the analysis of TSCA's statute of limitations "is straightforward." *Wilkins v. United States*, 598 U.S. 152, 158 (2023). The Supreme Court "ha[s] made plain that most time bars are nonjurisdictional" and nothing in TSCA section 19(a)(1)(A)'s "text or context gives reason to depart from this beaten path." *Id.* at 876–77 (quotation omitted). That provision states that "any person may file a petition for judicial review" of EPA's section 5(e) orders "not later than 60 days after … the date on which [the] order is issued." 15 U.S.C. § 2618(a)(1)(A). Rather than a clear statement of congressional intent to make the time bar jurisdictional, the provision "'speaks only to a claim's timeliness,' and its 'mundane statute-of-limitations language say[s] only what every time bar, by definition, must: that after a certain time a claim is barred.'" *Wilkins*, 598 U.S. at 159 (quoting *United States v. Wong*, 575 U.S. 402, 410 (2015)). That section 19(a)(1)(A) also includes the jurisdictional grant to the Court of Appeals does not change the outcome because "nothing conditions the jurisdictional grant on the limitations period." *Id.* (alterations omitted) (quoting *Wong*, 575 U.S. at 412).

Further, nothing in section 19(a)(1)(A) rebuts the presumption that its deadline is subject to equitable tolling. Like the provision in *Boechler*, section 19(a)(1)(A), 15 U.S.C. § 2618(a)(1)(A), "does not expressly prohibit equitable tolling"; its deadline is directed at the petitioner, not the court; and it includes

43

neither "detailed technical language" nor enumerated exceptions that imply tolling is precluded. 596 U.S. at 209–10. In short, "the Government must clear a high bar to establish that a statute of limitations is jurisdictional," *Wong*, 575 U.S. at 409, and EPA cannot do so here.

2. Tolling is Justified

Equitable tolling permits the Court to relieve a party from the consequences of untimely filing when, "due to circumstances external to the party's own conduct, it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Robinson v. Dep't of Homeland Sec. Off. of Inspector Gen.*, 71 F.4th 51, 58 (D.C. Cir. 2023) (quotation omitted). Equitable tolling is justified to permit Cherokee Concerned Citizens to challenge EPA's unlawful authorization for chemical production that—according to EPA's own findings— poses serious risks to the health of Cherokee Concerned Citizens' members and their children and grandchildren.

A party seeking equitable tolling "must show '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.'" *Id.* (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). At the same time, "[t]he Supreme Court has emphasized that equitable tolling must be applied flexibly" on a "case by case" basis. *Menominee Indian Tribe of Wis. v. United*

*States*, 764 F.3d 51, 58 (D.C. Cir. 2014) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

As EPA acknowledges, "extraordinary circumstances" exist when "despite all due diligence [a petitioner] is unable to obtain vital information bearing on the existence of [their] claim." EPA Reply 13 (quoting *Lattisaw v. Dist. of Columbia*, 118 F. Supp. 3d 142, 158 (D.D.C. 2015)). Here, Cherokee Concerned Citizens' members were unable to obtain the information supporting their claim before publication of the *ProPublica* article because of EPA's failure to provide any public notice of the Order and the impracticability of discovering the Order's existence and effects on their interests. Indeed, Cherokee Concerned Citizens is not aware of any interested party who identified the Order before *ProPublica*'s reporting, and EPA has identified none. EPA's actions respecting the Order are, by definition, "circumstances…beyond [Cherokee Concerned Citizens'] control" and were not "a product of [Cherokee Concerned Citizens'] own misunderstanding of the law or tactical mistakes in litigation." *Young v. SEC*, 956 F.3d 650, 655 (D.C. Cir. 2020) (quotation omitted).

Further, Cherokee Concerned Citizens pursued their rights with reasonable diligence. "The diligence required for equitable tolling purposes is reasonable

diligence, not maximum feasible diligence." *Holland*, 560 U.S. at 653 (quotations omitted). "Reasonable diligence does not require an overzealous or extreme pursuit of any and every avenue of relief. Rather, it requires the effort that a reasonable person might be expected to deliver under his or her particular circumstances." *Gibbs v. Legrand*, 767 F.3d 879, 890 (9th Cir. 2014) (quotations omitted).

