**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-1096

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CHEROKEE CONCERNED CITIZENS,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents*.

———————————

On Petition for Review of Final Administrative Action of
the United States Environmental Protection Agency

———————————

**BRIEF OF ENVIRONMENTAL DEFENSE FUND AS AMICUS CURIAE
SUPPORTING CHEROKEE CONCERNED CITIZENS**

———————————

Samantha Liskow
ENVIRONMENTAL DEFENSE FUND
257 Park Ave S
New York, NY 10010
(212) 616-1247
sliskow@edf.org

*Counsel for Amicus Curiae Environmental
Defense Fund*

May 17, 2024

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Amicus Curiae certifies as follows:

### A. Parties and Amici, and Corporate Disclosure

The parties are Petitioner, Cherokee Concerned Citizens, and Respondents, Environmental Protection Agency and Michael Regan (collectively, "EPA"). Counsel is not aware of other amici participating in this case.

### B. Ruling Under Review

Reference to the EPA order under review appears in the Brief of Cherokee Concerned Citizens.

### C. Related Cases

This case has not previously been before this Court or any other court, and the undersigned is not aware of any related cases as defined by D.C. Circuit Rule 28(a)(1)(C).

*/s/ Samantha Liskow*
Samantha Liskow

# RULE 26.1 DISCLOSURE STATEMENT

Environmental Defense Fund, organized and existing under the laws of the State of New York, is a national nonprofit organization that links science, economics, and the law to create solutions to urgent environmental problems.

Pursuant to D.C. Circuit Rule 26.1, Environmental Defense Fund certifies that it is a nonprofit corporation that does not issue stock, has no parent companies, and in which no publicly held corporations have any form of ownership interest.

*/s/ Samantha Liskow*
Samantha Liskow

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 DISCLOSURE STATEMENT............................................................... ii

TABLE OF AUTHORITIES ............................................................................v

GLOSSARY................................................................................................... viii

STATUTES AND REGULATIONS...................................................... ix

INTEREST OF AMICI ……………………………………………………………1

SUMMARY OF THE ARGUMENT ..................................................................4

ARGUMENT ...................................................................................................5

   I.  Using Standard Scientific Methods, EPA Estimated Extremely High Risks from the New Chemicals ……………………………………………………..5

   II.  EPA Violated TSCA by Failing to Require Mitigation of the New Chemicals' Unreasonable Risks ……… ……………………………………...11

   III.  EPA Impermissibly Dismissed the Unreasonable Risks that it Assessed, Implying that it Overestimated the Risks from the New Chemicals When In Fact it Limited and Excluded Risks from its Assessment ……… …………………13

   IV.  EPA Did Not Fully Assess All Risks from the Production and Use of the New Chemicals …………………………………………………………… .15

      A.  EPA Failed to Consider the Risks from Toxic Contaminants in the Waste Plastic Feedstocks …………………………………………………... 15

      B. EPA Did Not Account for Potential Increases in the Concentration of Toxic Components in the New Chemicals ………… ……………………19

      C. EPA Introduced False Constraints in its Assessment that Underestimated the New Chemicals' Exposures and Risks ………………………………...21

      D. EPA Underestimated the New Chemicals' Risks and Failed to Obtain Necessary Information About Their Toxic Effects ……………………… 22

      E.  EPA Violated TSCA by Not Sufficiently Considering and Protecting Exposed or Susceptible Subpopulations ………………………………...24

CONCLUSION ....................................................................................................26

CERTIFICATES OF COMPLIANCE AND SERVICE .........................................28

# TABLE OF AUTHORITIES

**Statutes**

15 U.S.C. § 2602(11) …………………………………………………………5

15 U.S.C. § 2602(12) ……………………………………………………..24

15 U.S.C. § 2603(a)(2)(A)(i) ……………………………………………..22

15 U.S.C. § 2604 …………………………………………………………5, 19

15 U.S.C. § 2604(a) ………………………………………………………11

15 U.S.C. § 2604(b) ………………………………………………………22

15 U.S.C. § 2604(a)(3) …………………………………………………5, 6, 9

15 U.S.C. § 2604(d) ……………………………………………………..6

15 U.S.C. § 2604(e) ……………………………………..5, 9, 11, 14, 22, 24

15 U.S.C. § 2605(a) ……………………………………………………..6

15 U.S.C. § 2625(h) ……………………………………………………..15, 18

Pub. L. No. 114-182 (June 22, 2016) …………………………………….13

**Other Authorities**

Jean Brender, et al. "Residential Proximity to Environmental Hazards and Adverse Health Outcomes," *American Journal of Public Health*, Vol. 101 (Suppl 1) (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3222489/ ………..……………24

Chevron Global, Pascagoula, *Our Products*, https://pascagoula.chevron.com/our-businesses/our-products ………. ……………………………………………25

EPA, "Learn about Dioxin," https://www.epa.gov/dioxin/learn-about-dioxin …. 17

EPA, "Our Current Understanding of the Human Health and Environmental Risks of PFAS," https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas……………………………………………………………17

EPA, *Predictive Models and Tools for Assessing Chemicals under the Toxic Substances Control Act*, https://www.epa.gov/tsca-screening-tools .......................9