Cherokee Concerned Citizens satisfies this standard. The organization has no employees; its members—many of whom are elderly, suffer from serious health problems, and have substantial caretaking responsibilities—work together to track pollution events and regulatory developments at nearby industrial facilities to the best of their ability. Second Weckesser Decl. ¶¶ 1, 9–14. These efforts include reviewing every regulatory notice from Mississippi's environmental agency, "attend[ing] every public meeting that is announced by Chevron or [the Mississippi Department of Environmental Quality] concerning the Chevron refinery," and diligently monitoring media sources for information about the refinery—as evidenced by the fact that Cherokee Concerned Citizens located the *ProPublica* article describing EPA's Order the day the article was published. *Id.* ¶¶ 11–15. After learning of the Order, Cherokee Concerned Citizens' leadership promptly launched a search for pro bono counsel and filed their petition for review within two weeks of identifying potential counsel. *Id.* ¶¶ 19–20. These efforts meet any

reasonable standard for "reasonable diligence" under the circumstances of an organization of neighbors working on a volunteer basis to track and respond to developments at multiple complex industrial facilities. *Gibbs*, 767 F.3d at 890.

Aside from disparaging Cherokee Concerned Citizens' efforts as "d[oing] nothing," EPA Reply 13, EPA's only answer to this argument is to rehash its theory that it timely "provided all the information needed to file the petition" by publishing a notice that it had received PMNs from Chevron in July 2021 and uploading the Order to ChemView without announcement fifteen months later, *id.* at 11–14. As explained above, that claim is false and fails to grapple with the serious limitations of EPA's Federal Register notice, ChemView, and the Order itself.

In sum, equitable tolling is justified to permit people facing grave health risks from production of the waste plastic chemicals to challenge EPA's Order authorizing that production—an order which, as explained below, flouts Congress's command that EPA take action to ensure that new chemical production presents no unreasonable health risks.

## III. THE ORDER VIOLATES TSCA BECAUSE IT DOES NOT LIMIT PRODUCTION AND USE OF THE WASTE PLASTIC CHEMICALS TO THE EXTENT NECESSARY TO PROTECT AGAINST THE UNREASONABLE HEALTH RISKS EPA IDENTIFIED

In the challenged Order, EPA concluded that "in the absence of sufficient information to permit the Agency to make a reasoned evaluation of the health and environmental effects of [the waste plastic chemicals], the manufacture, processing, distribution in commerce, use, or disposal of [the chemicals] may present an unreasonable risk of injury to health or the environment." Pet. for Review 14, JA_____. In fact, based on the information available, EPA calculated levels of human health risks from exposure to the waste plastic chemicals that vastly exceed EPA's benchmarks for "unreasonable risk" requiring mitigation under TSCA. *Supra*, pp. 7–8 (describing EPA's benchmarks). For example, EPA estimated that 1 in 4 people who are exposed long-term to air pollution generated by one of the waste plastic chemicals may develop cancer. Pet. for Review 38, JA_____ (representing this risk value as "2.5E-01"). This risk level is *250,000 times* higher than EPA's applicable benchmark. *Compare id., with supra*, p. 7 (describing EPA's 1-in-1,000,000 cancer risk benchmark). EPA also calculated cancer risks as high as 7 in 100 from eating fish contaminated by the waste plastic chemicals, O'Brien Decl. 86, JA_____, which is *70,000 times higher* than EPA's unreasonable risk benchmark. And EPA calculated risks of noncancer health harms

48

that exceed its unreasonable risk benchmark for eleven of the eighteen waste

plastic chemicals, including unreasonable risks to infants from consuming

contaminated drinking water for six of the waste plastic chemicals. *Id.* at 85–86,

JA_____–__.

Upon concluding that the waste plastic chemicals "*may* present an

unreasonable risk of injury to health"—let alone the extremely high risk levels that

EPA in fact calculated here—EPA was required to issue a section 5(e) order that

"prohibit[s] or limit[s] the manufacture, processing, distribution in commerce, use,

or disposal" of the waste plastic chemicals "to the extent necessary to protect

against an unreasonable risk of injury to health or the environment, without

consideration of costs or other nonrisk factors," including any unreasonable risks

to higher-risk subpopulations such as children or fenceline community residents.