EPA, "Risk Evaluation for Methylene Chloride (Dichloromethane) CASRN: 75-09-2," (June 2020), https://www.epa.gov/sites/default/files/2020-06/documents/1_mecl_risk_evaluation_final.pdf………………………………...10

EPA, *Toxics in the Food Web*, https://www.epa.gov/salish-sea/toxics-food-web (updated 2021) ……………………………………………………………………16

EPA, *Toxic Substances Control Act Inventory Representation for Chemical Substances of Unknown or Variable Composition, Complex Reaction Products and Biological Materials*, https://19january2017snapshot.epa.gov/tsca-inventory/chemical-substances-unknown-or-variable-composition-complex-reaction-products-and_.html ……………………………………………………...19

EPA, *TSCA New Chemicals Program (NCP) Chemical Categories*, https://www.epa.gov/system/files/documents/2024-02/ncp_chemical_categories.pdf (2010) ……………………………………….. 7

Jill Johnston & Laura Cushing, "Chemical exposures, health and environmental justice in communities living on the fenceline of industry," *Current Environmental Health Reports,* Vol. 7 (2020) ……..…………………………………………..24

Amber McNair, "Investigation of environmental justice analysis in airport planning practice from 2000 to 2010," *Transportation Research Part D*, Vol. 81 (2020), https://www.sciencedirect.com/science/article/pii/S1361920919311149 .25

OECD, *Grouping of Chemicals: Chemical Categories and Read-Across*, https://www.oecd.org/chemicalsafety/risk-assessment/groupingofchemicalschemicalcategoriesandread-across.htm/………...7

United Nations Environment Programme, "Chemicals in Plastics - A Technical Report" (2023), https://www.unep.org/resources/report/chemicals-plastics-technical-report ……………………………………………………………………17, 18

U.S. Energy Information Administration, *Oil and Petroleum Products Explained*, https://www.eia.gov/energyexplained/oil-and-petroleum-products/……………..18

**Legislative Materials**

162 Cong. Rec. S3513 (daily ed. June 7, 2016) …………………………………….12

**Federal Register Notices**

EPA, *Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances*, Policy Statement, 64 Fed. Reg. 60194 (Nov. 4, 1999) …………...…16

EPA, *Proposed Category for Persistent, Bioaccumulative, and Toxic Chemical Substances*, Notice, 63 Fed. Reg. 53,417 (Oct. 5, 1998), https://www.govinfo.gov/content/pkg/FR-1998-10-05/pdf/98-26630.pdf ……...…8

EPA, *Significant New Use Rules on Certain Chemical Substances (23–2.5e)*, Proposed Rule, 88 Fed. Reg. 39,804 (June 20, 2023) ………………………..16, 17

EPA, *Updates to New Chemicals Regulations under TSCA*, Proposed Rule, 88 Fed. Reg. 34,100 (May 26, 2023) ……………………………………………………...13

# GLOSSARY

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of abbreviations used in this brief:

| | |
|---|---|
| EDF | Environmental Defense Fund |
| EPA | Respondent United States Environmental Protection Agency |
| TSCA | Toxic Substances Control Act |

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in the addendum to the brief of

Petitioner, Cherokee Concerned Citizens.

## INTEREST OF AMICI CURIAE[1]

Amicus Curiae Environmental Defense Fund ("EDF") is a national nonprofit organization that links science, economics, and the law to create innovative, equitable, and cost-effective solutions to urgent environmental problems. EDF is one of the world's largest environmental organizations, with hundreds of thousands of members across the United States and a staff of over 1,000 scientists, policy experts, and other professionals from around the world.

EDF was founded in 1967 to address the impacts of the toxic pesticide DDT. Since then, EDF has continued to advocate for regulation of toxic chemicals. EDF played a central role in the 2016 bipartisan reform of the Toxic Substances Control Act ("TSCA"). In the decades before the law's passage, EDF staff published numerous reports documenting the original statute's problems, testified before congressional committees on the need for fundamental reform, and participated in many stakeholder meetings with the Environmental Protection Agency ("EPA") and congressional staff to discuss the needed changes.

Since passage of TSCA's 2016 amendments, EDF has closely tracked every aspect of implementation of the new law, continuously advocating for its health- and environment-protective implementation. EDF has filed thousands of pages of

---

[1] No people, other than Amicus, authored this brief in whole or part, or contributed money to fund its preparation or submission.

comments on EPA's proposed actions, including its approaches to evaluating and addressing the risks from new chemicals, publicly reported on the Agency's policies and rules implementing the reforms, and engaged directly with EPA in public meetings, including of its Science Advisory Council on Chemicals.

**Interest of Amicus in Filing**

This litigation falls squarely within EDF's interests in appropriately ensuring that Congress's amendment of TSCA, which included major enhancements to EPA's authority to review and regulate new chemicals, is implemented in accord with Congressional intent. EDF is deeply concerned that EPA contravened the intent of Congress by approving the eighteen new chemicals via its challenged order. EDF also has an interest in sustainable alternative fuels and in ensuring their safety. EPA reviewed and approved the new chemicals under a new program of streamlined reviews for certain new chemicals that it calls the Integrated Approach for Biofuel Premanufacture Notices. Despite the title, EPA has included in this program substances that are produced from non-bio-based materials, such as the new chemicals at issue. Such chemicals have none of the benefits of biofuels and pose many potential harms to human health and the environment.