15 U.S.C. § 2604(e)(1)(A), (e)(1)(A)(ii)(I) (emphasis added). Yet EPA's Order does

not impose any limits on the production or use of Chevron's waste plastic

chemicals to mitigate the risks EPA calculated. For that reason alone, the Order

violates TSCA and must be set aside. *See id.*

EPA's Order imposes three requirements on Chevron's manufacturing, processing, and use of the waste plastic chemicals—none of which mitigates the risks EPA calculated from environmental releases of the chemicals:

First, the Order states that Chevron may only manufacture, process, and use the chemicals "as a fuel, fuel additive, fuel blending stock, or refinery feedstock." Pet. for Review 15–16, JA_____ – __. But those are the very uses that Chevron proposed and that EPA found present extreme risks. *See* O'Brien Decl. 10, JA_____ (risk assessment stating that the chemicals' "intended uses are as fuels, fuel components, and chemical intermediates or refinery feedstocks"). Requiring Chevron to produce and use the chemicals only for those intended purposes does not mitigate the chemicals' identified risks—it causes them.

EPA's assertion in the Order that, "[w]hen used as a fuel," the waste plastic chemicals are regulated under existing EPA regulations at 40 C.F.R. Parts 79 and 1090, as well as "other applicable EPA and OSHA regulations," does not change the result. Pet. for Review 15, JA_____; *see also id.* at 48–52, JA_____ – __ (non-exhaustive list of "potentially applicable" regulations for "fuel stored, transported, dispensed and used within the United States") (capitalization omitted). This language is boilerplate that appeared in EPA's order template before EPA even

completed its risk evaluation for the waste plastic chemicals, AR0014812–13,

JA_____–__; *see* AR0014866, JA_____ (EPA email transmitting order template in

response to Chevron's request for "a draft of the boilerplate"), and does not reflect

any judgment by EPA that the referenced measures would mitigate the specific

risks presented by the waste plastic chemicals. Indeed, Chevron took the position

that the Order's references to preexisting regulations for fuels "are only

informational" such that any violations of those standards "would not be a

violation of the Order." AR0001783, JA_____. Nothing in the record indicates that

EPA refuted Chevron's interpretation.

In any event, the specific regulations that the Order asserts are applicable to

the waste plastic chemicals' use as fuel do not establish binding restrictions on

releases of the chemicals into the environment during their manufacturing,

processing, or use at Chevron's refinery and therefore could not mitigate the risks

EPA identified in the Order and supporting risk assessment. *See, e.g.*, 40 C.F.R.

Part 79 (requiring registration of certain fuels and additives with EPA under the

Clean Air Act); 40 C.F.R. § 1090.1 (explaining that Part 1090 regulations

"specif[y] fuel quality standards for gasoline and diesel fuel introduced into

commerce in the United States"). More fundamentally, the existing fuels

regulations referenced in the Order do not require the prevention of unreasonable

health risks as TSCA section 5(e) does. Because these non-TSCA regulations apply "a different level of protection," EPA could "not even purport to apply [TSCA's] protection standard" merely by noting the other regulations' existence and potential applicability to a subset of Chevron's intended uses of the waste plastic chemicals. *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1021 (D.C. Cir. 2014).

The Order's other two requirements pertain only to workplace exposure and likewise offer no protection for people living near Chevron's refinery. In this regard, the Order requires Chevron to "establish and implement a program to prevent workplace exposure" to the waste plastic chemicals, Petition for Review 19, JA_____, by ensuring that workers who are likely to touch the chemicals wear gloves and by employing unspecified "engineering … or administrative control measures" in the workplace "where feasible," *id.* at 41, JA_____. Setting aside the facial insufficiency of this requirement to protect Chevron's workers from the very serious risks to their health that EPA identified, *see*, *e.g.*, *id.* at 37, JA_____ (identifying cancer risks as high as 7.1 in 1,000 for workers who inhale the waste plastic chemicals), this requirement does nothing to protect people living near Chevron's refinery or the broader population, *id.* at 41, JA_____ (Order stating that this requirement is "to prevent exposure to these New Chemical Substances in the work area"). Similarly, the Order's requirement that Chevron "establish and

52

implement a hazard communication program" for its workers consistent with OSHA regulations, *id.* at 19, JA_____, does not limit releases of the waste plastic chemicals into the environment and affords no protection to people living near Chevron's refinery.