**Authority to File**

EDF has authority to file this brief because counsel for the Petitioner communicated Petitioner's consent to the participation of Environmental Defense Fund as amicus curiae, and counsel for the Respondents communicated that "EPA states that it takes no position on EDF's participation as amicus."

## SUMMARY OF THE ARGUMENT

Chevron U.S.A. sought approval from EPA to produce eighteen new chemicals for use as fuels. EPA scientifically assessed these substances, under the Toxic Substances Control Act, and determined that they may pose extremely high risks. Congress required that when EPA makes such a finding the Agency must impose restrictions necessary to protect against the unreasonable risks to health and the environment. The Agency violated TSCA by failing to do so, jeopardizing the health of communities like Pascagoula, Mississippi, where the chemicals will be produced and released.

The Agency characterized its own assessment of the chemicals' risks as "conservative" – an overestimate – apparently to justify its failure to regulate. In fact, EPA made these risk findings using long-established scientific approaches. Moreover, the new chemicals may pose numerous additional substantial risks beyond those the Agency quantified, but EPA failed to assess those risks.

Because EPA's order approving the eighteen new chemicals fails to comply with TSCA's requirement that people and the environment be protected from unreasonable risks, the order should be vacated.

## ARGUMENT

### I.  Using Standard Scientific Methods, EPA Estimated Extremely High Risks from the New Chemicals

A company must apply for EPA approval before it can begin producing any "new chemical"—one that has not been manufactured in the United States. 15 U.S.C. §§ 2602(11), 2604. EPA must review the application, which includes information about how the chemical will be manufactured, processed, distributed, used, and disposed of, and determine whether the chemical may present "an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2604(a)(3). In the case of eighteen new chemicals that Chevron sought to produce, all derived in part from plastic waste, EPA found that they may present an unreasonable risk of injury to health or the environment. EPA, *TSCA Section 5 Order for a New Chemical Substance* (the "Order") (attachment to Petition for Review, Doc. 1994141) (2022). When EPA makes this "may present" determination, it must then "prohibit or limit" the chemicals' production and other activities that could expose people and the environment, all "to the extent necessary to protect against" the risks, including to groups of people who face higher exposure or susceptibility to the chemicals. 15 U.S.C. § 2604(e).

5

Through its use of the word "may" in the "may present" finding option,
Congress envisioned that there may be some uncertainty in the determination.[2]
This is logical, given that the information available for new chemicals is generally
more limited than that available for chemicals that have long been on the market.
In submitting a new chemical application, a company is required to submit only the
information that is known to it or "reasonably ascertainable." 15 U.S.C. § 2604(d).
By establishing the "may present" test for evaluating new chemicals for which
information is lacking, Congress clearly intended that EPA act proactively to
protect public health and the environment. Only if EPA has enough information to
determine that a new chemical is "not likely to present an unreasonable risk" is
EPA not required to regulate a chemical. 15 U.S.C. § 2604(a)(3). Otherwise, the
Agency must impose necessary restrictions, ensuring that protection against
unreasonable risks is afforded even when information regarding a new chemical is
lacking. *Id.*

EPA regularly assesses the potential risks of new chemicals even when data
on those chemicals are limited or not available. To assess the eighteen new

---

[2] Compare with TSCA section 6, which concerns the evaluation and regulation of existing, as opposed to new, chemicals: "If the Administrator determines … that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, *presents an unreasonable risk of injury to health or the environment*," EPA is required to regulate the existing chemical. 15 U.S.C. § 2605(a) (emphasis added)

chemicals (the "waste plastic chemicals"), EPA used standard scientific methods for evaluating new chemicals to conclude that the chemicals may pose serious risks. Specifically, EPA employed the routine scientific assessment approach of looking for data on other chemicals that are the most similar to the new chemicals – known as chemical analogs – to gain knowledge about the waste plastic chemicals. *See* EPA, *Integrated Risk Assessment for Chevron Waste Plastic Fuels* ("Risk Assessment") at 39-54, Doc. 2031734, Exhibit 1 to Decl. of Katherine K. O'Brien (redacted EPA risk assessment). EPA uses analogs to understand new chemicals' toxicity to humans and the environment, and to learn about their physical-chemical properties, such as the temperature at which they evaporate, in order to understand how people and the environment will be exposed to the chemicals. *See* EPA, *TSCA New Chemicals Program (NCP) Chemical Categories*, https://www.epa.gov/system/files/documents/2024-02/ncp_chemical_categories.pdf (2010), at ii.; OECD, *Grouping of Chemicals: Chemical Categories and Read-Across*, https://www.oecd.org/chemicalsafety/risk-assessment/groupingofchemicalschemicalcategoriesandread-across.htm/(last visited May 17, 2024).

EPA also assessed the waste plastic chemicals by using knowledge about certain existing chemicals that in part compose the new chemicals. Risk Assessment at 39-45 (Doc. 2031734, Ex. 1 to O'Brien Decl.). For new chemicals

that are composed in part of combinations of known, and not new, chemicals, EPA

typically assesses them by using information on those component chemicals, for

which the toxicity and chemical properties will often have already been well

established. *Id.* at 20.[3] Based on this data about toxicity and exposures, EPA will

estimate the magnitude of the risk from the new chemical.