The Order should be vacated for this reason alone. Nowhere in the Order, the supporting risk assessment, or elsewhere in the record did EPA even attempt to demonstrate that the Order's requirements—that Chevron produce the waste plastic chemicals only for the very uses that generated the shockingly high risk calculations in EPA's assessment, that Chevron require some of its workers to wear gloves, and that Chevron follow existing OSHA requirements for communicating chemical hazards to its workers—would be sufficient to prevent the unreasonable risks that EPA calculated for people exposed to the waste plastic chemicals beyond the refinery's fenceline. *See* 15 U.S.C. § 2604(a)(3)(B)(ii)(I), (e) (mandating that EPA "shall" issue an order restricting the production and use of new chemicals to the extent necessary to protect against unreasonable health risks where the available information, while insufficient to permit a reasoned evaluation of the chemicals' effects, indicates that the chemicals "may present" unreasonable risk).

Indeed, EPA did not make any finding that the Order's requirements are sufficient to protect against the identified risks to which this Court might defer. To the contrary, the Order summarizes numerous risks that exceed by orders of magnitude the risk levels EPA has consistently defined as "unreasonable" and then recites trivial requirements for Chevron's production and use of the waste plastic chemicals that could not possibly mitigate the risks to people living near the refinery, without even acknowledging that the limits EPA imposed must bear any particular relationship to the risks EPA identified. *Cf. id*. § 2604(e)(1)(A) (requiring order to "prohibit or limit" new chemicals' production and use "to the extent necessary to protect against an unreasonable risk of injury to health or the environment"). EPA failed, for example, to restrict fugitive air emissions from Chevron's refinery despite calculating unreasonable cancer risks from those emissions. *See* O'Brien Decl. 86–87, JA_____–__ (estimating cancer risks exceeding 1-in-1,000,000 benchmark from fugitive emissions for six waste plastic chemicals). Because the record "lacks indicators of [EPA's] seriously tackling" its obligation to limit production and use of the waste plastic chemicals to the extent necessary to protect against any unreasonable risks to human health, the Order fails under even the APA's general standard of review, *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 53 (D.C. Cir. 2002), let alone TSCA's "particularly

demanding" substantial evidence standard, *Chem. Mfrs. Ass'n*, 859 F.2d at 992

(quotation omitted).

## IV. THE ORDER VIOLATES TSCA BECAUSE IT DOES NOT PROTECT AGAINST ADDITIONAL HEALTH RISKS THAT EPA ACKNOWLEDGED BUT COULD NOT CHARACTERIZE

The Order further violates TSCA because EPA failed to address additional

health risks presented by the waste plastic chemicals that EPA acknowledged but

claimed it lacked sufficient information to characterize. TSCA does not permit EPA

to dismiss identified risks that new chemicals may present because EPA

purportedly lacks sufficient information to characterize those risks. To the contrary,

TSCA requires EPA to impose restrictions on the new chemicals' production and

use that will prevent potential unreasonable risks pending the development of

information needed to fill identified data gaps. 15 U.S.C. § 2604(e). EPA's failure

to do so in the challenged Order violates TSCA and undermines EPA's claims that

its decision reflects "conservative approaches" and "conservative assumptions."

O'Brien Decl. 11, 92–93, JA_____, _____–__.

### A. EPA Failed to Address the Risks from Exposure to the Waste Plastic Chemicals' Toxic Degradation Products

First, although EPA articulated "concerns" in its risk assessment that

degradation of the waste plastic chemicals after their release into the environment

would "result[] in more toxic constituents," *id*. at 89, JA_____ EPA failed to

55

evaluate or address the associated risks because it purportedly did not have "adequate information to predict degradation products," *id.* at 14, 89, JA_____, _____. Evaluating a chemical substance's degradation products—the chemicals that will form when that substance breaks down in the environment—is an essential element of characterizing the substance's "environmental fate," which itself "is an important factor in determining exposure and risk." *Id.* at 26, JA_____.