The use of data from analog chemicals and component chemicals, because

they are not the subject new chemicals themselves, will introduce some uncertainty

in this estimate. Even with that uncertainty, however, EPA generally makes the

risk determination using the analog and component chemicals, as it did in the case

of the waste plastic chemicals:

> [B]ecause test data on [new] chemical substances are not required, EPA
> typically receives few [new chemical applications] that contain sufficient
> data on health or environmental effects, or on the potential to persist or
> bioaccumulate in the environment. As a result, the Agency often relies on
> computer models and structural or functional analogues as indicators of the
> potential toxicity and environmental fate of a [new] chemical substance. Due
> to the generally limited test data that are submitted or are otherwise available
> on a new chemical substance, EPA often identifies the substance for TSCA
> section 5(e) action because it is similar in molecular structure or function to
> other chemical substances known or suspected to have adverse health or
> environmental effects.

EPA, *Proposed Category for Persistent, Bioaccumulative, and Toxic Chemical

Substances*, Notice, 63 Fed. Reg. 53,417, 53,419 (Oct. 5, 1998),

---

[3] "NCSs" refers to "new chemical substances" and "NCD" refers to EPA's new
chemicals division.

https://www.govinfo.gov/content/pkg/FR-1998-10-05/pdf/98-26630.pdf. If EPA

cannot determine the magnitude of the unreasonable risk, the Agency can make a

finding under TSCA that there is an absence of sufficient information, and require

in its order that company develop that information. 15 U.S.C. §§ 2604(a)(3), (e).

The Agency is still required in that circumstance to issue an order protecting

against risks that the new chemicals may present. *Id.*

    In addition to assessing the waste plastic chemicals using known

components (which EPA calls "constituents") and chemical analogs and of the new

chemicals, EPA also relied on standard models to estimate exposures of the

chemicals to people and the environment. Order at 24 (att. to Doc. 1994141); Risk

Assessment at 9-10, 55, 65, 83-84 (Doc. 2031734, Ex. 1 to O'Brien Decl.); EPA,

*Predictive Models and Tools for Assessing Chemicals under the Toxic Substances

Control Act*, https://www.epa.gov/tsca-screening-tools (last updated May 15,

2024). Using these approaches, EPA determined that the waste plastic chemicals

may present unreasonable risks to health and the environment. Order at 5 (att. to

Doc. 1994141). This determination followed from the fact that the new chemicals'

analogs are highly toxic and that EPA estimated that people and the environment

would be exposed to the chemicals at levels that presented significant risks. For

example, several of the new chemicals are composed partly of benzene, a

carcinogen long known to cause leukemia and immune system harm in humans,

and benzo(a) pyrene, a carcinogen long known to cause gastrointestinal cancer in humans and toxicity to the developing fetus, including decreased survival. Risk Assessment at 43-44 (Doc. 2031734, Ex. 1 to O'Brien Decl.).

EPA estimated extremely high cancer risks, including an astonishing risk finding that greater than 1 in 4 people exposed to one of the waste plastic chemicals may develop cancer, and greater than 1 in 10 people for another chemical. *Id.* at 9, 81. These estimated risks are more than 100,000 times greater than EPA's acceptable cancer risk level (which is less than 1 in 1,000,000) for the general population. EPA, "Risk Evaluation for Methylene Chloride (Dichloromethane) CASRN: 75-09-2," at 454-455 (June 2020), https://www.epa.gov/sites/default/files/2020-06/documents/1_mecl_risk_evaluation_final.pdf. EPA also found that each of the eighteen new chemicals could be expected to cause a wide range of additional toxic health harms and that exposures to many of these new chemicals were so high that EPA identified risks, including to infants from drinking water. Risk Assessment at 39-41, 80 (Doc. 2031734, Ex. 1 to O'Brien Decl.). [4]

---

[4] For example, chemicals P-21-0155 and P-21-0156 are associated with eye, skin, and respiratory irritation, acute toxicity, developmental toxicity, reproductive toxicity, neurotoxicity, genetic toxicity, body weight effects, and liver, kidney, blood, spleen, adrenal gland, lung, and thymus toxicity. These new chemicals are also carcinogenic. Multiple other of the eighteen new chemicals have all but two of

## II.  EPA Violated TSCA by Failing to Require Mitigation of the New Chemicals' Unreasonable Risks

Once EPA has determined that a proposed new chemical "may present an unreasonable risk of injury to health or the environment," as the Agency concluded for the new waste plastic chemicals, it is required to regulate to mitigate the estimated risks based on the totality of the information on the new chemicals, including analogs, components, and exposure models. 15 U.S.C. § 2604(a), (e). The restrictions must sufficiently mitigate the unreasonable risks. *Id.* However, EPA's consent order with Chevron reflects a rejection of its own risk assessment, as it does not impose any requirements on Chevron that substantively address the unreasonable risks posed by the company's new chemicals. Order (att. to Doc. 1994141).