Here, EPA had sufficient information to generate concerns that chemicals even more toxic than the waste plastic chemicals will form in the environment from the waste plastic chemicals' degradation but stated that it lacked adequate information about the waste plastic chemicals' characteristics "to predict degradation products." *Id.* at 89, JA_____. In its risk evaluation, EPA lamented that understanding the waste plastic chemicals' degradation products "is challenging" and observed that "[a]ny potential method/model to better inform this would be useful." *Id.* But rather than prohibit or limit the chemicals' production "while any required information [was] being developed" to support a reasoned evaluation of the risks posed by the chemicals' degradation products, 15 U.S.C. § 2604(e), EPA effectively shrugged and moved on.

This approach violates section 5(e) of TSCA, which directly addresses what EPA must do when, as here, it lacks sufficient information to complete a reasoned evaluation of risks; specifically, EPA must impose safeguards sufficient to prevent the potential unreasonable risks identified pending the development of information needed to characterize them. *Id*. By failing to address the potential risks from the waste plastic chemicals' degradation products—by, for example, restricting releases of the chemicals into the environment—EPA violated section 5(e) of TSCA, *id.*, and "ignore[d] an important aspect of the problem," which renders the Order invalid under the substantial evidence standard, *Spirit Airlines v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021); *see also Sierra Club v. EPA*, 895 F.3d 1, 11 (D.C. Cir. 2018) (holding EPA's conclusion that acid gas pollutants do not pose cancer risks was not supported by substantial evidence given EPA's "acknowledged lack of evidence" to characterize risks).

## B. EPA Failed to Address the Potential Cancer Risks Associated with Multiple Waste Plastic Chemicals Under Multiple Exposure Scenarios

Second, although EPA calculated extremely high cancer risks from exposure to many of the waste plastic chemicals in many settings, for many of the other chemicals and exposure scenarios EPA made no cancer risk determination at all. Yet it did not require Chevron to develop any information to fill the identified data

gaps nor restrict the chemicals' production "while any required information is being developed." 15 U.S.C. § 2604(e).

For example, EPA did not determine whether people exposed to chemical P-21-0145 in drinking water, contaminated fish, groundwater, or fugitive air emissions will be at risk of developing cancer and, if so, how high those risks are. O'Brien Decl. 86, JA_____. EPA also did not determine whether chemical P-21-0149 presents cancer risks to the general population under any exposure scenario. *Id.* And for nine additional chemicals, EPA failed to determine whether people exposed to the chemicals in stack and/or fugitive air emissions are at risk of cancer. *Id.* at 81–82, JA_____–__ In each case, EPA stated only that a "point of departure," or "POD," was "not available." *Id.*[11]

Here too, EPA acknowledged that it lacked information needed to understand an important aspect of the chemicals' health risks but nonetheless approved their production without any restrictions to mitigate the potential cancer risks "pending development of [that] information." 15 U.S.C. § 2604(e). EPA's leap-before-you-look approach inverts the framework Congress established in

_____

[11] The "point of departure" is the value used to quantify a chemical's health hazard and is used with exposure data to estimate risk.

58

section 5(e) of TSCA, which mandates that EPA prohibit or limit new chemical

production "to the extent necessary to protect against an unreasonable risk of

injury to health" "pending development of information" that may be needed to

fully characterize the risks. 15 U.S.C. § 2604(e). EPA's authorization for Chevron

to produce chemicals for which EPA made no, or incomplete, cancer risk

determinations without establishing measures to control environmental releases of,

and general population exposures to, those chemicals is contrary to TSCA, not

supported by substantial evidence, and must be set aside. *Id.; id.*

§ 2618(c)(1)(B)(i)(II); *Spirit Airlines*, 997 F.3d at 1255; *Sierra Club*, 895 F.3d at

11.

## V.  EPA UNLAWFULLY FAILED TO EVALUATE AND ADDRESS THE RISKS TO PEOPLE WHO WILL BE EXPOSED TO THE WASTE PLASTIC CHEMICALS IN MULTIPLE WAYS

The Order is contrary to TSCA and not supported by substantial evidence

because EPA failed to evaluate and address the risks to people who will be exposed

to the waste plastic chemicals in multiple ways—such as from environmental

releases caused by the chemicals' manufacturing, processing, and use, and through

breathing polluted air, drinking contaminated water, and eating contaminated fish.