To address the unreasonable risks presented by the chemicals, EPA could have, for example, banned their production and use, required production changes to limit the creation of their most toxic components, or limited their releases to air and water. EPA did none of these things, nor took any other steps to meaningfully address the new chemicals' risks, and thus failed to comply with TSCA. 15 U.S.C. § 2604(e).

---

the same effects. And, each of the new chemicals is associated with multiple toxic effects. *Id.* at 40-41.

EPA discounted its own estimated risks for these new chemicals by indicating that the substances are similar to certain chemicals (fuels) already on the market, despite the presence of contaminants in the new chemicals that do not appear in the fuels. Order at 7 (att. to Doc. 1994141). But Congress did not authorize EPA to deem risks "reasonable" based on their similarity to a substance already on the market. If EPA were to use this approach for a new PFAS chemical (a category of substances known as "forever chemicals"), for example, it could approve every new PFAS chemical on the ground that there are hundreds, if not thousands, already in use.

Moreover, for EPA to perform its new chemicals reviews in this way would be contrary to a key aspect of Congress' reforms to TSCA. Before Congress reformed TSCA, "unreasonable risk" included a strong element of cost to be weighed in the analysis, whereas now TSCA defines unreasonable risk solely on the basis of risk. *See* 162 Cong. Rec. S3513 (daily ed. June 7, 2016) (statement of Sen. Tom Udall) ("Today, the old law requires that the EPA consider the costs and benefits of regulation when studying the safety of chemicals. Very soon, EPA will have to consider only the health and environmental impacts of a chemical. If they demonstrate a risk, EPA will have to regulate."). Simply assuming that existing chemicals permitted on the market before the passage of the Lautenberg Act are adequately regulated to eliminate unreasonable risk would undermine this major

12

change to TSCA wrought by the Act – the increased stringency of the unreasonable risk test brought about by the elimination of cost as a criterion. Pub. L. No. 114-182 (June 22, 2016). For EPA to conclude that new chemicals do not pose unreasonable risks because they have some similarity to those brought onto the market before the Lautenberg Act would be to greenlight new chemicals under the standard that Congress rejected when it revised TSCA in 2016.

**III.  EPA Impermissibly Dismissed the Unreasonable Risks that it Assessed, Implying that it Overestimated the Risks from the New Chemicals When In Fact it Limited and Excluded Risks from its Assessment**

In an apparent defense of its obvious failures to regulate, EPA implied, incorrectly, that it overestimated the risks from the new chemicals in its Risk Assessment. EPA stated that it used "conservative" assumptions and modeling – that is, assumptions and modeling that would produce overestimates of risk. *See, e.g.*, Order at 24-25 (att. to Doc. 1994141); Risk Assessment at 6, 177 (Doc. 2031734, Ex. 1 to O'Brien Decl.).

There are numerous problems with this contention.

First, EPA simply may not dismiss unreasonable risks that it determines new chemicals may pose, and fail to regulate them, based on a contention that it used "conservative" scientific assumptions. EPA, *Updates to New Chemicals Regulations under TSCA*, Proposed Rule, 88 Fed. Reg. 34,100, 34,103 (May 26, 2023).

13

Second, EPA gave no inkling of how "conservative" it believed its use of analogs or modeling to be (for example, by a factor of 100 or 10,000?), or what assumptions the agency would instead consider appropriate. Thus, in attempting to back away from its Risk Assessment, EPA provided no clarity whatsoever about the risks the Agency alternatively believes these chemicals actually pose to workers or to communities like the frontline neighborhood in Pascagoula. Nor did EPA provide any information supporting the contention that the chemicals' risks to human health are less than the estimates on which EPA's Order is based.

Third, EPA presented no scientific basis on which to dismiss the risks, or any rationale that would support such a dismissal. Specifically, EPA did not identify any reason why the risk assessment methods it used here – which, as explained above in Section I, are core methods of EPA's new chemical assessments and the foundation of many consent orders under 15 U.S.C. § 2604(e) – are not valid for the waste plastic chemicals. In the normal course of its new chemical reviews, EPA does not estimate risks and then summarily dismiss those risk estimates, characterizing them blithely as "conservative," and nor is it permitted to do so under TSCA. *See*, *e.g.*, EPA, *Consent Order and Determinations Supporting Consent Order, P-10-580* (2011) (EPA placing restrictions on a chemical in the PFAS class based on data-rich PFAS analogs), https://library.edf.org/AssetLink/84obk3gkp06j410d60bb82juti4hes27.pdf; EPA,

*Consent Order and Determinations Supporting Consent Order, P-14-0712, P-14-0713, P-14-0714, and P-14-0715* (2016) (EPA restricting the production and use of the chemicals based on the analog benzene),

https://library.edf.org/AssetLink/68cx76xy58ssu52ke76f46pr6ps67gme.pdf.

## IV.  EPA Did Not Fully Assess All Risks from the Production and Use of the New Chemicals

Even assuming, *arguendo*, that some aspects of EPA's Risk Assessment may be deemed "conservative," EPA decidedly did not overestimate the overall risk of the waste plastic chemicals. This is because, although EPA did assess certain very high risks, it also underestimated or entirely excluded numerous other potential risks. In other words, the high assessed risks are just one piece of the overall risk picture of the waste plastic chemicals, a picture that remains understated and incomplete due to EPA's assessment failures. Thus, for reasons described more specifically below, EPA's overall scientific assessment cannot plausibly be characterized as "conservative" and in fact fails to meet the TSCA requirement that EPA use the best available science in evaluating risk. 15 U.S.C. § 2625(h).