Instead, EPA irrationally considered the human exposures from each condition of

use and exposure pathway only in isolation. EPA's approach is contrary to the

evidence in the record, which shows that people living near Chevron's Pascagoula refinery will be exposed to the waste plastic chemicals during multiple phases of the chemicals' life cycle and through multiple exposure pathways—placing them at greater risk of health harms than EPA considered. It also contravenes EPA's statutory duty to address the risks the waste plastic chemicals present to "potentially exposed or susceptible subpopulations" such as the fenceline community near Chevron's refinery. 15 U.S.C. § 2604(e).

EPA predicts that releases of the waste plastic chemicals into the environment during the chemicals' manufacturing, processing, and use will expose people outside Chevron's refinery to the chemicals through breathing contaminated air, drinking contaminated water, and eating contaminated fish. *See* O'Brien Decl. 12, 78–79, JA_____, _____–__. Further, the record demonstrates that manufacturing, processing, and use of some of the chemicals may all occur at Chevron's Pascagoula refinery. Specifically, in addition to manufacturing the waste plastic chemicals in Pascagoula, Chevron advised EPA that it intends to utilize the bulk storage terminal at its Pascagoula refinery for processing the chemicals. AR0014697, JA_____ (Chevron email to EPA transmitting data on bulk storage "tanks … that will (and/or) have a potential to be impacted by the PyOil co-feeding at the Chevron Pascagoula Refinery"); *see* O'Brien Decl. 12, JA_____ (describing

activities at bulk storage terminals as a component of the "processing" condition of use), 62–63, JA\_\_\_\_\_–\_\_ (including tank emissions in environmental release estimates for processing condition of use). In addition, the intended use for six of the chemicals is as intermediates in the production of other chemicals or refinery feedstocks, *id*. at 60, JA\_\_\_\_\_, which also can occur at Chevron's Pascagoula refinery.

Despite these facts, nothing in EPA's risk assessment reflects consideration of the total exposure that people living near the refinery will experience from the combined environmental releases that EPA predicts during the manufacturing, processing, and on-site use of the waste plastic chemicals at Chevron's Pascagoula refinery. EPA also failed to aggregate the health risks it calculated from breathing contaminated air, drinking contaminated water, and eating contaminated fish for people living near the refinery—ignoring the reality that those individuals must breathe, drink, and eat where they live. *See*, *e.g.*, *id*. at 78–79, JA\_\_\_\_\_–\_\_ (risk assessment presenting general population exposure estimates for individual exposure pathways only); *id*. at 83–87, JA\_\_\_\_\_–\_\_ (summarizing general population risk findings).

In so doing, EPA again "ignore[d] an important aspect of the problem" and reached conclusions about the waste plastic chemicals' risks that are at odds with the evidence in the record. *Spirit Airlines*, 997 F.3d at 1255. EPA also violated its statutory obligation to assess and mitigate potential unreasonable risks to "potentially exposed or susceptible subpopulation[s]," 15 U.S.C. § 2604(e), which include populations who, "due to … greater exposure" to a chemical substance than the general population, "may be at a greater risk" of health harm "than the general population," *id.* § 2602(12). People living near Chevron's refinery—who will be exposed to the waste plastic chemicals from multiple conditions of use and through multiple exposure pathways—meet this definition and EPA was required to determine and protect against any unreasonable risks they may face. *Id.* § 2604(e). For this reason, too, the Order should be set aside.

## CONCLUSION

For the foregoing reasons, Cherokee Concerned Citizens respectfully requests that this Court vacate the challenged Order.

Respectfully submitted this 10th day of May, 2024,

/s/Katherine K. O'Brien
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

TOSH SAGAR
Earthjustice
1001 G St., NW, Ste. 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

JONATHAN KALMUSS-KATZ
Earthjustice
48 Wall St., 19th Floor
New York, NY 10005
(212) 823-4989
jkalmusskatz@earthjustice.org

*Counsel for Petitioner*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

I hereby certify that this document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), it contains 12,978 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word version 2311 in 14-point Times New Roman font.

/s/Katherine K. O'Brien
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org