### A.  EPA Failed to Consider the Risks from Toxic Contaminants in the Waste Plastic Feedstocks

The waste plastic chemicals are made in part using a complex combination of chemicals generated from thermal breakdown ("pyrolysis") of waste plastics.

15

These combinations of chemicals are used as "feedstocks," or inputs in the production process, for the new chemicals, and often include toxic contaminants such as PFAS, heavy metals (including arsenic, lead, and mercury), phthalates, flame retardants, and dioxins, which are known not only for their high toxicity but also for their high persistence and bioaccumulative potential.[5] Chemicals that are persistent take months to years to break down in the environment, and so releases of such chemicals will build up in the environment, increasing their potential exposure to humans and wildlife. Order at 25 (att. to Doc. 1994141); EPA, *Category for Persistent, Bioaccumulative, and Toxic New Chemical Substances*, Policy Statement, 64 Fed. Reg. 60194 (Nov. 4, 1999), available at https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/policy-statement-new-chemicals. Similarly, chemicals that are bioaccumulative will concentrate in a human or other animal, making them a continual internal source of additional exposure that increases the risk of harm to the organism. EPA, *Toxics in the Food Web*, https://www.epa.gov/salish-sea/toxics-food-web (updated 2021).

---

[5]After issuing the consent order, EPA realized that it should have addressed the toxic contaminants and proposed a TSCA "significant new use rule." EPA, *Significant New Use Rules on Certain Chemical Substances (23–2.5e)*, Proposed Rule, 88 Fed. Reg. 39,804 (June 20, 2023).

16

The toxic contaminants, which under the terms of the Order can be present in any amount in the new chemicals' feedstocks, can then become part of the new chemicals, risking exposure to communities, workers, and the environment. *See* United Nations Environment Programme, "Chemicals in Plastics - A Technical Report," at 87-88 (2023), https://www.unep.org/resources/report/chemicals-plastics-technical-report. However, EPA failed to consider these contaminants, thereby significantly underestimating the potential toxicity and risks of the waste plastic chemicals. For example, EPA has found that the toxic contaminants, such as PFAS and dioxins, can cause profound long-term health harms, including cancer, reproductive and developmental problems, and immune system damage. EPA, *Significant New Use Rules on Certain Chemical Substances (23–2.5e)*, Proposed Rule, 88 Fed. Reg. 39,804; EPA, "Our Current Understanding of the Human Health and Environmental Risks of PFAS," https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last updated May 16, 2024); EPA, "Learn about Dioxin," https://www.epa.gov/dioxin/learn-about-dioxin (last updated Dec. 17, 2023).

EPA in part seems to have disregarded the toxic contaminants in the waste-plastic pyrolysis feedstock, and thus their presence in the new chemicals, based on a statement from the submitter: "Chevron claims that the [waste plastic]-derived

fuels are chemically equivalent to their petroleum analogues." Risk Assessment at 11 (Doc. 2031734, Ex. 1 to O'Brien Decl.).

But this is impossible, given the fact that the new chemicals are, unlike petroleum, composed of a complex combination of contaminants from the additives in the original plastics; contaminants from residual materials in plastic containers, such as pesticides; the dioxins introduced during processing; and hydrocarbons, which are chemicals made of carbon and hydrogen produced during the pyrolysis of the waste plastics. *See* United Nations Environment Programme, "Chemicals in Plastics - A Technical Report," https://www.unep.org/resources/report/chemicals-plastics-technical-report. Petroleum products, on the other hand, are only mixtures of hydrocarbons that formed millions of years ago from the remains of animals and plants. In contrast to the new waste plastic chemicals, petroleum does not contain human-made chemicals such as PFAS, dioxins, or brominated or chlorinated flame retardants. U.S. Energy Information Administration, *Oil and Petroleum Products Explained*, https://www.eia.gov/energyexplained/oil-and-petroleum-products/ (last updated June 12, 2023).

EPA's failure to fully evaluate the risks posed by these contaminants violates TSCA's requirements to use the best available science in assessing and managing risk. 15 U.S.C. § 2625(h). The consequence of this failure is exposure of

the public and the environment to potentially severe risks that EPA did not

quantify and thus did not manage or mitigate.

### B. EPA Did Not Account for Potential Increases in the Concentration of Toxic Components in the New Chemicals

Once a company's new chemical application is approved by EPA under

TSCA, and it begins manufacturing the new chemicals, the company may increase

the toxic components in the chemicals unless EPA had imposed limits on those

components in its 15 U.S.C. § 2604 order. EPA, *Toxic Substances Control Act*

*Inventory Representation for Chemical Substances of Unknown or Variable*

*Composition, Complex Reaction Products and Biological Materials*, at 2 ("many

commercial substances that are subject to TSCA … may have unknown or variable

compositions or be composed of a complex combination of different molecules"),

https://19january2017snapshot.epa.gov/tsca-inventory/chemical-substances-

unknown-or-variable-composition-complex-reaction-products-and_.html; Risk

Assessment at 10 (identifying all eighteen chemicals as chemical substances of

unknown or variable compositions and complex reaction products) (Doc. 2031734,

Ex. 1 to O'Brien Decl.). EPA imposed no such limits in its Order approving the

waste plastic chemicals. This means that Chevron, along with any other companies

who choose to produce or use the new chemicals, may employ any level of toxic

components, such as benzene.

Specifically, EPA appeared to assume that the concentrations would not vary from the baseline concentrations provided by Chevron. Risk Assessment at 10, 13 (Doc. 2031734, Ex. 1 to O'Brien Decl.) But under real-world conditions, companies can, for example, change the relative ratio of the feedstocks they use; modify their production processes; and make their new chemicals using waste plastic pyrolysis feedstocks from different suppliers who use different types and amounts of waste plastic.[6] Such significant changes, which EPA did not restrict in any way in the Order, can lead to concentrations of toxic components in the new chemicals, and thus to exposure levels of components such as benzene, that are significantly higher than those on which EPA based its safety assessment. This would result in higher risks than EPA estimated.

EPA's Risk Assessment functions as a snapshot frozen in time, in which the Agency assumed nothing would change that would heighten the chemicals' toxicity. As a result, EPA failed to order that Chevron may not make such changes

---

[6] Indeed, EPA itself acknowledged that increasing the relative amount of the waste-plastic pyrolysis feedstocks will affect the ratio of the toxic components. *See* Risk Assessment at 13 (Doc. 2031734, Ex. 1 to O'Brien Decl.) ("Although, increasing the concentration of WP feedstock to [REDACTED]% does impact the [REDACTED] content relative to [REDACTED]. Given that there is very little variation overall, it is reasonable to conclude that the concentration of WP feedstock (up to [REDACTED]%) does not significantly change the composition of the [ REDACTED] products").

to the new chemicals, and the Order thereby fails to appropriately protect against unreasonable health risks.

### C. EPA Introduced False Constraints in its Assessment that Underestimated the New Chemicals' Exposures and Risks

EPA placed limits on the physical-chemical properties used in its release models that resulted in an underestimate of the emissions, and thus exposures, of the new chemicals. Specifically, a key aspect of the new chemicals' potential to expose people is its "vapor pressure," which dictates how readily the chemical will evaporate into the air. The higher the vapor pressure, the greater the percentage of the chemical that will move from being in a liquid form to being in the air as a vapor, and thus available for inhalation. In the case of the new chemicals, a higher vapor pressure would mean more ready escape from factory equipment into the air, exposing surrounding communities and workers.

In its Risk Assessment, EPA inexplicably introduced a false limitation to the vapor pressure values to be applied in its models that estimated exposure. EPA chose to model exposure from all the new chemicals to humans via air using a vapor pressure limit of 35 torr, which is significantly lower than what has actually been measured for components of the waste plastic chemicals. Benzene's pressure is nearly three times EPA's limit (94.8 torr), 1,3-pentadiene's ten times the limit (405 torr), and the pressure of 2-methylpropene, which is a gas at room

21

temperature, is over sixty times the estimate (2,308 torr).[7]  EPA's artificially low vapor pressure limit – lower than the vapor pressure for any of these chemicals – therefore leads to artificially low estimates of human exposure to the new chemicals.

### D. EPA Underestimated the New Chemicals' Risks and Failed to Obtain Necessary Information About Their Toxic Effects

EPA's risk estimates for many of the new chemicals are incomplete because the Agency failed to quantify all the risks for the chemicals and did not use its authority to obtain the information it needed to do so. 15 U.S.C. §§ 2603(a)(2)(A)(i); 2604(b), (e). EPA estimated risks for some of the ways people can be exposed to the chemicals, such as by drinking water contaminated by the new chemicals. At the same time, EPA was not able to estimate risks for other types of exposure, such as inhalation, because, as the Agency acknowledged, it lacked sufficient toxicity data. EPA knows that certain chemicals cause particular harms, such as kidney and liver toxicity, but the Agency did not have sufficient information to quantify their risks – again acknowledging that it lacked key data. Order at 23-24 (att. to Doc. 1994141). For example, EPA identified cancer risks

---

[7] EPA, *Comptox Chemicals Dashboard* (benzene: https://comptox.epa.gov/dashboard/chemical/properties/DTXSID3039242; 1,3-pentadiene: https://comptox.epa.gov/dashboard/chemical/properties/DTXSID3027160; 2-methylpropene (a.k.a. isobutylene): https://comptox.epa.gov/dashboard/chemical/properties/DTXSID9020748)

resulting from inhalation of new chemical P-21-0155 but did not estimate the cancer risk from exposure to the chemical through the skin because the Agency lacked sufficient information on how much dermal exposure to the substance is needed to cause cancer. Risk Assessment at 82 ("Cancer risks from dermal exposure were not quantified due to the lack of suitable POD for this exposure route") (Doc. 2031734, Ex. 1 to O'Brien Decl.). EPA did not, however, require that this information be developed. Because EPA did not have an estimate, the Agency did not include the cancer risk from skin exposure in its assessment of the chemical's overall cancer risks. As another example, EPA knows that chemical P-21-0153 may cause a range of non-cancer health harms, including kidney, liver, spleen, and blood toxicity, but lacked the quantification to appropriately determine the risk, and like for the other chemicals, it did not use its TSCA authority to gather the missing data. As a result, EPA excluded these risks altogether in its risk determination. Order at 29 (att. to Doc. 1994141); Risk Assessment at 40, 79 (Doc. 2031734, Ex. 1 to O'Brien Decl.).

Despite these absences of sufficient information, EPA went forward precipitously, closing out its scientific assessment and then approving the waste plastic chemicals with no meaningful requirements for health or safety and no mandates for testing to generate the necessary data.

### E. EPA Violated TSCA by Not Sufficiently Considering and Protecting Exposed or Susceptible Subpopulations

TSCA requires that EPA give specific consideration to frontline communities such as the Petitioner. 15 U.S.C. § 2604(e) (mandating that EPA address risks to "potentially exposed or susceptible subpopulations"). TSCA requires EPA to take these groups into account because they "may be at greater risk than the general population of adverse health effects from exposure to a chemical." 15 U.S.C. § 2602(12). Yet EPA failed to consider the petitioner community, living a mile from where Chevron planned to produce the waste plastic chemicals, Second Weckesser Decl., Doc. 2053885, at 2, or indeed to consider any other such directly exposed and susceptible communities.

Frontline communities, who are often low-income communities or communities of color, face higher risks from chemical exposures that contribute to higher incidences of respiratory problems, cancers, and other serious health issues. *See, e.g.*, Jill Johnston & Laura Cushing, "Chemical exposures, health and environmental justice in communities living on the fenceline of industry," *Current Environmental Health Reports,* Vol. 7 (2020), at 48-57, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7035204/; Jean Brender, et al. "Residential Proximity to Environmental Hazards and Adverse Health Outcomes," *American Journal of Public Health*, Vol. 101 (Suppl 1) (2011), at S37-S52, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3222489/. These communities

24

often are continuously exposed to multiple chemicals that often cause the same toxic harms.

The frontline community in Pascagoula, Mississippi was already, at the time EPA approved the waste plastic chemicals, being exposed to some of the most toxic components of those new chemicals. For example, Chevron releases the toxic substance benzene as part of the fuels it produces at its Pascagoula facility. Chevron Global, Pascagoula, *Our Products*, https://pascagoula.chevron.com/our-businesses/our-products (last visited May 17, 2024). The waste plastic chemicals, which contain toxic contaminants, are not chemically equivalent to these existing petroleum fuels, but there is some overlap between the new chemicals and the fuels because they share many of the same toxic constituents, such as benzene.

Further, the new chemical with the 1 in 4 cancer risk is intended to be used as a jet fuel at airports, and Chevron is already producing other aviation gasoline and jet fuel that are being used at airports.[8] Chevron Global, Pascagoula, *Our Products*, https://pascagoula.chevron.com/our-businesses/our-products (last visited May 17, 2024). Given the presence of some common constituents between the new

---

[8] Communities near airports in the U.S. are more likely to be Black and Brown or low-income communities. Amber McNair, "Investigation of environmental justice analysis in airport planning practice from 2000 to 2010," *Transportation Research Part D*, Vol. 81 (2020), at 102286, https://www.sciencedirect.com/science/article/pii/S1361920919311149; EPA, *Environmental Justice and Transportation*, https://www.epa.gov/mobile-source-pollution/environmental-justice-and-transportation (last updated May 2, 2024).

chemicals intended to be used as jet fuel and existing jet fuel, the surrounding communities will thus be exposed to additional risks, on top of the exposures they already endure, when the waste plastic chemicals are released into their neighborhoods.

Yet, EPA's Risk Assessment fails to consider such additive risks to the frontline communities living where the new chemicals will be released and used, and therefore fails to meet its statutory obligation to these communities. 15 U.S.C. § 2604(e).

---

In summary, EPA attempted in various ways to undercut its Risk Assessment, claiming that its employment of its own standard scientific methodology resulted in an overestimation of risk in this case. If anything, however, EPA underestimated, rather than overestimated, given that it discounted risks, excluded risks, and failed to provide itself the information needed to gain a complete picture of the new chemicals' unreasonable risks.

## CONCLUSION

For all the reasons set forth above and in the Brief of Cherokee Concerned Citizens, this Court should vacate the challenged Order.

26

Respectfully submitted,

DATED: May 17, 2024                    */s/ Samantha Liskow*

Samantha Liskow
ENVIRONMENTAL DEFENSE FUND
257 Park Ave S
New York, NY 10010
(212) 616-1247
sliskow@edf.org

*Counsel for Amicus Curiae*
*Environmental Defense Fund*

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I also certify that this brief complies with Federal Rule of Appellate Procedure 29(a)(5) because by Microsoft Word's count, it contains 5,442 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 33(e)(1).

Finally, I certify that today I electronically filed this Brief of Environmental Defense Fund on all registered counsel through the Electronic Case Filing (ECF) system for the United States Court of Appeals for the D.C. Circuit.


*/s/ Samantha Liskow*
Samantha Liskow


DATED: May 17, 2024