<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 23-1096

---

CHEROKEE CONCERNED CITIZENS,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL REGAN, Administrator, United States Environmental Protection
Agency,

*Respondents.*

---

PETITION FOR REVIEW OF FINAL ADMINISTRATIVE ACTION OF
THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

---

**ADDENDUM TO PETITIONER'S PROOF OPENING BRIEF**

---

KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

TOSH SAGAR
Earthjustice
1001 G St., NW, Ste. 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

JONATHAN KALMUSS-KATZ
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
jkalmusskatz@earthjustice.org

*Counsel for Petitioner*

**DATED: May 10, 2024**

# DECLARATIONS

# TABLE OF CONTENTS

**DECLARATION**                                                           **PAGE**

Second Declaration of Barabara Weckesser..........................................ADD0001

Second Declaration of Katherine K. O'Brien.......................................ADD0039

Second Declaration of Maria J. Doa.....................................................ADD0049

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CHEROKEE CONCERNED CITIZENS,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL
REGAN, Administrator, United States
Environmental Protection Agency,

*Respondents*.

No. 23-1096

**SECOND DECLARATION OF BARBARA WECKESSER**

I, Barbara Weckesser, declare and state as follows:

1.      I am co-founder, treasurer, and an active volunteer leader of Cherokee Concerned Citizens, a volunteer-run non-profit organization dedicated to protecting the health and well-being of residents of the Cherokee Forest neighborhood in Pascagoula, Mississippi. Before serving as Cherokee Concerned Citizens' treasurer, I served as the organization's president for eight years.

2.      I have lived in the Cherokee Forest neighborhood with my husband since 2010.

3.      Cherokee Concerned Citizens officially formed in 2013 to advocate for protections from the persistent toxic pollution that residents of our neighborhood experience from the more than half-dozen major industrial facilities nearby. These facilities include the Chevron refinery, which is located approximately one mile from my home; the Gulf LNG liquified natural gas terminal; Bollinger Shipbuilding (formerly VT Halter Marine & Offshore); the BP Enterprise gas processing plant; Destin Pipeline; the former First Chemical facility; and the Mississippi Phosphates Superfund site.

4.      I understand, from data published by the U.S. Environmental Protection Agency (EPA), that the industrial facilities near my home in Pascagoula release millions of pounds of toxic chemicals into the air, water, and land each year, including approximately half a million pounds of hazardous air pollutants.

1

5.     My neighbors and I feel the impact of this pollution every day. Because I am so close to the Chevron refinery and other industrial facilities, I smell chemical odors almost daily. These odors include smells of oil or gas, hydrocarbons (which smell like welding fumes), paint or lacquer smells, smells like burnt cooking, and sweet smells that I understand are likely emissions of the carcinogenic chemical benzene. I have also experienced odors that smell like burning plastic. These odors often permeate throughout the inside of my home.

6.     From my neighborhood, I see flares and plumes of dark black smoke approximately once every two months. For example, on February 7th and 8th, 2024, I could see flaring at the Chevron refinery from my neighborhood. The flaring was accompanied by an overpowering acid smell that persisted in the neighborhood for approximately five days. The smell on my property was so strong it took my breath away. I experienced burning in my nose and eyes, rawness in my throat, numb lips, chest pain, shortness of breath, and headaches during this incident and I continued to feel ill for about two weeks. Many of my neighbors experienced these symptoms too.

7.     My neighbors and I also experience noise from the facilities at all hours, including extremely loud siren-like sounds at least twice a month. Both the ongoing noise and the periodic sirens cause me great stress and anxiety, as I do not

ADD0003

know which sounds indicate that something especially dangerous is happening nearby.

8.    I have noticed deposits on my home and car, and my neighbors' homes and cars, due to the industrial pollution, including deposits of calcium phosphorous, "black beauty" sand blast dust, and specks of oil and paint.

9.    As part of my work with Cherokee Concerned Citizens, I collect reports from my neighbors regarding acute health symptoms that they experience during toxic chemical release events that affect our neighborhood, including sinus problems, skin rashes, fatigue, burning eyes, headaches, and shortness of breath. In 2023, I helped conduct a neighborhood survey on behalf of Cherokee Concerned Citizens to better understand the long-term health effects of the persistent industrial pollution in my community. Sixty-two percent of households surveyed reported that one or more household residents suffer from heart disease, stroke, or high blood pressure. Forty percent of households reported that one or more household residents suffer from respiratory diseases, and twelve percent reported that one or more household residents have cancer. Eighty-three percent of residents surveyed believe that the air in our neighborhood is not safe to breathe, and seventy-six percent believe that our tap water is not safe to drink. Presentation slides summarizing our survey results are attached to this declaration as **Exhibit 1**.

3

10.     Like so many of my neighbors, I suffer from health conditions that are associated with exposure to toxic chemical pollution. For example, in 2014, at age 68, I was diagnosed with adult-onset asthma. I had never experienced asthma symptoms before moving to my home in Pascagoula. I also suffer from chronic kidney disease. I have experienced chemical dermatitis (blisters on my face) as a result of spending time outside documenting or investigating industrial facility upsets and pollution. In 2014, I experienced two episodes of chemical pneumonia, which is caused by exposure to chemicals. Four nearby neighbors experienced chemical pneumonia at the same time.

11.     Because of the struggles that I and my neighbors experience with this persistent toxic pollution, I am very involved in the leadership and initiatives of Cherokee Concerned Citizens. This includes documenting and reporting noxious chemical odors, noise, and visible pollution from nearby industrial facilities and assisting neighbors in doing the same; monitoring and reviewing permitting and other regulatory actions that affect the industrial facilities in our area and the pollution they emit; attending public meetings hosted by Chevron and the Mississippi Department of Environmental Quality (MDEQ) to learn about and comment on permitting actions and other developments at Chevron and other nearby industrial facilities that impact our neighborhood; carrying out neighborhood surveys to understand the impacts of industrial pollution on

4

residents' health and wellbeing; advocating to the city government for a buyout that would give residents a viable option for leaving the neighborhood to escape the pollution and health risks; collaborating with scientists to better understand and document the sources, nature, and health impacts of the toxic pollution harming our neighborhood; speaking with reporters on behalf of Cherokee Concerned Citizens; reviewing and approving comment letters from Cherokee Concerned Citizens to EPA and other authorities; and serving as the primary point of contact for our pro bono lawyers in this case.

12.    I also receive and maintain the organization's mail at my home. This includes a weekly packet that I receive from MDEQ with copies of all public announcements regarding MDEQ permitting actions in Mississippi—something we receive as a result of persistent advocacy to MDEQ to ensure that our organization has timely access to this information. I review these materials to determine if there are any public comment processes, public meetings, or other regulatory developments that concern the Chevron refinery or other polluting facilities that affect my neighborhood. I also receive by mail notices from Chevron about public meetings concerning its Pascagoula refinery.

13.    I or another member of Cherokee Concerned Citizens attend every public meeting that is announced by Chevron or MDEQ concerning the Chevron refinery.

ADD0006

14.     We do this despite the fact that many members of Cherokee Concerned Citizens are elderly, have serious health problems, and/or have major caretaking responsibilities for children, grandchildren, or other family members.

15.     I first learned about EPA's decision to allow Chevron to make highly toxic fuel chemicals from plastic waste at the refinery near my home on February 23, 2023. I received a text message from a neighbor with a link to a ProPublica article by Sharon Lerner called "This 'Climate-Friendly' Fuel Comes with an Astronomical Cancer Risk," which was published online that day and describes EPA's decision. A copy of that article is attached to this declaration as **Exhibit 2.**

16.     To the best of my knowledge, there was no public notice of EPA's decision from EPA or Chevron at the time the decision was made or at any other point prior to the ProPublica article's publication. In contrast, we have received public notice of other federal regulatory processes and actions that affect the Chevron refinery, such as hazardous waste permitting actions under the Resource Conservation and Recovery Act (RCRA).

17.     Around the time I received the ProPublica article, I was in the process of conducting a neighborhood survey for Cherokee Concerned Citizens. As I went door-to-door throughout the neighborhood conducting the survey, I asked the neighbors I spoke to if they knew about Chevron planning to make fuels and other chemicals from plastic waste at the Pascagoula refinery but no one had heard

6

anything about it before the ProPublica article came out. This did not surprise me because I typically learn about developments at Chevron and the other industrial facilities in the area first and share that information with others in the neighborhood.

18.     When I read about EPA's decision and the terrifying health risks associated with the fuel chemicals EPA is allowing Chevron to make in Pascagoula, I was extremely concerned. Given the unbearable pollution we already experience in our neighborhood, we cannot take the additional pollution and health threats that would come with the new chemical production at Chevron that EPA approved.

19.     I shared the February 23, 2023, ProPublica article with Cherokee Concerned Citizens' current president, Jennifer Crosslin. We then connected with an attorney in private practice in the region who has previously assisted Cherokee Concerned Citizens to discuss the EPA decision. I knew that we would need to find pro bono legal assistance to help us understand the implications of EPA's decision and try to challenge it because Cherokee Concerned Citizens does not have the financial resources to pay attorneys.

20.     On March 28, 2023, the local attorney we contacted put us in touch with the lawyers from Earthjustice who are now representing Cherokee Concerned Citizens in this case pro bono. I worked with the Earthjustice attorneys to get our

7

lawsuit prepared and filed as quickly as possible. We were able to file two weeks later, on April 11, 2023.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed this 22 day of March, 2024, in Pascagoula, Mississippi.

*Barbara Weckesser*
Barbara Weckesser

ADD0009

**Exhibit 1**

ADD0010



# Cherokee Concerned Citizens Buyout Interest Survey

## Results as of June 14, 2023

Meeting with City of Pascagoula
June 15, 2023

ADD0011

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Overview

- The Buyout Interest survey was developed in partnership with Buy-In Community Planning, Cherokee Concerned Citizens, and other neighborhood residents.

- The survey covered the following information.

  - Perceptions about contamination and exposure
  - Health Impacts
  - Flood history and impacts
  - Interest in relocation support through a voluntary home buyout program

- Surveying began in March 5 and Ran through May 8

- The team collected 100 survey responses.

- Responses include landlords, renters, current residents, and people who own vacant parcels.

- A small number of households refused to participate.



ADD0012

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Housing Satisfaction

The air in the subdivision is safe to breathe.

Answered: 92    Skipped: 8



When you moved into your home in Cherokee subdivision, were you notified about your proximity to industrial sources of toxic air pollution?

Answered: 92    Skipped: 8



The tap water in my home is clean enough to drink.

Answered: 92    Skipped: 8



I could not sell my home if I told potential buyers about its flood risk and toxic exposure.

Answered: 90    Skipped: 10



ADD0013

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Housing Satisfaction



### I am satisfied with the home I currently live in.
Answered: 92    Skipped: 8



Strongly agree 13.04% (12)

Agree 23.91% (22)

Neither agree nor disagree 10.87% (10)

Disagree 13.04% (12)

Strongly disagree 39.13% (36)

### My home could resist damage from a storm or flooding.
Answered: 91    Skipped: 9



Strongly agree 8.79% (8)

Agree 7.69% (7)

Neither agree nor disagree 19.78% (18)

Disagree 16.48% (15)

Strongly disagree 47.25% (43)

### My current housing situation is stable and affordable.
Answered: 92    Skipped: 8



Strongly agree 22.83% (21)

Agree 19.57% (18)

Neither agree nor disagree 9.78% (9)

Disagree 9.78% (9)

Strongly disagree 38.04% (35)

### My home is a safe place for children or elderly people to live.
Answered: 92    Skipped: 8



Strongly agree 10.87% (10)

Agree 14.13% (13)

Neither agree nor disagree 6.52% (6)

Disagree 15.22% (14)

Strongly disagree 53.26% (49)

ADD0014

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Perceptions of Moving



### Have you ever considered moving to remove yourself from the toxic environment of Cherokee Subdivision?

Answered: 90   Skipped: 10



Other (please specify) 18.89% (17)

No, I have never considered moving. 12.22% (11)

Yes, but I have not wanted to or not been able to do so. 42.22% (38)

Yes, but I struggled to find a comparable home to buy or rent... 20.00% (18)

Yes, I have tried to sell my home, but could not get the value I was... 4.44% (4)

| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| Yes, but I have not wanted to or not been able to do so. | 42.22% | 38 |
| Yes, I have tried to sell my home, but did not get any offers. | 2.22% | 2 |
| Yes, I have tried to sell my home, but could not get the value I was seeking. | 4.44% | 4 |
| Yes, but I struggled to find a comparable home to buy or rent elsewhere. | 20.00% | 18 |
| No, I have never considered moving. | 12.22% | 11 |
| Other (please specify)   Responses | 18.89% | 17 |
| TOTAL | | 90 |

### If you have considered moving before, what has kept you from moving?

| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| None of the above | 7.78% | 7 |
| The value of my home is too low due to the toxic environment of the subdivision. | 47.78% | 43 |
| The value of my home is too low due to the age and deterioration of the building. | 4.44% | 4 |
| It would be challenging due to my age, health, mobility or other personal factors | 24.44% | 22 |
| It's too expensive to find similar housing. | 60.00% | 54 |
| It would be too time-consuming to try to move. | 0.00% | 0 |
| I want to stay close to the same grocery stores, clinics, schools, churches, etc. | 2.22% | 2 |
| I want to stay close to family and friends. | 4.44% | 4 |
| I want to stay close to my workplace/job. | 6.67% | 6 |
| I am not that concerned about pollution and its effect on my health or my household. | 1.11% | 1 |
| I will file a flood insurance claim if damaged in the future. | 0.00% | 0 |
| Other considerations (please specify)   Responses | 11.11% | 10 |
| Total Respondents: 90 | | |

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Health



How many individuals living with a handicap, disability, or limited mobility? Skip to leave blank.

**39% of HH**

Answered: 39    Skipped: 61



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| 1 | 64.10% | 25 |
| 2 | 33.33% | 13 |
| 5 | 2.56% | 1 |
| TOTAL | | 39 |

How many individuals living with dementia and related health issues? Skip to leave blank.

**19% of HH**

Answered: 19    Skipped: 81



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| 1 | 78.95% | 15 |
| 2 | 10.53% | 2 |
| 3 | 5.26% | 1 |
| 5 | 5.26% | 1 |
| TOTAL | | 19 |

ADD0016

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Additional Health Details

- **62% of households report heart disease, history of stroke, or high blood pressure.**
  - 49% have one person, 10% have 2 people, 3% have 3 people

- **40% of households** reported at least one person with a **respiratory disease such as asthma or bronchitis.** 14% reported two people.

- **39% of households** reported someone living with a **handicap, disability, or limited mobility**

- **24% of households** report someone with **diabetes**

- **19% of households** reported at least one person with **dementia**

- **12 households (12%) report at least one individual who has been diagnosed with cancer.**

- **11 households report at least one person who has had a miscarriage or pregnancy complications.**

- **9% of households** reported at least one person with a **learning disability** such as ASD or ADHD.

ADD0017

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Interest in a Buyout





# 90%

of people surveyed said that they were either **immediately interested** in a buyout program or would like more information

ADD0018

# Cherokee Concerned Citizens Buyout Interest Survey Results:
Interest in a Buyout





ADD0019

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Interest in a Buyout



Is there anything you want us to share with government agencies regarding your concerns about a potential buyout of Cherokee Subdivision?



"I am concerned about my health and the health of my husband and grandkids who frequently visit me. I am lethargic most of the time, have head and scalp aches, allergies, sinus issues and high blood pressure just to name a few. The sooner the buyout happens perhaps I can began to feel normal again."

"Not everyone has the same financial situation as when they purchased their homes. The buy out would have to be enough to cover what is owed as well as setting families up for a housing they could afford in the same or more conforming situation. I'm worried those requirements will not be met and my children and I will have to live here due to financial difficulties/ responsibilities."

"Toxic environment keeps getting worse. Health issues worse. This is not a safe healthy place for anyone to live in."

ADD0020

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Interest in a Buyout



| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| The health and safety of myself and my family (i.e. away from flooding or pollution) | 84.44% | 76 |
| The amount of money that I'm offered for my property | 84.44% | 76 |
| Finding an affordable place to live | 66.67% | 60 |
| Having a home that is the same size and has similar features to my current home | 10.00% | 9 |
| None of the above | 3.33% | 3 |
| Distance from my job or school | 3.33% | 3 |
| Having a home or way to build wealth I can pass down to my children | 2.22% | 2 |
| Living in a place I am familiar with | 1.11% | 1 |
| Whether my home is increasing in value | 1.11% | 1 |
| Staying connected to my friends and family | 1.11% | 1 |
| Distance from other places in my current neighborhood that are important to me like parks, restaurants, or places of worship | 1.11% | 1 |
| Other considerations (please specify)                    Responses | 1.11% | 1 |
| Whether my home is decreasing in value | 0.00% | 0 |
| Staying connected to my current neighbors | 0.00% | 0 |
| Distance from my children's school | 0.00% | 0 |
| Total Respondents: 90 | | |

For people who were interested in a buyout, **the health and safety of their family was the most important consideration in deciding to move,** along with getting enough financial support to find another place to live.

ADD0021

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Flood Impacts



### In the next 12 MONTHS, how likely do you think it is that your home will be flooded?

Answered: 92   Skipped: 8



Extremely unlikely 3.26% (3)
Unlikely 3.26% (3)
Extremely likely 31.52% (29)
Neutral / Don't know 36.96% (34)
Likely 25.00% (23)

### In the next 10 YEARS, how likely do you think it is that your home will be flooded?

Answered: 92   Skipped: 8



Extremely unlikely 1.09% (1)
Unlikely 1.09% (1)
Neutral / Don't know 21.74% (20)
Extremely likely 59.78% (55)
Likely 16.30% (15)

## How have you been affected by flooding?

| ANSWER CHOICES | RESPONSES | |
|---|---|---|
| None of the above | 46.74% | 43 |
| I or someone else in my household experienced stress, anxiety or emotional trauma. | 40.22% | 37 |
| We lost irreplaceable personal or familial treasures. | 40.22% | 37 |
| Our vehicle (e.g. car or boat) was lost or damaged. | 35.87% | 33 |
| We have had to live with mold or mildew in our home. | 31.52% | 29 |
| I or someone else in my household took on debt to repair our property. | 22.83% | 21 |
| I or someone else in my household experienced a bodily injury or became ill. | 8.70% | 8 |
| Other flood impacts (please describe)  Responses | 6.52% | 6 |
| I or someone else in my household lost my job or ability to work. | 4.35% | 4 |
| We lost a pet, or had to give up a pet because we were unable to shelter it. | 3.26% | 3 |
| We lost a home that suited us better than our current home. | 2.17% | 2 |
| Someone in my household lost their life. | 0.00% | 0 |
| Total Respondents: 92 | | |

ADD0022

*Meeting with City of Pascagoula, June 15 2023*

# Cherokee Concerned Citizens Buyout Interest Survey Results:
## Next Steps



- Support from the city to contact remaining home owners and ensure everyone has an opportunity to speak up and express their opinion and desire for relocation support.

  - Share pollution results and ensure all households understand contamination risks
  - Ensure and communicate the voluntary nature of the program

- Identify resources for buyout implementation - Industry, Federal/State, or Local

  - Coordinate with industry to facilitate and pay for buyouts and/or contribute resources
  - Utilize available funding from Mississippi Emergency Management Agency to seek buyouts for those who want them using disaster relief funds.
  - Identify local funding sources

- Additional opportunities for partnership

  - NFWF National Coastal Resilience Fund proposal could help pay for additional studies, landscape restoration and creation of buffer zones to improve resilience for remaining households
  - Partnerships with other cities and regional coalitions to work on coastal resilience ADD0023

**Exhibit 2**

ADD0024

# This "Climate-Friendly" Fuel Comes With an Astronomical Cancer Risk

Almost half of products cleared so far under the new federal biofuels program are not in fact biofuels — and the EPA acknowledges that the plastic-based ones may present an "unreasonable risk" to human health or the environment.

[Sharon Lerner](#)   Feb. 23, 6 a.m. EST

ADD0025



Chevron's Pascagoula refinery in September 2021 Kathleen Flynn, special to ProPublica

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive [our biggest stories](#) as soon as they're published.*

The Environmental Protection Agency recently gave a Chevron refinery the green light to create fuel from discarded plastics as part of a "climate-friendly" initiative to boost alternatives to petroleum. But, according to agency records obtained by ProPublica and The Guardian, the production of one of the fuels could emit air pollution that is so toxic, 1 out of 4 people exposed to it over a lifetime could get cancer.

ADD0026

"That kind of risk is obscene," said Linda Birnbaum, former head of the National Institute of Environmental Health Sciences. "You can't let that get out."

That risk is 250,000 times greater than the level usually considered acceptable by the EPA division that approves new chemicals. Chevron hasn't started making this jet fuel yet, the EPA said. When the company does, the cancer burden will disproportionately fall on people who have low incomes and are Black because of the population that lives within 3 miles of the refinery in Pascagoula, Mississippi.

ProPublica and The Guardian asked Maria Doa, a scientist who worked at the EPA for 30 years, to review the document laying out the risk. Doa, who once ran the division that managed the risks posed by chemicals, was so alarmed by the cancer threat that she initially assumed it was a typographical error. "EPA should not allow these risks in Pascagoula or anywhere," said Doa, who now is the senior director of chemical policy at Environmental Defense Fund.

In response to questions from ProPublica and The Guardian, an EPA spokesperson wrote that the agency's lifetime cancer risk calculation is "a very conservative estimate with 'high uncertainty,'" meaning the government erred on the side of caution in calculating such a high risk.

Under federal law, the EPA can't approve new chemicals with

serious health or environmental risks unless it comes up with ways to minimize the dangers. And if the EPA is unsure, the law allows the agency to order lab testing that would clarify the potential health and environmental harms. In the case of these new plastic-based fuels, the agency didn't do either of those things. In approving the jet fuel, the EPA didn't require any lab tests, air monitoring or controls that would reduce the release of the cancer-causing pollutants or people's exposure to them.

In January 2022, the EPA announced the initiative to streamline the approval of petroleum alternatives in what a press release called "part of the Biden-Harris Administration's actions to confront the climate crisis." While the program cleared new fuels made from plants, it also signed off on fuels made from plastics even though they themselves are petroleum-based and contribute to the release of planet-warming greenhouse gases.

Although there's no mention of discarded plastics in the press release or on the EPA website's description of the program, an agency spokesperson told ProPublica and The Guardian that it allows them because the initiative also covers fuels made from waste. The spokesperson said that 16 of the 34 fuels the program approved so far are made from waste. She would not say how many of those are made from plastic and stated that such information was

ADD0028

confidential.

All of the waste-based fuels are the subject of consent orders, documents the EPA issues when it finds that new chemicals or mixtures may pose an "unreasonable risk" to human health or the environment. The documents specify those risks and the agency's instructions for mitigating them.

But the agency won't turn over these records or reveal information about the waste-based fuels, even their names and chemical structures. Without those basic details, it's nearly impossible to determine which of the thousands of consent orders on the EPA website apply to this program. In keeping this information secret, the EPA cited a legal provision that allows companies to claim as confidential any information that would give their competitors an advantage in the marketplace.

Nevertheless, ProPublica and The Guardian did obtain one consent order that covers a dozen Chevron fuels made from plastics that were reviewed under the program. Although the EPA had blacked out sections, including the chemicals' names, that document showed that the fuels that Chevron plans to make at its Pascagoula refinery present serious health risks, including developmental problems in children and cancer and harm to the nervous system, reproductive system, liver, kidney, blood and spleen.

Aside from the chemical that carries a 25% lifetime risk of cancer from smokestack emissions, another of the Chevron fuels ushered in through the program is expected to cause 1.2 cancers in 10,000 people — also far higher than the agency allows for the general population. The EPA division that screens new chemicals [typically limits cancer risk](#) from a single air pollutant to 1 case of cancer in a million people. The agency also calculated that air pollution from one of the fuels is expected to cause 7.1 cancers in every 1,000 workers — more than 70 times the level EPA's new chemicals division usually considers acceptable for workers.

In addition to the chemicals released through the creation of fuels from plastics, the people living near the Chevron refinery are exposed to an [array of other cancer-causing pollutants](#), as ProPublica reported in 2021. In that series, which [mapped excess cancer risk](#) from lifetime exposure to air pollution across the U.S., the highest chance was 1 cancer in 53 people, in Port Arthur, Texas.

The 1-in-4 lifetime cancer risk from breathing the emissions from the Chevron jet fuel is higher even than the lifetime risk of lung cancer for current smokers.

In an email, Chevron spokesperson Ross Allen wrote: "It is incorrect to say there is a 1-in-4 cancer risk from smokestack emissions. I urge you avoid suggesting otherwise." Asked to clarify what exactly was wrong, Allen

ADD0030

wrote that Chevron disagrees with ProPublica and The Guardian's "characterization of language in the EPA Consent Order." That document, signed by a Chevron manager at its refinery in Pascagoula, quantified the lifetime cancer risk from the inhalation of smokestack air as 2.5 cancers in 10 people, which can also be stated as 1 in 4.

In a subsequent phone call, Allen said: "We do take care of our communities, our workers and the environment generally. This is job one for Chevron."

In a [separate written statement](), Chevron said it followed the EPA's process under the Toxic Substances Control Act: "The TSCA process is an important first step to identify risks and if EPA identifies unreasonable risk, it can limit or prohibit manufacture, processing or distribution in commerce during applicable review period."

The Chevron statement also said: "Other environmental regulations and permitting processes govern air, water and handling hazardous materials. Regulations under the Clean Water, Clean Air and Resource Conservation and Recovery Acts also apply and protect the environment and the health and safety of our communities and workers."

Similarly, the EPA said that other federal laws and requirements might reduce the risk posed by the pollution, including Occupational Safety and Health Administration's

regulations for worker protection, the Clean Water Act, the Clean Air Act and rules that apply to refineries.

But OSHA has warned the public not to rely on its [outdated chemical standards](). The refinery rule calls for air monitoring only for one pollutant: benzene. The Clean Water Act does not address air pollution. And the new fuels are not regulated under the Clean Air Act, which applies to a [specific list of pollutants](). Nor can states monitor for the carcinogenic new fuels without knowing their names and chemical structures.

We asked Scott Throwe, an air pollution specialist who worked at the EPA for 30 years, how existing regulations could protect people in this instance. Now an independent environmental consultant, Throwe said the existing testing and monitoring requirements for refineries couldn't capture the pollution from these new plastic-based fuels because the rules were written before these chemicals existed. There is a chance that equipment designed to limit the release of other pollutants may incidentally capture some of the emissions from the new fuels, he said. But there's no way to know whether that is happening.

Appendix 2: Basis for EPA's Determination

**Chemical Name:**
Specific: ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

A redacted section of an EPA consent order covering plastic-derived fuels. The agency withheld basic information on the grounds that it is confidential business information.

Under federal law, companies have to apply to the EPA for permission to introduce new chemicals or mixtures. But manufacturers don't have to supply any data showing their products are safe. So the EPA usually relies on studies of similar chemicals to anticipate health effects. In this case, the EPA used a mixture of chemicals made from crude oil to gauge the risks posed by the new plastic-based fuels. Chevron told the EPA the chemical components of its new

fuel but didn't give the precise proportions. So the EPA had to make some assumptions, for instance that people absorb 100% of the pollution emitted.

Asked why it didn't require tests to clarify the risks, a spokesperson wrote that the "EPA does not believe these additional test results would change the risks identified nor the unreasonable risks finding."

In her three decades at the EPA, Doa had never seen a chemical with that high a cancer risk that the agency allowed to be released into a community without restrictions.

"The only requirement seems to be just to use the chemicals as fuel and have the workers wear gloves," she said.

While companies have made fuels from discarded plastics before, this EPA program gives them the same administrative break that renewable fuels receive: a dedicated EPA team that combines the usual six regulatory assessments into a single report.

The irony is that Congress created the Renewable Fuel Standard Program, which this initiative was meant to support, to reduce greenhouse gas emissions and boost the production of renewable fuels. Truly renewable energy sources can be regenerated in a short period of time, such as plants or algae. While there is significant debate about

whether ethanol, which is made from corn, and other plant-based renewable fuels are really better for the environment than fossil fuels, there is no question that plastics are not renewable and that their production and conversion into fuel releases climate-harming pollution.

Under the [EPA's Renewable Fuel Standard](#), biobased fuels must meet specific criteria related to their biological origin as well as the amount they reduce greenhouse gas emissions compared with petroleum-based fuels. But under this new approach, fuels made from waste don't have to meet those targets, the agency said.

In its written statement, Chevron said that "plastics are an essential part of modern life and plastic waste should not end up in unintended places in the environment. We are taking steps to address plastic waste and support a circular economy in which post-use plastic is recycled, reused or repurposed."

But environmentalists say such claims are just [greenwashing](#).

Whatever you call it, the creation of fuel from plastic is in some ways worse for the climate than simply making it directly from fossil fuels. Over 99% of all plastic is derived from fossil fuels, including coal, oil and gas. To produce fuel from plastics, additional fossil fuels are used to generate the

heat that converts them into petrochemicals that can be used as fuel.

"It adds an extra step," said Veena Singla, a senior scientist at NRDC. "They have to burn a lot of stuff to power the process that transforms the plastic."

Less than 6% of plastic waste is recycled in the U.S. Scientists estimate that more than a million tons of that unrecycled plastic ends up in the environment each year, killing marine mammals and polluting the world. Plastic does not fully decompose; instead it eventually breaks down into tiny bits, some of which wind up inside our bodies. As the public's awareness of the health and environmental harm grows, the plastics industry has found itself under increasing pressure to find a use for the waste.

The idea of creating fuel from plastic offers the comforting sense that plastics are sustainable. But the release of cancer-causing pollution is just one of several significant problems that have plagued attempts to convert discarded plastic into new things. One recent study by scientists from the Department of Energy found that the economic and environmental costs of turning old plastic into new using a process called pyrolysis were 10 to 100 times higher than those of making new plastics from fossil fuels. The lead author said similar issues plague the use of this process to create fuels from plastics.

ADD0036

Chevron buys oil that another company extracts from discarded plastics through pyrolysis. Though the parts of the consent order that aren't blacked out don't mention that this oil came from waste plastics, a related EPA record makes this clear. The cancer risks come from the pollution emitted from Chevron's smokestacks when the company turns that oil into fuel.

The EPA attributed its decision to embark on the streamlined program in part to its budget, which it says has been "essentially flat for the last six years." The EPA spokesperson said that the agency "has been working to streamline its new chemicals work wherever possible."

The New Chemicals Division, which houses the program, has been under particular pressure because updates to the chemicals law gave it additional responsibilities and faster timetables. That division of the agency is also the subject of an ongoing EPA Inspector General investigation into whistleblowers' allegations of corruption and industry influence over the chemical approval process.

Do You Live Near an Industrial Facility? Help Us Investigate.

If you live in or work near a hot spot, we'd like to hear from you. Fill out our form below.

**If you have a story to share or question to ask, we invite you to fill out our form.** Submit A Tip While specific tips are most helpful for future stories, we would also welcome general help and advice from subject-matter experts. Just include your contact information and some details about what you do.

ADD0037

If you wish for additional anonymity, please get in touch via one of these methods:

If you can't access our form, call or text our reporters at: **(347) 558-2844**

*Correction*

**Feb. 23, 2023:** *This story originally misstated how much plastic ends up in the oceans each year. It is millions of tons, not hundreds of millions of tons.*

*Correction*

**March 1, 2023:** *A corrected version of this story misstated what happens to U.S. unrecycled plastic. Scientists estimate that more than a million tons of it end up in the environment each year. It is not known precisely how much of this plastic from the U.S. winds up in the oceans.*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CHEROKEE CONCERNED CITIZENS,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL
REGAN, Administrator, United States
Environmental Protection Agency,

*Respondents*.

No. 23-1096

**SECOND DECLARATION OF KATHERINE K. O'BRIEN**

I, Katherine K. O'Brien, declare and state as follows:

1.      I am counsel of record for Petitioner Cherokee Concerned Citizens in the above-captioned matter.

Petitioner's Citations to Redacted Versions of Administrative Record Documents

2.      As described in the first Declaration of Katherine K. O'Brien (Doc. 2031734), pursuant to the protective order entered by this Court on August 22, 2023, Respondent U.S. Environmental Protection Agency transmitted to Petitioner's counsel redacted versions of certain documents in the administrative record for this matter in EPA's possession. *See* Protective Ord. Governing Protected Information § 7(b) (Doc. 2013651).

3.      In Petitioner's Opening Brief, filed concurrently with this declaration, Petitioner cites the redacted versions of several record documents provided by EPA in lieu of the unredacted versions in the administrative record to minimize necessary redactions in Petitioner's brief. All cited documents are attached in their entirety as exhibits to the first Declaration of Katherine K. O'Brien in the form transmitted by EPA. Where EPA transmitted multiple versions of the same document, the most recent version (according to the version number provided by EPA) is cited.

1

<u>EPA's Inconsistent Formatting of Premanufacture Notice Numbers in its Federal
Register Notices and ChemView Database</u>

4.      EPA formats the numbers it assigns to new chemicals for which
manufacturers seek approval pursuant to a Toxic Substances Control Act ("TSCA")
Premanufacture Notice ("PMN") differently in EPA's Federal Register notices
announcing receipt of PMNs and EPA's ChemView database. Specifically, EPA
uses en dashes in PMN numbers printed in the Federal Register (*e.g.*, P–21–0157),
*see* Certain New Chemicals; Receipt and Status Information for June 2021, 86 Fed.
Reg. 38,475, 38,478 (July 21, 2021) (attached as **Exhibit A**), but uses hyphens to
represent the same PMN number in ChemView (*e.g.*, P-21-0157).

5.      Because of this discrepancy and the operation of ChemView's PMN
search function, entering a PMN number into ChemView using the formatting EPA
uses in its Federal Register notice announcing the agency's receipt of that PMN
does not produce the PMN file or associated EPA decision documents. For
example, on April 30, 2024, I searched in ChemView for the Chevron PMN
identified as P–21–0157 by copying the PMN number directly from the Federal
Register notice announcing EPA's receipt of this PMN (*i.e.*, P–21–0157) and
pasting that number into ChemView's "Chemical Name or Chemical Identifier"
search function. ChemView returned no results.

ADD0041

6.      When I repeated the search in ChemView substituting hyphens for en dashes in the PMN number (*i.e.*, P-21-0157), ChemView produced the relevant PMN and the associated TSCA section 5 order that is challenged in this case.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed this 2nd day of May, 2024, in Cape Elizabeth, Maine.

/s/Katherine K. O'Brien

ADD0042

**Exhibit A**

ADD0043

environmental mailing list, and will receive notification when the environmental documents (EA or EIS) are issued for this project and will be notified of meetings associated with the Commission's environmental review process.

*Interventions*

Any person, which includes individuals, organizations, businesses, municipalities, and other entities,[2] has the option to file a motion to intervene in this proceeding. Only intervenors have the right to request rehearing of Commission orders issued in this proceeding and to subsequently challenge the Commission's orders in the U.S. Circuit Courts of Appeal.

To intervene, you must submit a motion to intervene to the Commission in accordance with Rule 214 of the Commission's Rules of Practice and Procedure[3] and the regulations under the NGA[4] by the intervention deadline for the project, which is August 4, 2021. As described further in Rule 214, your motion to intervene must state, to the extent known, your position regarding the proceeding, as well as your interest in the proceeding. [For an individual, this could include your status as a landowner, ratepayer, resident of an impacted community, or recreationist. You do not need to have property directly impacted by the project in order to intervene.] For more information about motions to intervene, refer to the FERC website at *https://www.ferc.gov/ resources/guides/how-to/intervene.asp.*

All timely, unopposed motions to intervene are automatically granted by operation of Rule 214(c)(1). Motions to intervene that are filed after the intervention deadline are untimely and may be denied. Any late-filed motion to intervene must show good cause for being late and must explain why the time limitation should be waived and provide justification by reference to factors set forth in Rule 214(d) of the Commission's Rules and Regulations. A person obtaining party status will be placed on the service list maintained by the Secretary of the Commission and will receive copies (paper or electronic) of all documents filed by the applicant and by all other parties.

*How To File Comments and Interventions*

There are two ways to submit your comments and motions to intervene to the Commission. In all instances, please reference the Project docket numbers

CP21–470–000 in your submission. The Commission encourages electronic filing of submissions.

(1) You may file your comments or motions to intervene electronically by using the eFiling feature, which is located on the Commission's website (*www.ferc.gov*) under the link to Documents and Filings. New eFiling users must first create an account by clicking on "eRegister." You will be asked to select the type of filing you are making; first select "General" and then select "Comment on a Filing" or "Intervention"; or

(2) You can file a paper copy of your comments by mailing them to the following address below. Your written comments must reference the Project docket numbers (CP21–470–000).

To mail via USPS, use the following address: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426.

To mail via any other courier, use the following address: Kimberly D. Bose, Secretary, Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, Maryland 20852.

Motions to intervene must be served on the applicant either by mail or email (with a link to the document) at: Freeport LNG Development, L.P., 333 Clay Street, Suite 5050, Houston, TX 77002, or at *jtobola@freeportlng.com.* Any subsequent submissions by an intervenor must be served on the applicant and all other parties to the proceeding. Contact information for parties can be obtained from the service list at the eService link on FERC Online. Service can be via email with a link to the document.

All timely, unopposed[5] motions to intervene are automatically granted by operation of Rule 214(c)(1).[6] Motions to intervene that are filed after the intervention deadline are untimely, and may be denied. Any late-filed motion to intervene must show good cause for being late and must explain why the time limitation should be waived and provide justification by reference to factors set forth in Rule 214(d) of the Commission's Rules and Regulations.[7] A person obtaining party status will be placed on the service list maintained by the Secretary of the Commission and will receive copies (paper or electronic) of all documents filed by the applicant and by all other parties.

**Tracking the Proceeding**

Throughout the proceeding, additional information about the project will be available from the Commission's Office of External Affairs, at (866) 208– FERC, or on the FERC website *www.ferc.gov* using the "eLibrary" link as described above. The eLibrary link also provides access to the texts of all formal documents issued by the Commission, such as orders, notices, and rulemakings.

In addition, the Commission offers a free service called eSubscription which allows you to keep track of all formal issuances and submittals in specific dockets. This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to the documents. For more information and to register, go to *www.ferc.gov/docs-filing/ esubscription.asp.*

*Intervention Deadline:* 5:00 p.m. Eastern Time on August 4, 2021.

Dated: July 14, 2021.

**Debbie-Anne A. Reese,**
*Deputy Secretary.*
[FR Doc. 2021–15485 Filed 7–20–21; 8:45 am]
**BILLING CODE 6717–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**[EPA–HQ–OPPT–2021–0068; FRL–8732–01– OCSPP]**

**Certain New Chemicals; Receipt and Status Information for June 2021**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** EPA is required under the Toxic Substances Control Act (TSCA), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, to make information publicly available and to publish information in the **Federal Register** pertaining to submissions under TSCA, including notice of receipt of a Premanufacture notice (PMN), Significant New Use Notice (SNUN) or Microbial Commercial Activity Notice (MCAN), including an amended notice or test information; an exemption application (Biotech exemption); an application for a test marketing exemption (TME), both pending and/or concluded; a notice of commencement (NOC) of manufacture (including import) for new chemical substances; and a periodic status report on new chemical substances that are currently under EPA review or have recently concluded review. This

---

[2] 18 CFR 385.102(d).
[3] 18 CFR 385.214.
[4] 18 CFR 157.10.

[5] The applicant has 15 days from the submittal of a motion to intervene to file a written objection to the intervention.
[6] 18 CFR 385.214(c)(1).
[7] 18 CFR 385.214(b)(3) and (d).

ADD0044

document covers the period from 06/01/2021 to 06/30/2021.

**DATES:** Comments identified by the specific case number provided in this document must be received on or before August 20, 2021.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number EPA–HQ–OPPT–2021–0068, and the specific case number for the chemical substance related to your comment, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

• *Mail:* Document Control Office (7407M), Office of Pollution Prevention and Toxics (OPPT), Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001.

• *Hand Delivery:* To make special arrangements for hand delivery or delivery of boxed information, please follow the instructions at *http://www.epa.gov/dockets/contacts.html.*

Additional instructions on commenting or visiting the docket, along with more information about dockets generally, is available at *http://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:**

*For technical information contact:* Jim Rahai, Project Management and Operations Division (MC 7407M), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001; telephone number: (202) 564–8593; email address: *rahai.jim@epa.gov.*

*For general information contact:* The TSCA-Hotline, ABVI-Goodwill, 422 South Clinton Ave., Rochester, NY 14620; telephone number: (202) 554–1404; email address: *TSCA-Hotline@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Executive Summary**

*A. What action is the Agency taking?*

This document provides the receipt and status reports for the period from 06/01/2021 to 06/30/2021. The Agency is providing notice of receipt of PMNs, SNUNs and MCANs (including amended notices and test information); an exemption application under 40 CFR part 725 (Biotech exemption); TMEs, both pending and/or concluded; NOCs to manufacture a new chemical substance; and a periodic status report

on new chemical substances that are currently under EPA review or have recently concluded review.

EPA is also providing information on its website about cases reviewed under the amended TSCA, including the section 5 PMN/SNUN/MCAN and exemption notices received, the date of receipt, the final EPA determination on the notice, and the effective date of EPA's determination for PMN/SNUN/MCAN notices on its website at: *https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/status-pre-manufacture-notices.* This information is updated on a weekly basis.

*B. What is the Agency's authority for taking this action?*

Under the Toxic Substances Control Act (TSCA), 15 U.S.C. 2601 *et seq.,* a chemical substance may be either an "existing" chemical substance or a "new" chemical substance. Any chemical substance that is not on EPA's TSCA Inventory of Chemical Substances (TSCA Inventory) is classified as a "new chemical substance," while a chemical substance that is listed on the TSCA Inventory is classified as an "existing chemical substance." (See TSCA section 3(11).) For more information about the TSCA Inventory please go to: *https://www.epa.gov/tsca-inventory.*

Any person who intends to manufacture (including import) a new chemical substance for a non-exempt commercial purpose, or to manufacture or process a chemical substance in a non-exempt manner for a use that EPA has determined is a significant new use, is required by TSCA section 5 to provide EPA with a PMN, MCAN or SNUN, as appropriate, before initiating the activity. EPA will review the notice, make a risk determination on the chemical substance or significant new use, and take appropriate action as described in TSCA section 5(a)(3).

TSCA section 5(h)(1) authorizes EPA to allow persons, upon application and under appropriate restrictions, to manufacture or process a new chemical substance, or a chemical substance subject to a significant new use rule (SNUR) issued under TSCA section 5(a)(2), for "test marketing" purposes, upon a showing that the manufacture, processing, distribution in commerce, use, and disposal of the chemical will not present an unreasonable risk of injury to health or the environment. This is referred to as a test marketing exemption, or TME. For more information about the requirements applicable to a new chemical go to: *http://www.epa.gov/oppt/newchems.*

Under TSCA sections 5 and 8 and EPA regulations, EPA is required to publish in the **Federal Register** certain information, including notice of receipt of a PMN/SNUN/MCAN (including amended notices and test information); an exemption application under 40 CFR part 725 (biotech exemption); an application for a TME, both pending and concluded; NOCs to manufacture a new chemical substance; and a periodic status report on the new chemical substances that are currently under EPA review or have recently concluded review.

*C. Does this action apply to me?*

This action provides information that is directed to the public in general.

*D. Does this action have any incremental economic impacts or paperwork burdens?*

No.

*E. What should I consider as I prepare my comments for EPA?*

1. *Submitting confidential business information (CBI).* Do not submit this information to EPA through *regulations.gov* or email. Clearly mark the part or all of the information that you claim to be CBI. For CBI information in a disk or CD–ROM that you mail to EPA, mark the outside of the disk or CD–ROM as CBI and then identify electronically within the disk or CD–ROM the specific information that is claimed as CBI. In addition to one complete version of the comment that includes information claimed as CBI, a copy of the comment that does not contain the information claimed as CBI must be submitted for inclusion in the public docket. Information so marked will not be disclosed except in accordance with procedures set forth in 40 CFR part 2.

2. *Tips for preparing your comments.* When preparing and submitting your comments, see the commenting tips at *http://www.epa.gov/dockets/comments.html.*

**II. Status Reports**

In the past, EPA has published individual notices reflecting the status of TSCA section 5 filings received, pending or concluded. In 1995, the Agency modified its approach and streamlined the information published in the **Federal Register** after providing notice of such changes to the public and an opportunity to comment (See the **Federal Register** of May 12, 1995, (60 FR 25798) (FRL–4942–7). Since the passage of the Lautenberg amendments to TSCA in 2016, public interest in information on the status of section 5

cases under EPA review and, in particular, the final determination of such cases, has increased. In an effort to be responsive to the regulated community, the users of this information, and the general public, to comply with the requirements of TSCA, to conserve EPA resources and to streamline the process and make it more timely, EPA is providing information on its website about cases reviewed under the amended TSCA, including the section 5 PMN/SNUN/MCAN and exemption notices received, the date of receipt, the final EPA determination on the notice, and the effective date of EPA's determination for PMN/SNUN/MCAN notices on its website at: *https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/status-pre-manufacture-notices.* This information is updated on a weekly basis.

## III. Receipt Reports

For the PMN/SNUN/MCANs that have passed an initial screening by EPA during this period, Table I provides the following information (to the extent that such information is not subject to a CBI claim) on the notices screened by EPA during this period: The EPA case number assigned to the notice that indicates whether the submission is an initial submission, or an amendment, a notation of which version was received, the date the notice was received by EPA, the submitting manufacturer (*i.e.,* domestic producer or importer), the potential uses identified by the manufacturer in the notice, and the chemical substance identity.

As used in each of the tables in this unit, (S) indicates that the information in the table is the specific information provided by the submitter, and (G)

indicates that this information in the table is generic information because the specific information provided by the submitter was claimed as CBI. Submissions which are initial submissions will not have a letter following the case number. Submissions which are amendments to previous submissions will have a case number followed by the letter "A" (*e.g.,* P–18–1234A). The version column designates submissions in sequence as "1", "2", "3", etc. Note that in some cases, an initial submission is not numbered as version 1; this is because earlier version(s) were rejected as incomplete or invalid submissions. Note also that future versions of the following tables may adjust slightly as the Agency works to automate population of the data in the tables.

## TABLE I—PMN/SNUN/MCANs APPROVED * FROM 06/01/2021 TO 06/30/2021

| Case No. | Version | Received date | Manufacturer | Use | Chemical substance |
|---|---|---|---|---|---|
| J–21–0010 ..... | 2 | 02/11/2021 | Danisco US, Inc ....... | (G) Production of a chemical substance. | (G) Genetically modified microorganism for the production of a chemical substance. |
| J–21–0011 ..... | 2 | 05/11/2021 | Lesaffre Yeast Corporation. | (G) Ethanol production ........................ | (G) Saccharomyces cerevisiae fermenting C5 sugars, modified. |
| J–21–0011A .. | 3 | 06/22/2021 | Lesaffre Yeast Corporation. | (G) Ethanol production ........................ | (G) Saccharomyces cerevisiae fermenting C5 sugars, modified. |
| P–18–0293A .. | 13 | 06/23/2021 | Sirrus, Inc ................. | (S) Intermediate: Monomer used as a chemical intermediate in the manufacture of polymers. (G) Coatings: Monomer used in the manufacture of industrial coatings (*e.g.,* protective floor coatings). (G) Adhesives: Monomer used in the manufacture (formulation) of adhesives (*e.g.,* reactive, industrial structural adhesives or lamination). Adhesives are applied from a liquid form as a bead or film and are applied via static mixer, roller, brush, roll coater, or squeegee. | (S) Propanedioic acid, 2-methylene-, 1,3-dihexyl ester. |
| P–18–0294A .. | 13 | 06/23/2021 | Sirrus, Inc ................. | (S) Intermediate: Monomer used as a chemical intermediate in the manufacture of polymers. (G) Coatings: Monomer used in the manufacture of industrial coatings (*e.g.,* protective floor coatings). (G) Adhesives: Monomer used in the manufacture (formulation) of adhesives or lamination. Adhesives are applied from a liquid as a bead or film and are applied via static mixer, roller, brush, roll coater, or squeegee. | (S) Propanedioic acid, 2-methylene-, 1,3-dicyclohexyl ester. |
| P–20–0005A .. | 6 | 05/28/2021 | RMC Advanced Technologies Inc. | (G) Additive for plastics and resins ..... | (G) modified graphene. |
| P–20–0010A .. | 13 | 06/09/2021 | CBI ............................ | (G) Polymerization auxiliary ................ | (G) Carboxylic acid, reaction products with metal hydroxide, inorganic dioxide and metal. |
| P–20–0077A .. | 7 | 06/01/2021 | CBI ............................ | (S) UV Curing Agent for use in Inks and Coatings. | (G) 1-(dialkyl-diphenylene alkane)-2-alkyl-2-hydrooxazine-1-alkylketone;. |
| P–21–0005A .. | 5 | 06/02/2021 | Evonik Corporation .... | (S) Polymeric additive in gear oils ...... | (G) Carbonmonocyclic alkene polymer with alkyl alkenoate, alkyl alkenoate, alkyl alkenoate and polyalkyldiene alkenoate. |
| P–21–0020A .. | 4 | 06/03/2021 | Allnex USA Inc ......... | (S) Modifier for hardness development in paint formulations for metal applications. | (G) Alkanedioic acid, dialkyl ester, polymer with dialkylalkanediol, alkyl(substituted alkyl)-alkanediol and heteropolycycle. |
| P–21–0077A .. | 2 | 06/02/2021 | CBI ............................ | (G) battery additive ............................. | (G) Alkylene Sulfate. |
| P–21–0077A .. | 3 | 06/08/2021 | CBI ............................ | (G) battery additive ............................. | (G) Alkylene Sulfate. |
| P–21–0085A .. | 3 | 06/21/2021 | CBI ............................ | (G) Used as an additive in the manufacture of tires to improve performance. | (S) 1-Propanethiol, 3-(triethoxysilyl)-, reaction products with polybutadiene. |

TABLE I—PMN/SNUN/MCANs APPROVED * FROM 06/01/2021 TO 06/30/2021—Continued

| Case No. | Version | Received date | Manufacturer | Use | Chemical substance |
|---|---|---|---|---|---|
| P–21–0133 .... | 2 | 06/29/2021 | CBI .......................... | (S) Chemical Intermediate .................. | (G) Distillation bottoms from manufacture of alkanoic acid by organic acid-producing organism, modified. |
| P–21–0138 .... | 2 | 06/22/2021 | LG Energy Solution Michigan Inc. | (S) Electrode material for use in the manufacture of batteries. | (G) Lithium metal oxide. |
| P–21–0139 .... | 1 | 05/28/2021 | Solvay Chemicals Inc | (S) Stationary Energy Storage ............ | (S) Methanesulfonamide,1,1,1-trifluoro-N-[(trifluoromethyl)sulfonyl]-, sodium salt (1:1). |
| P–21–0140 .... | 1 | 05/28/2021 | CHS Inc ................... | (G) Raw material for Viscosity Modifier | (S) Soybean oil, oleic acid-high, epoxidized. |
| P–21–0141 .... | 2 | 06/08/2021 | Valero Energy Corporation. | (S) Transportation Fuel ...................... | (S) Alkanes, C4-8—Branched and Linear. |
| P–21–0141A .. | 3 | 06/14/2021 | Valero Energy Corporation. | (S) Transportation Fuel ...................... | (S) Alkanes, C4-8—Branched and Linear. |
| P–21–0141A .. | 4 | 06/23/2021 | Valero Energy Corporation. | (S) Transportation Fuel ...................... | (S) Alkanes, C4-8—Branched and Linear. |
| P–21–0142 .... | 2 | 06/04/2021 | CBI .......................... | (S) Resin/binder in paint formulations for industrial applications. | (G) Organic acid dimethyl ester, polymer with mixed alkanediolsand 5-isocyanato-1-(isocyanatomethyl)-1,3,3-trimethylcyclohexane, N-(trimethoxysilylalkyl)alkanamine blocked. |
| P–21–0143 .... | 1 | 06/07/2021 | CBI .......................... | (G) Coating ingredient, Adhesive ingredient. | (G) Aliphatic Diisocyanate, homopolymer, aliphatic alcohol blocked. |
| P–21–0143A .. | 2 | 06/18/2021 | CBI .......................... | (G) Coating ingredient, Adhesive ingredient. | (G) Aliphatic Diisocyanate, homopolymer, aliphatic alcohol blocked. |
| P–21–0144 .... | 1 | 06/07/2021 | Chevron ................... | (G) Gasoline .................................... | (G) Naphtha, heavy catalytic cracked. |
| P–21–0145 .... | 1 | 06/07/2021 | Chevron ................... | (G) Gasoline .................................... | (G) Naphtha, heavy alkylate. |
| P–21–0146 .... | 1 | 06/07/2021 | Chevron ................... | (G) gasoline .................................... | (G) Naphtha, full range alkylate, butane-contg. |
| P–21–0147 .... | 1 | 06/07/2021 | Chevron ................... | (G) Gasoline .................................... | (G) Naphtha, hydrotreated heavy. |
| P–21–0148 .... | 1 | 06/07/2021 | Chevron ................... | (G) Gasoline .................................... | (G) Naphtha, light catalytic cracked. |
| P–21–0149 .... | 1 | 06/07/2021 | Chevron ................... | (G) Aviation gasoline ........................ | (G) Naphtha, light alkylate. |
| P–21–0150 .... | 1 | 06/07/2021 | Chevron ................... | (G) Gasoline .................................... | (G) Naphtha, hydrotreated light. |
| P–21–0151 .... | 1 | 06/08/2021 | CBI .......................... | (G) Polyurethane applications .......... | (G) Epoxidized Vegetable oil, polymer with bisphenol A, aryl glycidyl ether, epichlorohydrin, polyethylene glycol and trimethylolpropane. |
| P–21–0152 .... | 3 | 06/14/2021 | Chevron ................... | (G) Marine fuel ................................. | (G) Clarified oils, catalytic cracked. |
| P–21–0153 .... | 3 | 06/14/2021 | Chevron ................... | (G) Chemical intermediate ............... | (G) Distillates, hydrotreated heavy. |
| P–21–0154 .... | 3 | 06/14/2021 | Chevron ................... | (G) chemical intermediate ................ | (G) Gas Oils hydrotreated vacuum. |
| P–21–0155 .... | 1 | 06/08/2021 | Chevron ................... | (G) Diesel fuel ................................. | (G) Distillates, light catalytic cracked. |
| P–21–0156 .... | 1 | 06/08/2021 | Chevron ................... | (G) Jet fuel ...................................... | (G) Distillates, clay-treated middle. |
| P–21–0157 .... | 1 | 06/08/2021 | Chevron ................... | (G) diesel fuel ................................. | (G) Distillates, hydrotreated middle. |
| P–21–0158 .... | 1 | 06/08/2021 | Chevron ................... | (G) jet fuel ...................................... | (G) Distillates, hydrotreated light. |
| P–21–0159 .... | 3 | 06/14/2021 | Chevron ................... | (G) chemical intermediate ................ | (G) Gases, C3–C4. |
| P–21–0160 .... | 3 | 06/14/2021 | Chevron ................... | (G) chemical intermediate ................ | (G) Gases, C4-rich. |
| P–21–0161 .... | 3 | 06/14/2021 | Chevron ................... | (G) chemical intermediate ................ | (G) Gases, catalytic cracking. |
| P–21–0162 .... | 3 | 06/14/2021 | Chevron ................... | (G) chemical intermediate ................ | (G) Residues, butane splitter bottoms. |
| P–21–0163 .... | 3 | 06/14/2021 | Chevron ................... | (G) chemical intermediate ................ | (G) Tail gas, saturate gas plant mixed stream, C4-rich. |
| P–21–0164 .... | 1 | 06/09/2021 | Polysi Research LLC | (S) Crosslinker for waterproofing ....... | (S) 2-Butanone, oxime, reaction products with Trimethoxymethylsilane. |
| P–21–0165 .... | 1 | 06/09/2021 | Colonial Chemical, Inc. | (S) anionic surfactant in cleaning products. | (S) DGlucopyranose, oligomeric, C1016alkyl glycosides, 3(3,4dicarboxy3hydroxy1oxobutoxy)2hydroxypropyl ethers, sodium salts. |
| P–21–0166 .... | 1 | 06/11/2021 | Rudolf Venture Chemical. | (S) Textile softening agent ................ | (G) Siloxanes and Silicones, di-Me, [alkylpiperazinium-hydroxyalkoxy]alkyl group-terminated, arylsulfonates (salts). |
| P–21–0167 .... | 1 | 06/11/2021 | Rudolf Venture Chemical. | (S) Textile softening agent ................ | (G) Siloxanes and Silicones, di-Me, [alkylpiperazinium-hydroxyalkoxy]alkyl group- and (hydroxyalkoxy)alkyl group-terminated, ethers with polyethylene glycol alkyl ethers, arylsulfonates (salts). |
| P–21–0174 .... | 1 | 06/22/2021 | Marubeni America Corporation. | (G) Raw material for polyurethane .... | (G) Carbonic acid, ester, polymer with alkanediol (C=4,5). |
| P–21–0175 .... | 1 | 06/22/2021 | Marubeni America Corporation. | (G) Raw material of polyurethane ..... | (G) Carbonic acid, ester, polymer with alkanediol (C=4,10). |
| P–21–0176 .... | 2 | 06/29/2021 | CBI .......................... | (G) component in plastics .................. | (G) Alkane dioic acid, bis (poly aromatic triazine) alkanoic ether phenoxy ester. |
| SN–21–0010 .. | 1 | 06/18/2021 | CBI .......................... | (G) Additive used in coatings ............ | (G) 2-Oxepanone, reaction products with alkylenediamine-alkyleneimine polymer, 2-[[(2-alkyl)oxy]alkyl]oxirane and tetrahydro-2H-pyran-2-one. |

*The term 'Approved' indicates that a submission has passed a quick initial screen ensuring all required information and documents have been provided with the submission prior to the start of the 90 day review period, and in no way reflects the final status of a complete submission review.

In Table II of this unit, EPA provides the following information (to the extent that such information is not claimed as CBI) on the NOCs that have passed an initial screening by EPA during this period: The EPA case number assigned to the NOC including whether the submission was an initial or amended submission, the date the NOC was received by EPA, the date of commencement provided by the submitter in the NOC, a notation of the type of amendment (*e.g.,* amendment to generic name, specific name, technical contact information, etc.) and chemical substance identity.

ADD0047

TABLE II—NOCs APPROVED * FROM 06/01/2021 TO 06/30/2021

| Case No. | Received date | Commencement date | If amendment, type of amendment | Chemical substance |
|---|---|---|---|---|
| J–20–0025 ........ | 06/04/2021 | 04/08/2021 | N .............................. | (G) Biofuel producing saccharomyces cerevisiae modified, genetically stable. |
| J–21–0003A ....... | 05/28/2021 | 04/16/2021 | Provided CBI sub-stantiation. | (G) Genetically modified saccharomyces cerevisiae. |
| J–21–0010 ........ | 05/25/2021 | 05/10/2021 | N .............................. | (G) Genetically modified microorganism. |
| P–09–0506 ........ | 06/03/2021 | 08/09/2010 | N .............................. | (S) Hexanedioic acid, polymer with oxybis[propanol] and 1,2,3-propanetriol. |
| P–12–0518 ........ | 06/22/2021 | 06/24/2021 | N .............................. | (S) 1,2,3-propanetricarboxylic acid, 2-hydroxy-, titanium (4+) salt (5:2). |
| P–17–0259 ........ | 06/17/2021 | 06/09/2021 | N .............................. | (S) Benzenediamine, ar-chloro-ar,ar-diethyl-ar-methyl-. |
| P–19–0114 ........ | 06/16/2021 | 05/23/2021 | N .............................. | (G) Sulfonium, triphenyl-, trifluoro-hydroxy-(triheterosubstitutedalkyl)alkanoate (1:1),. |
| P–20–0068 ........ | 05/27/2021 | 05/11/2021 | N .............................. | (S) 1,3-propanediol, 2,2-dimethyl-, 1,3-diacetate. |
| P–20–0069 ........ | 06/09/2021 | 05/10/2021 | N .............................. | (S) 2-propenoic acid, 2-methyl-, polymer with 2-hydroxyethyl 2-methyl-2-propenoate phosphate and 2-propenoic acid, sodium salt, peroxydisulfuric acid ([(ho)s(o)2]2o2) sodium salt (1:2)- and sodium (disulfite) (2:1)-initiated. |
| P–20–0103 ........ | 06/22/2021 | 02/01/2021 | N .............................. | (G) Cycloalphatic amine formate. |
| P–20–0140 ........ | 06/23/2021 | 06/19/2021 | N .............................. | (G) N-substituted-beta-alanine, heterosubstituted-alkyl ester, ion(1-), triphenylsulfonium (1:1),. |
| P–20–0141 ........ | 06/23/2021 | 06/19/2021 | N .............................. | (G) Sulfonium, [4-(1,1-dimethylethyl)phenyl]diphenyl-, salt with heterosubstituted-alkyl tricycloalkane-carboxylate (1:1),. |
| P–20–0161 ........ | 06/11/2021 | 05/14/2021 | N .............................. | (S) Propanedioic acid, 2-methylene-, 1,3-diethyl ester, polymer with 1,4-butanediol. |
| P–20–0167 ........ | 05/27/2021 | 05/03/2021 | N .............................. | (G) Phenylene, alkyl and polycarbomonocycle substituted, 1,2-dicarboxylate. |
| P–94–0492 ........ | 06/11/2021 | 05/27/2021 | N .............................. | (S) 1,2,4-benzenetricarboxylic acid, trinonyl ester, branched and linear. |
| P–94–1647 ........ | 06/10/2021 | 06/06/2021 | N .............................. | (S) Isocyanic acid, polymethylenepolyphenylene ester, polymer with 2,2'-iminobis[ethanol] and 4-methyl-1,3-dioxolan-2-one, 2-hydroxyethyl methacrylate-blocked. |

*The term 'Approved' indicates that a submission has passed a quick initial screen ensuring all required information and documents have been provided with the submission.

In Table III of this unit, EPA provides the following information (to the extent such information is not subject to a CBI claim) on the test information that has been received during this time period: The EPA case number assigned to the test information; the date the test information was received by EPA, the type of test information submitted, and chemical substance identity.

TABLE III—TEST INFORMATION RECEIVED FROM 06/01/2021 TO 06/30/2021

| Case No. | Received date | Type of test information | Chemical substance |
|---|---|---|---|
| P–18–0407 ........ | 06/11/2021 | Acute Fish Toxicity (OECD Test Guidelines 203), Acute Fish Toxicity Phase Report Analysis, Hydrolysis as a Function of pH (OECD Test Guidelines 111), Estimation of the Adsorption Coefficient (Koc) on Soil and on Sewage Sludge using High Performance Liquid Chromatography (HPLC) (OECD Test Guideline 121), and Modified Activated Sludge, Respiration Inhibition Test for sparingly Soluble Chemicals (OECD Test Guideline 209). | (S) 1,2-ethanediamine, n,n-dimethyl-n-(1-methylethyl)-n-[2-[methyl(1-methylethyl)amino]ethyl]-. |
| P–20–0018 ........ | 06/22/2021 | Freshwater Alga and Cyanobacteria, Growth Inhibition Test (OECD Test Guideline 201), and Fish, Early-Life Stage Toxicity Test (OECD Test Guideline 210). | (G) Fatty acid dimers, polymers with glycerol and triglycerides. |
| P–12–0241 ........ | 06/23/2021 | Annual Reporting of Certificate of Analysis ................................ | (G) C6-2 Methacrylate. |

If you are interested in information that is not included in these tables, you may contact EPA's technical information contact or general information contact as described under **FOR FURTHER INFORMATION CONTACT** to access additional non-CBI information that may be available.

*Authority:* 15 U.S.C. 2601 *et seq.*

Dated: July 15, 2021.

**Pamela Myrick,**

*Director, Project Management and Operations Division, Office of Pollution Prevention and Toxics.*

[FR Doc. 2021–15523 Filed 7–20–21; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OECA–2014–0099; FRL—8748–01–OMS]

**Information Collection Request Submitted to OMB for Review and Approval; Comment Request; NESHAP for Ferroalloys Production Area Sources (Renewal)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** The Environmental Protection Agency (EPA) has submitted an information collection request (ICR), NESHAP for Ferroalloys Production Area Sources (EPA ICR Number 2303.06, OMB Control Number 2060–0625), to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act. This is a proposed extension of the ICR, which is currently approved through September 30, 2021. Public comments were previously requested, via the **Federal Register**, on May 12, 2020 during a 60-day comment period. This notice allows for an additional 30 days for public comments. A fuller description of the ICR is given below, including its estimated burden and cost to the public. An agency may neither conduct nor sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**DATES:** Additional comments may be submitted on or before August 20, 2021.

ADD0048

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CHEREKOKEE CONCERNED CITIZENS,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL
REGAN, Administrator, United States
Environmental Protection Agency,

*Respondents*.

No. 23-1096

**SECOND DECLARATION OF MARIA J. DOA**

I, Maria J. Doa, declare and state as follows:

1.     I am the Senior Director, Chemicals Policy at the Environmental
Defense Fund. I hold a Bachelor of Science in chemistry and a Ph.D. in organic
chemistry. Before joining Environmental Defense Fund, I worked at the U.S.
Environmental Protection Agency (EPA), where for twenty-two years I held
various leadership positions focused on the regulation of toxic chemicals and the
management of scientific research and data. A copy of my CV is attached as
**Exhibit 1**.

2.     The Environmental Defense Fund is a non-profit organization that
works to protect the public from toxic chemicals, including new chemicals that are
reviewed and approved under the Toxic Substances Control Act (TSCA). In my
role at the Environmental Defense Fund, I use EPA's "ChemView" web portal
database, https://chemview.epa.gov/chemview/#, for research on recently
submitted new chemical premanufacture notices (PMNs), including the basis of
EPA decisions on individual new chemicals and categories of chemicals, such as
per- and polyfluoroalkyl substances (PFAS), and risk assessments EPA has
conducted as part of its new chemical premanufacture notice reviews.

3.     Before joining the Environmental Defense Fund in November 2021, I
held leadership positions at EPA, most recently as the director of the Science
Policy Division in EPA's Office of Research and Development. The Science

1

Policy Division coordinates scientific advice on regulatory activities and coordinates science and technology issues, such as public access to data, across the agency.

4.      Before I joined the Office of Research and Development in 2018, I served for seven years as Director of the Chemical Control Division in the Office of Chemical Safety and Pollution Prevention. The Chemical Control Division was responsible for the development and implementation of regulations and programs for the testing, data development and collection, and risk management functions for most industrial, commercial, and consumer chemicals subject to TSCA, including new chemicals first coming on to the market.

5.      As part of my role as the Director of the Chemical Control Division, I led the new chemicals program, which evaluates the safety of and regulates new chemicals and significant new uses proposed for commercialization. This included managing the overall new chemicals review process, identifying ways to mitigate risks posed by these chemicals, issuing orders and rules under TSCA to mitigate the risks, and requiring testing or additional evaluation of significant uses.

6.      Soon after becoming the Director of the Chemical Control Division, I was asked to also lead the development and implementation of a new web portal database that would make certain chemical-specific regulatory information developed by EPA, as well as data collected from regulated parties under TSCA,

2

publicly available and accessible. This web portal database would become ChemView.

7.     ChemView, which launched in 2013, was intended to help users make more informed decisions about the chemicals they use. Per the direction for this project provided by James Jones, then the Assistant Administrator for EPA's Office of Chemical Safety and Pollution Prevention, the primary target audience for ChemView was the downstream commercial users of chemicals, specifically those much closer to the consumer, such as companies that make household detergents and other household cleaning supplies.

8.     ChemView was not designed to serve as a web application for notifying the general public of TSCA chemical data and related EPA decisions. Rather, ChemView was designed primarily to allow commercial chemical users to make safer chemical choices by providing them with access to information and tools to allow them to compare chemicals by type of use, category of chemical, certain EPA regulatory chemical actions, and health and environmental effects.

9.     ChemView's design reflects its original purpose.  In addition to providing the user with the ability to search by uses of the chemicals in the database, ChemView includes a search function for a regulatory requirement that

ADD0052

applies to some chemicals called significant new use notifications.[1] The requirement for a significant new use notification may be of interest to a formulator or other downstream user of a chemical. If a company intends to use a chemical in a particular way that EPA has determined is a significant new use for the chemical, *e.g.*, in a consumer product, the company will need to first submit a significant new use notice to EPA so that the agency can determine if that significant new use of the chemical may present an unreasonable risk.

10.    In contrast, ChemView is not currently designed to provide timely notice of EPA's actions to the general public. There is no notification function in ChemView that provides notice to users when EPA has added a new case or a new document to the data portal.

11.    There is also no ability to search for EPA actions or other documents by locality—state, city, county, or zip code. As a result, a person trying to monitor EPA approvals for new chemical production in a specific community could not do so through location-based searches in ChemView.

---

[1] Under TSCA section 5(a) EPA can determine that a use of a chemical substance is a "significant new use." 15 U.S.C. § 2604(a). Once EPA determines that a use of a chemical substance is a significant new use, TSCA section 5(a) requires persons to submit a significant new use notice (SNUN) to EPA at least 90 days before they manufacture (including import) or process the chemical substance for that use. *See* EPA, *Actions Under TSCA Section 5, Significant New Use Rules (SNURs)*, https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/actions-under-tsca-section-5#SNURs (last visited Apr. 18, 2024).

ADD0053

12.     While the ability to search by company name was added as part of ChemView's "Advanced Search," running such a search often will not return all the information associated with a company or a specific facility because EPA does not systematically link a company name to the documents in ChemView.

13.     For example, when I selected the ChemView output option to search for "TSCA § 5 Orders" associated with the Chevron Pascagoula Refinery, which is identified in ChemView as "Chevron Products Co Pascagoula Refinery," ChemView returned no results, misleadingly indicating that EPA has not issued any TSCA section 5 Orders for operations at that facility. When I reran the search using output "TSCA § 5 Orders" and the more generic company/submitter name "Chevron," ChemView again returned no results.

14.     A ChemView user often will not be able to find individual facility-specific information about a premanufacture notice or a TSCA section 5 order. TSCA new chemical notices are company-specific submissions, rather than facility-specific submissions (although in some instances they are the same). The premanufacture notice requires that a submitter identify the submitter's company name and the "industrial sites controlled by the submitter."[2] The premanufacture

_____

[2] *See* EPA, *Sample Premanufacture Notification (PMN) Form* at 3, 10, https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/sample-premanufacture-notification (last visited Apr. 18, 2024).

ADD0054

notice and TSCA section 5 order are associated in ChemView with the name of the company rather than the name of the industrial sites controlled by the submitter.

15.     In many instances, the corporate official signing new chemical review documents and the industrial site manufacturing the chemical are in different locations. For instance, a new chemical application submitted by Chevron Phillips Chemical Company (T-17-0012) listed the submitter's address as The Woodlands, TX, and the site of the chemical's manufacturing, processing, or use as Borger, TX—more than 500 miles away. Another PMN submitted by Clariant Corporation (P-24-0043) listed the submitter's address as Charlotte, NC, and the site of the chemical's manufacturing, processing, or use as Louisville, KY—more than 300 miles away. [3] And a PMN submitted by Evonik Corp. (P-22-0157) listed the submitter's address as Parsippany, NJ, and the site of the chemical's manufacturing, processing, or use as Haysville, KS—more than 1,200 miles away. The location of a chemical's production and use cannot be inferred from the address of the company official who submitted the PMN or who signed a section 5 order.

16.     Further, given the extensive confidential business information redactions in many premanufacture notices and consent orders, it is often

---

[3] Problematically, neither the Chevron Phillips Chemical Company nor the Clariant notices referenced in this paragraph can be found on ChemView by searching for their PMN numbers.

ADD0055

impossible to determine where a chemical is manufactured or by whom, or how much of it is released into the environment. In addition, premanufacture notices and TSCA section 5 orders rarely contain any information on the location of uses of a new chemical.

17.     EPA does not add documents to ChemView on a set schedule, and it is difficult for the public to identify when a particular document has been posted. Neither EPA's ChemView Tutorial Video nor its ChemView User Interface Guide provide any direction on how to search ChemView by document posting date, and I have found that EPA does not consistently post documents in a timely manner. For example, in the October 24, 2023, Federal Register, EPA identified certain test data received for case number P-18-0304,[4] but this data was not available in ChemView when I searched for it on November 13, 2023 and again on April 23, 2024. This discrepancy is not unusual. When I searched for EPA decisions posted between August 17, 2023 and September 18, 2023, the results included not only consent orders with May–September 2023 effective dates but also three cases with March 2023 effective dates. These were posted five months after they were

---

[4] Notice, Certain New Chemicals; Receipt and Status of Information for Sept. 2023, 88 Fed. Reg. 73,013, 73,017(Oct. 24, 2023).

ADD0056

signed.[5] Therefore, a user cannot be confident that searching by consent order posting date will identify all recently effective consent orders.

18.     For many chemicals, only some of the information is available. For example, the TSCA section 5 order for PMN number P-14-0712 is in ChemView. The consent order requires that the company submit quarterly testing to EPA for certain contaminant chemicals. EPA received some of this testing information on November 30, 2022,[6] but it was not posted in ChemView for several months. It was posted in ChemView in February 2023 only after Environmental Defense Fund staff asked EPA for the data.

19.     Even when information is in ChemView, finding that information may not be straightforward. One can search for information on a specific chemical using either the chemical name or the assigned chemical identifier. I have found that in some instances, an individual chemical may have two separate listings in ChemView, each under a different chemical identifier. One listing will identify a subset of information for the chemical and the other listing will identify a different

---

[5] P-21-0074, Effective Date: March 28, 2023; P-22-0010, Effective Date: March 16, 2023; P-22-0054, Effective Date: March 17, 2023.

[6] Notice, Certain New Chemicals; Receipt and Status Information for Dec. 2022, 88 Fed. Reg 2,912, 2,915 (Jan. 18, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-18/pdf/2023-00859.pdf.

ADD0057

subset of information.[7] Thus, using ChemView can sometimes be a cumbersome activity that requires multiple search strategies to obtain information on a specific chemical.

20.    The TSCA section 5 order at issue in this case illustrates the limitations of ChemView. It was posted to ChemView, without notice, months after it was signed. As explained above, even a user familiar with ChemView and the significance of TSCA section 5 orders could not identify the order by searching by location or by searching for Chevron or the Chevron Products Co Pascagoula Refinery. Further, even a user who was aware of the underlying PMNs would have received no notice of the order or its posting to ChemView, and would likely have to search for EPA decision documents based on their ChemView posting date over and over to have a chance of retrieving the order at issue given the lengthy and apparently arbitrary delay between the decision date and the ChemView posting date. And if that user utilized ChemView's "Advanced Search" function to narrow

_____

[7] For example, there are two different listings for the same chemical: "Waste plastic, polyester, depolymd, with glycols, polymers with dicarboxylic acids (PROVISIONAL)." One is associated with the number P-18-0070 and the second with the number 200078. The first listing identifies a premanufacture notice, a notice of commencement, and a not likely to present unreasonable risk determination; the second listing identifies Significant New Use Rule information, TSCA section 12(b) Export Notification information and Chemical Data Reporting information.

9

the date-based search results to documents related to Chevron or Chevron Products Co Pascagoula Refinery, ChemView would return no results.

21. In sum, ChemView is not currently designed or structured to be a means of providing timely notification to the public about decisions on new chemicals and providing them with practicable access to information about the new chemicals manufactured, processed, and used in their communities. A community member would encounter significant obstacles if they were to try to use ChemView to track whether EPA had approved chemicals that would be produced or used in their community or region because: it is difficult to determine when specific information is posted to ChemView; the information on a new chemical may not be available under a single entry for the chemical; the available information on the new chemical may not have been posted to ChemView; a user cannot reliably search by company name or facility location and consistently obtain all relevant TSCA orders from ChemView; the available information may or may not indicate where the chemical is being produced or imported and much of the information on the new chemical, particularly processing and release information in the premanufacture notice, is heavily redacted; and premanufacture notices and TSCA section 5 orders rarely contain any information on the location of uses of a new chemical.

10

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed this 8th day of May 2024 in Washington, DC.

_____
Maria J. Doa, Ph.D.

ADD0060

# Exhibit 1

# Maria J. Doa, Ph.D.
4223 38th Street, N.W., Washington, DC 20016
202.286.3020; mariajdoa@gmail.com

_____

*Summary*
- Extensive experience in the integration of science and public policy
- Effective communicator of complex interdisciplinary scientific issues at the national and international levels
- Focus on developing risk assessment and risk management practices that consider the impacts of chemicals wholistically
- Expertise in modern risk-management practices
- Experience working with international organizations

*Employment History*

**Environmental Defense Fund, Washington, DC**

**Senior Director, Chemical Policy**                                        November 2021 – Present

*I lead efforts to reduce exposures to toxic chemicals through health-protective implementation of the nation's primary chemical safety law – the Toxic Substances Control Act. My efforts focus on encouraging more robust, inclusive, and transparent decisions that consider the impacts chemicals can have throughout their lifecycle on communities, particularly those most at risk.*

**U.S. Environmental Protection Agency, Office of Research and Development, Washington, DC**

**Director, Science Policy Division**                                        October 2019 – October 2021

*I led the synthesis of the Office of Research and Development's scientific support for EPA regulatory activities and coordinate cross-EPA science and technology policy issues.*

*Accomplishments*
- Led the coordination and synthesis of the Office of Research and Development's scientific contributions to the development of more than 40 significant EPA regulations and regulatory-related scientific assessments.
- Developed metrics and an information system to evaluate the impact of the Office of Research and Development's contributions to the development of EPA regulations.
- Improved the cross-EPA coordination of science and technology policy issues, such as peer review, risk assessment guidelines, and reproducibility of information.

**Senior Science Advisor**                                        April 2018 – October 2019

*In this position, I led evaluations on the impact of EPA's Office of Research and Development's science on decision making at the national, regional, state, and local level.*

**U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxics, Office of Chemical Safety and Pollution Prevention, Washington, DC**

**Director, Chemical Control Division**                                        May 2011 – April 2018

*In this position I developed and implemented incentive-based and regulatory risk management approaches to significantly reduce risks from industrial, commercial and consumer chemicals. Many actions involved complex scientific, technical and policy issues and were done under tight legislative deadlines.*

*Accomplishments*
- Increased access to, usability of, and transparency of scientific and regulatory information on more than 15,000 chemicals and nanomaterials through the development of ChemView, a modern Web-based information system available to industry, the public, and government.
- Improved EPA's approach on established chemicals through leadership on the prioritization of more than 1,000 candidate chemicals for risk evaluation. The prioritization methodology I developed was subsequently included by Congress as a key component in the 2016 amendments to the Toxic Substances Control Act.
- Annually, completed pre-market regulatory evaluations for 1,000 chemicals.
- Successfully led the development of the first proposed regulations in 25 years to protect the public and workers from exposures to highly toxic chemicals.

- Improved the quality, timeliness and consistency of regulations on industrial, commercial and consumer chemicals by collaboratively leading cultural change, identifying critical solutions and empowering managers and staff resulting in the elimination of a backlog of 400 chemical cases within 2 years and timely completion of 100 chemical cases annually.

- Provided leadership at the international level representing the United States environmental policies to the Organization for Economic Cooperation and Development (OECD) Working Party on Manufactured Nanomaterials, chairing international expert meetings on nanomaterials, and leading bilateral negotiations on nanomaterials with Canada and the European Union.

**Director, National Program Chemicals Division**                                       July 2003 – May 2011

*I led EPA's lead paint program, resulting in major progress toward eliminating lead poisoning in children; risk-reduction programs on polychlorinated biphenyls (PCB) and mercury; and the asbestos in schools program. This work required strong scientific and policy backgrounds and involved working with a wide range of international and domestic public, industry, and government stakeholders.*

*Accomplishments*

- Created a strong community of collaboration to coordinate scientific and regulatory activities with partners across EPA, the Federal Government (including the Centers for Disease Control and Prevention, the Consumer Products Safety Commission, the National Institute of Standards and Technology (NIST), the Department of Housing and Urban Development), with states, the Environmental Council of States (ECOS), the Quicksilver Caucus, industry, and environmental, public health and community public interest groups.

- Chaired the United Nations Environment Program – World Health Organization Global Alliance to Eliminate Lead in Paints and the United Nations Environment Program Global Mercury Partnership Mercury-Containing Products Partnership Area.

- Reduced children's exposure to lead paint from residential renovations by leading the development and implementation of regulatory renovation standards, through innovative collaborative outreach strategies, including with the Ad Council, and by the creation of a new grant program supporting local efforts to reduce lead poisoning. These lead poisoning prevention efforts have resulted in more than $1.5 billion in benefits.

**U.S. Environmental Protection Agency, Office of Environmental Information**

**Director, Toxics Release Inventory Program Division**                               October 1999 - July 2003

*I led the multi-media Toxics Release Inventory (TRI) Program - a key community right- to-know program about toxic chemicals.*

*Accomplishments*

- Created a modern data management approach to TRI data including development of intelligent reporting tools, annual receipt and processing of 100,000 plus submissions, quality control, and working with community and environmental groups on the use of the data

- Expanded TRI by completing hazard determinations for and adding to TRI more than 300 chemicals and 5 industry sectors, significantly increasing publicly available information on toxic chemical releases and industry's environmental performance.

- Chaired the OECD Task Force on Pollutant Release and Transfer Registers and represented the Agency in other international fora, including the North American Commission for Environmental Cooperation, and the Inter-Organization Programme for the Sound Management of Chemicals.

- Represented EPA in the United Nations Economic Commission for Europe negotiations on the development of a Pollutant Release and Transfer Register protocol under the Convention on Access to Information, Public Participation in Decision-making and Access to Justice in Environmental Matters.

*Education*

University of Pittsburgh, Pittsburgh, Pennsylvania; Ph.D., Organic Chemistry

University of Michigan, Ann Arbor, Michigan; B.S., Chemistry

# TABLE OF CONTENTS

**STATUTES**                                                        **PAGE**

5 U.S.C. § 706...............................................................................ADD0001

15 U.S.C. § 2602...........................................................................ADD0003

15 U.S.C. § 2604...........................................................................ADD0007

15 U.S.C. § 2618...........................................................................ADD0017


**REGULATIONS**                                                     **PAGE**

40 C.F.R. § 23.5............................................................................ADD0020

40 C.F.R. § 1090.1........................................................................ADD0021

# STATUTES

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Krafsur v. Davenport,  6th Cir.(Tenn.),  Dec. 04, 2013

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)

---

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

  **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

  **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 118-41. Some statute sections may be more current, see credits for details.

  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  ADD0002  2

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 53. Toxic Substances Control (Refs & Annos)
            Subchapter I. Control of Toxic Substances (Refs & Annos)

15 U.S.C.A. § 2602

§ 2602. Definitions

Effective: June 22, 2016
Currentness

As used in this chapter:

**(1)** the [1] term "Administrator" means the Administrator of the Environmental Protection Agency.

**(2)(A)** Except as provided in subparagraph (B), the term "chemical substance" means any organic or inorganic substance of a particular molecular identity, including--

**(i)** any combination of such substances occurring in whole or in part as a result of a chemical reaction or occurring in nature, and

**(ii)** any element or uncombined radical.

**(B)** Such term does not include--

**(i)** any mixture,

**(ii)** any pesticide (as defined in the Federal Insecticide, Fungicide, and Rodenticide Act) when manufactured, processed, or distributed in commerce for use as a pesticide,

**(iii)** tobacco or any tobacco product,

**(iv)** any source material, special nuclear material, or byproduct material (as such terms are defined in the Atomic Energy Act of 1954 and regulations issued under such Act),

**(v)** any article the sale of which is subject to the tax imposed by section 4181 of the Internal Revenue Code of 1986 (determined without regard to any exemptions from such tax provided by section 4182 or 4221 or any other provision of such Code) and any component of such an article (limited to shot shells, cartridges, and components of shot shells and cartridges), and

**(vi)** any food, food additive, drug, cosmetic, or device (as such terms are defined in section 201 of the Federal Food, Drug, and Cosmetic Act) when manufactured, processed, or distributed in commerce for use as a food, food additive, drug, cosmetic, or device.

The term "food" as used in clause (vi) of this subparagraph includes poultry and poultry products (as defined in sections 4(e) and 4(f) of the Poultry Products Inspection Act), meat and meat food products (as defined in section 1(j) of the Federal Meat Inspection Act), and eggs and egg products (as defined in section 4 of the Egg Products Inspection Act).

**(3)** The term "commerce" means trade, traffic, transportation, or other commerce (A) between a place in a State and any place outside of such State, or (B) which affects trade, traffic, transportation, or commerce described in clause (A).

**(4)** The term "conditions of use" means the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of.

**(5)** The terms "distribute in commerce" and "distribution in commerce" when used to describe an action taken with respect to a chemical substance or mixture or article containing a substance or mixture mean to sell, or the sale of, the substance, mixture, or article in commerce; to introduce or deliver for introduction into commerce, or the introduction or delivery for introduction into commerce of, the substance, mixture, or article; or to hold, or the holding of, the substance, mixture, or article after its introduction into commerce.

**(6)** The term "environment" includes water, air, and land and the interrelationship which exists among and between water, air, and land and all living things.

**(7)** The term "guidance" means any significant written guidance of general applicability prepared by the Administrator.

**(8)** The term "health and safety study" means any study of any effect of a chemical substance or mixture on health or the environment or on both, including underlying information and epidemiological studies, studies of occupational exposure to a chemical substance or mixture, toxicological, clinical, and ecological studies of a chemical substance or mixture, and any test performed pursuant to this chapter.

**(9)** The term "manufacture" means to import into the customs territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States), produce, or manufacture.

**(10)** The term "mixture" means any combination of two or more chemical substances if the combination does not occur in nature and is not, in whole or in part, the result of a chemical reaction; except that such term does include any combination which occurs, in whole or in part, as a result of a chemical reaction if none of the chemical substances comprising the combination is a new chemical substance and if the combination could have been manufactured for commercial purposes without a chemical reaction at the time the chemical substances comprising the combination were combined.

**(11)** The term "new chemical substance" means any chemical substance which is not included in the chemical substance list compiled and published under section 2607(b) of this title.

**(12)** The term "potentially exposed or susceptible subpopulation" means a group of individuals within the general population identified by the Administrator who, due to either greater susceptibility or greater exposure, may be at greater risk than the general population of adverse health effects from exposure to a chemical substance or mixture, such as infants, children, pregnant women, workers, or the elderly.

**(13)** The term "process" means the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce--

   **(A)** in the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such substance or mixture, or

   **(B)** as part of an article containing the chemical substance or mixture.

**(14)** The term "processor" means any person who processes a chemical substance or mixture.

**(15)** The term "protocols and methodologies for the development of information" means a prescription of--

   **(A)** the--

      **(i)** health and environmental effects, and

      **(ii)** information relating to toxicity, persistence, and other characteristics which affect health and the environment,

      for which information for a chemical substance or mixture are to be developed and any analysis that is to be performed on such information, and

   **(B)** to the extent necessary to assure that information respecting such effects and characteristics are reliable and adequate--

      **(i)** the manner in which such information are [2] to be developed,

      **(ii)** the specification of any test protocol or methodology to be employed in the development of such information, and

      **(iii)** such other requirements as are necessary to provide such assurance.

**(16)** The term "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Canal Zone, American Samoa, the Northern Mariana Islands, or any other territory or possession of the United States.

**(17)** The term "United States", when used in the geographic sense, means all of the States.

## CREDIT(S)

(Pub.L. 94-469, Title I, § 3, Oct. 11, 1976, 90 Stat. 2004; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; renumbered Title I, Pub.L. 99-519, § 3(c)(1), Oct. 22, 1986, 100 Stat. 2989; amended Pub.L. 100-418, Title I, § 1214(e)(1), Aug. 23, 1988, 102 Stat. 1156; Pub.L. 114-92, Div. A, Title III, § 315, Nov. 25, 2015, 129 Stat. 791; Pub.L. 114-182, Title I, §§ 3, 19(c), June 22, 2016, 130 Stat. 448, 505.)

Notes of Decisions (5)

## Footnotes

1      So in original. Probably should be capitalized.

2      So in original. Probably should be "is".

15 U.S.C.A. § 2602, 15 USCA § 2602
Current through P.L. 118-46. Some statute sections may be more current, see credits for details.

**End of Document**      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 53. Toxic Substances Control (Refs & Annos)
      Subchapter I. Control of Toxic Substances (Refs & Annos)

15 U.S.C.A. § 2604

§ 2604. Manufacturing and processing notices

Effective: June 22, 2016
Currentness

**(a) In general**

**(1)(A)** Except as provided in subparagraph (B) of this paragraph and subsection (h), no person may--

**(i)** manufacture a new chemical substance on or after the 30th day after the date on which the Administrator first publishes the list required by section 2607(b) of this title, or

**(ii)** manufacture or process any chemical substance for a use which the Administrator has determined, in accordance with paragraph (2), is a significant new use.

**(B)** A person may take the actions described in subparagraph (A) if--

**(i)** such person submits to the Administrator, at least 90 days before such manufacture or processing, a notice, in accordance with subsection (d), of such person's intention to manufacture or process such substance and such person complies with any applicable requirement of, or imposed pursuant to, subsection (b), (e), or (f); and

**(ii)** the Administrator--

**(I)** conducts a review of the notice; and

**(II)** makes a determination under subparagraph (A), (B), or (C) of paragraph (3) and takes the actions required in association with that determination under such subparagraph within the applicable review period.

**(2)** A determination by the Administrator that a use of a chemical substance is a significant new use with respect to which notification is required under paragraph (1) shall be made by a rule promulgated after a consideration of all relevant factors, including--

**(A)** the projected volume of manufacturing and processing of a chemical substance,

**(B)** the extent to which a use changes the type or form of exposure of human beings or the environment to a chemical substance,

**(C)** the extent to which a use increases the magnitude and duration of exposure of human beings or the environment to a chemical substance, and

**(D)** the reasonably anticipated manner and methods of manufacturing, processing, distribution in commerce, and disposal of a chemical substance.

**(3) Review and determination**

Within the applicable review period, subject to section 2617 of this title, the Administrator shall review such notice and determine--

**(A)** that the relevant chemical substance or significant new use presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator under the conditions of use, in which case the Administrator shall take the actions required under subsection (f);

**(B)** that--

  **(i)** the information available to the Administrator is insufficient to permit a reasoned evaluation of the health and environmental effects of the relevant chemical substance or significant new use; or

  **(ii)(I)** in the absence of sufficient information to permit the Administrator to make such an evaluation, the manufacture, processing, distribution in commerce, use, or disposal of such substance, or any combination of such activities, may present an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator; or

  **(II)** such substance is or will be produced in substantial quantities, and such substance either enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance,

  in which case the Administrator shall take the actions required under subsection (e); or

**(C)** that the relevant chemical substance or significant new use is not likely to present an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator under the conditions of use, in which case the

submitter of the notice may commence manufacture of the chemical substance or manufacture or processing for a significant new use.

**(4) Failure to render determination**

**(A) Failure to render determination**

If the Administrator fails to make a determination on a notice under paragraph (3) by the end of the applicable review period and the notice has not been withdrawn by the submitter, the Administrator shall refund to the submitter all applicable fees charged to the submitter for review of the notice pursuant to section 2625(b) of this title, and the Administrator shall not be relieved of any requirement to make such determination.

**(B) Limitations**

**(i)** A refund of applicable fees under subparagraph (A) shall not be made if the Administrator certifies that the submitter has not provided information required under subsection (b) or has otherwise unduly delayed the process such that the Administrator is unable to render a determination within the applicable review period.

**(ii)** A failure of the Administrator to render a decision shall not be deemed to constitute a withdrawal of the notice.

**(iii)** Nothing in this paragraph shall be construed as relieving the Administrator or the submitter of the notice from any requirement of this section.

**(5) Article consideration**

The Administrator may require notification under this section for the import or processing of a chemical substance as part of an article or category of articles under paragraph (1)(A)(ii) if the Administrator makes an affirmative finding in a rule under paragraph (2) that the reasonable potential for exposure to the chemical substance through the article or category of articles subject to the rule justifies notification.

**(b) Submission of information**

**(1)(A)** If (i) a person is required by subsection (a)(1) to submit a notice to the Administrator before beginning the manufacture or processing of a chemical substance, and (ii) such person is required to submit information for such substance pursuant to a rule, order, or consent agreement under section 2603 of this title before the submission of such notice, such person shall submit to the Administrator such information in accordance with such rule, order, or consent agreement at the time notice is submitted in accordance with subsection (a)(1).

**(B)** If--

**(i)** a person is required by subsection (a)(1) to submit a notice to the Administrator, and

**(ii)** such person has been granted an exemption under section 2603(c) of this title from the requirements of a rule or order under section 2603 of this title before the submission of such notice,

such person may not, before the expiration of the 90 day period which begins on the date of the submission in accordance with such rule of the information the submission or development of which was the basis for the exemption, manufacture such substance if such person is subject to subsection (a)(1)(A)(i) or manufacture or process such substance for a significant new use if the person is subject to subsection (a)(1)(A)(ii).

**(2)(A)** If a person--

**(i)** is required by subsection (a)(1) to submit a notice to the Administrator before beginning the manufacture or processing of a chemical substance listed under paragraph (4), and

**(ii)** is not required by a rule, order, or consent agreement under section 2603 of this title before the submission of such notice to submit information for such substance,

such person may submit to the Administrator information prescribed by subparagraph (B) at the time notice is submitted in accordance with subsection (a)(1).

**(B)** Information submitted pursuant to subparagraph (A) shall be information which the person submitting the information believes shows that--

**(i)** in the case of a substance with respect to which notice is required under subsection (a)(1)(A)(i), the manufacture, processing, distribution in commerce, use, and disposal of the chemical substance or any combination of such activities will not present an unreasonable risk of injury to health or the environment, or

**(ii)** in the case of a chemical substance with respect to which notice is required under subsection (a)(1)(A)(ii), the intended significant new use of the chemical substance will not present an unreasonable risk of injury to health or the environment.

**(3)** Information submitted under paragraph (1) or (2) of this subsection or under subsection (e) shall be made available, subject to section 2613 of this title, for examination by interested persons.

**(4)(A)(i)** The Administrator may, by rule, compile and keep current a list of chemical substances with respect to which the Administrator finds that the manufacture, processing, distribution in commerce, use, or disposal, or any combination of such activities, presents or may present an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors.

**(ii)** In making a finding under clause (i) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or any combination of such activities presents or may present an unreasonable risk of injury to health or the environment, the Administrator shall consider all relevant factors, including--

**(I)** the effects of the chemical substance on health and the magnitude of human exposure to such substance; and

**(II)** the effects of the chemical substance on the environment and the magnitude of environmental exposure to such substance.

**(B)** The Administrator shall, in prescribing a rule under subparagraph (A) which lists any chemical substance, identify those uses, if any, which the Administrator determines, by rule under subsection (a)(2), would constitute a significant new use of such substance.

**(C)** Any rule under subparagraph (A), and any substantive amendment or repeal of such a rule, shall be promulgated pursuant to the procedures specified in section 553 of Title 5.

**(c) Extension of review period**

The Administrator may for good cause extend for additional periods (not to exceed in the aggregate 90 days) the period, prescribed by subsection (a) or (b). Subject to section 2613 of this title, such an extension and the reasons therefor shall be published in the Federal Register and shall constitute a final agency action subject to judicial review.

**(d) Content of notice; publications in the Federal Register**

**(1)** The notice required by subsection (a) shall include--

**(A)** insofar as known to the person submitting the notice or insofar as reasonably ascertainable, the information described in subparagraphs (A), (B), (C), (D), (F), and (G) of section 2607(a)(2) of this title, and

**(B)** in such form and manner as the Administrator may prescribe, any information in the possession or control of the person giving such notice which are related to the effect of any manufacture, processing, distribution in commerce, use, or disposal of such substance or any article containing such substance, or of any combination of such activities, on health or the environment, and

**(C)** a description of any other information concerning the environmental and health effects of such substance, insofar as known to the person making the notice or insofar as reasonably ascertainable.

Such a notice shall be made available, subject to section 2613 of this title, for examination by interested persons.

**(2)** Subject to section 2613 of this title, not later than five days (excluding Saturdays, Sundays and legal holidays) after the date of the receipt of a notice under subsection (a) or of information under subsection (b), the Administrator shall publish in the Federal Register a notice which--

**(A)** identifies the chemical substance for which notice or information has been received;

**(B)** lists the uses of such substance identified in the notice; and

**(C)** in the case of the receipt of information under subsection (b), describes the nature of the tests performed on such substance and any information which was developed pursuant to subsection (b) or a rule, order, or consent agreement under section 2603 of this title.

A notice under this paragraph respecting a chemical substance shall identify the chemical substance by generic class unless the Administrator determines that more specific identification is required in the public interest.

**(3)** At the beginning of each month the Administrator shall publish a list in the Federal Register of (A) each chemical substance for which notice has been received under subsection (a) and for which the applicable review period has not expired, and (B) each chemical substance for which such period has expired since the last publication in the Federal Register of such list.

**(e) Regulation pending development of information**

**(1)(A)** If the Administrator determines that--

**(i)** the information available to the Administrator is insufficient to permit a reasoned evaluation of the health and environmental effects of a chemical substance with respect to which notice is required by subsection (a); or

**(ii)(I)** in the absence of sufficient information to permit the Administrator to make such an evaluation, the manufacture, processing, distribution in commerce, use, or disposal of such substance, or any combination of such activities, may present an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed subpopulation identified as relevant by the Administrator under the conditions of use; or

**(II)** such substance is or will be produced in substantial quantities, and such substance either enters or may reasonably be anticipated to enter the environment in substantial quantities or there is or may be significant or substantial human exposure to the substance,

the Administrator shall issue an order, to take effect on the expiration of the applicable review period, to prohibit or limit the manufacture, processing, distribution in commerce, use, or disposal of such substance or to prohibit or limit any combination of such activities to the extent necessary to protect against an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator under the conditions of use, and the submitter of the notice may commence manufacture of the chemical substance, or manufacture or processing of the chemical substance for a significant new use, including while any required information is being developed, only in compliance with the order.

**(B)** An order may not be issued under subparagraph (A) respecting a chemical substance (i) later than 45 days before the expiration of the applicable review period, and (ii) unless the Administrator has, on or before the issuance of the order, notified, in writing, each manufacturer or processor, as the case may be, of such substance of the determination which underlies such order.

**(2)** Repealed. Pub.L. 114-182, Title I, § 5(5)(D), June 22, 2016, 130 Stat. 458

**(f) Protection against unreasonable risks**

**(1)** If the Administrator determines that a chemical substance or significant new use with respect to which notice is required by subsection (a) presents an unreasonable risk of injury to health or environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed subpopulation identified as relevant by the Administrator under the conditions of use, the Administrator shall, before the expiration of the applicable review period, take the action authorized by paragraph (2) or (3) to the extent necessary to protect against such risk.

**(2)** The Administrator may issue a proposed rule under section 2605(a) of this title to apply to a chemical substance with respect to which a finding was made under paragraph (1)--

   **(A)** a requirement limiting the amount of such substance which may be manufactured, processed, or distributed in commerce,

   **(B)** a requirement described in paragraph (2), (3), (4), (5), (6), or (7) of section 2605(a) of this title, or

   **(C)** any combination of the requirements referred to in subparagraph (B).

Such a proposed rule shall be effective upon its publication in the Federal Register. Section 2605(d)(3)(B) of this title shall apply with respect to such rule.

**(3)(A)** The Administrator may issue an order to prohibit or limit the manufacture, processing, or distribution in commerce of a substance with respect to which a finding was made under paragraph (1). Such order shall take effect on the expiration of the applicable review period.

**(B)** The provisions of subparagraph (B) of subsection (e)(1) shall apply with respect to an order issued under subparagraph (A).

**(4) Treatment of nonconforming uses**

Not later than 90 days after taking an action under paragraph (2) or (3) or issuing an order under subsection (e) relating to a chemical substance with respect to which the Administrator has made a determination under subsection (a)(3)(A) or (B), the Administrator shall consider whether to promulgate a rule pursuant to subsection (a)(2) that identifies as a significant new use any manufacturing, processing, use, distribution in commerce, or disposal of the chemical substance that does not conform to the restrictions imposed by the action or order, and, as applicable, initiate such a rulemaking or publish a statement describing the reasons of the Administrator for not initiating such a rulemaking.

**(5) Workplace exposures**

To the extent practicable, the Administrator shall consult with the Assistant Secretary of Labor for Occupational Safety and Health prior to adopting any prohibition or other restriction relating to a chemical substance with respect to which the Administrator has made a determination under subsection (a)(3)(A) or (B) to address workplace exposures.

**(g) Statement on Administrator finding**

If the Administrator finds in accordance with subsection (a)(3)(C) that a chemical substance or significant new use is not likely to present an unreasonable risk of injury to health or the environment, then notwithstanding any remaining portion of the applicable review period, the submitter of the notice may commence manufacture of the chemical substance or manufacture or processing for the significant new use, and the Administrator shall make public a statement of the Administrator's finding. Such a statement shall be submitted for publication in the Federal Register as soon as is practicable before the expiration of such period. Publication of such statement in accordance with the preceding sentence is not a prerequisite to the manufacturing or processing of the substance with respect to which the statement is to be published.

**(h) Exemptions**

**(1)** The Administrator may, upon application, exempt any person from any requirement of subsection (a) or (b) to permit such person to manufacture or process a chemical substance for test marketing purposes--

**(A)** upon a showing by such person satisfactory to the Administrator that the manufacture, processing, distribution in commerce, use, and disposal of such substance, and that any combination of such activities, for such purposes will not present any unreasonable risk of injury to health or the environment, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified by the Administrator for the specific conditions of use identified in the application, and

**(B)** under such restrictions as the Administrator considers appropriate.

**(2)(A)** The Administrator may, upon application, exempt any person from the requirement of subsection (b)(2) to submit information for a chemical substance. If, upon receipt of an application under the preceding sentence, the Administrator determines that--

**(i)** the chemical substance with respect to which such application was submitted is equivalent to a chemical substance for which information has been submitted to the Administrator as required by subsection (b)(2), and

**(ii)** submission of information by the applicant on such substance would be duplicative of information which has been submitted to the Administrator in accordance with such subsection,

the Administrator shall exempt the applicant from the requirement to submit such information on such substance. No exemption which is granted under this subparagraph with respect to the submission of information for a chemical substance may take effect before the beginning of the reimbursement period applicable to such information.

**(B)** If the Administrator exempts any person, under subparagraph (A), from submitting information required under subsection (b)(2) for a chemical substance because of the existence of previously submitted information and if such exemption is granted during the reimbursement period for such information, then (unless such person and the persons referred to in clauses (i) and (ii)

agree on the amount and method of reimbursement) the Administrator shall order the person granted the exemption to provide fair and equitable reimbursement (in an amount determined under rules of the Administrator)--

**(i)** to the person who previously submitted the information on which the exemption was based, for a portion of the costs incurred by such person in complying with the requirement under subsection (b)(2) to submit such information, and

**(ii)** to any other person who has been required under this subparagraph to contribute with respect to such costs, for a portion of the amount such person was required to contribute.

In promulgating rules for the determination of fair and equitable reimbursement to the persons described in clauses (i) and (ii) for costs incurred with respect to a chemical substance, the Administrator shall, after consultation with the Attorney General and the Federal Trade Commission, consider all relevant factors, including the effect on the competitive position of the person required to provide reimbursement in relation to the persons to be reimbursed and the share of the market for such substance of the person required to provide reimbursement in relation to the share of such market of the persons to be reimbursed. For purposes of judicial review, an order under this subparagraph shall be considered final agency action.

**(C)** For purposes of this paragraph, the reimbursement period for any previously submitted information for a chemical substance is a period--

**(i)** beginning on the date of the termination of the prohibition, imposed under this section, on the manufacture or processing of such substance by the person who submitted such information to the Administrator, and

**(ii)** ending--

**(I)** five years after the date referred to in clause (i), or

**(II)** at the expiration of a period which begins on the date referred to in clause (i) and is equal to the period which the Administrator determines was necessary to develop such information,

whichever is later.

**(3)** The requirements of subsections (a) and (b) do not apply with respect to the manufacturing or processing of any chemical substance which is manufactured or processed, or proposed to be manufactured or processed, only in small quantities (as defined by the Administrator by rule) solely for purposes of--

**(A)** scientific experimentation or analysis, or

**(B)** chemical research on, or analysis of such substance or another substance, including such research or analysis for the development of a product,

if all persons engaged in such experimentation, research, or analysis for a manufacturer or processor are notified (in such form and manner as the Administrator may prescribe) of any risk to health which the manufacturer, processor, or the Administrator has reason to believe may be associated with such chemical substance.

**(4)** The Administrator may, upon application and by rule, exempt the manufacturer of any new chemical substance from all or part of the requirements of this section if the Administrator determines that the manufacture, processing, distribution in commerce, use, or disposal of such chemical substance, or that any combination of such activities, will not present an unreasonable risk of injury to health or the environment, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified by the Administrator under the conditions of use.

**(5)** The Administrator may, upon application, make the requirements of subsections (a) and (b) inapplicable with respect to the manufacturing or processing of any chemical substance (A) which exists temporarily as a result of a chemical reaction in the manufacturing or processing of a mixture or another chemical substance, and (B) to which there is no, and will not be, human or environmental exposure.

**(6)** Immediately upon receipt of an application under paragraph (1) or (5) the Administrator shall publish in the Federal Register notice of the receipt of such application. The Administrator shall give interested persons an opportunity to comment upon any such application and shall, within 45 days of its receipt, either approve or deny the application. The Administrator shall publish in the Federal Register notice of the approval or denial of such an application.

**(i) Definitions**

**(1)** For purposes of this section, the terms "manufacture" and "process" mean manufacturing or processing for commercial purposes.

**(2)** For purposes of this chapter, the term "requirement" as used in this section shall not displace any statutory or common law.

**(3)** For purposes of this section, the term "applicable review period" means the period starting on the date the Administrator receives a notice under subsection (a)(1) and ending 90 days after that date, or on such date as is provided for in subsection (b)(1) or (c).

**CREDIT(S)**

(Pub.L. 94-469, Title I, § 5, Oct. 11, 1976, 90 Stat. 2012; renumbered Title I, Pub.L. 99-519, § 3(c)(1), Oct. 22, 1986, 100 Stat. 2989; amended Pub.L. 114-182, Title I, §§ 5, 19(e), June 22, 2016, 130 Stat. 454, 506.)

15 U.S.C.A. § 2604, 15 USCA § 2604
Current through P.L. 118-41. Some statute sections may be more current, see credits for details.

WESTLAW　© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 53. Toxic Substances Control (Refs & Annos)
         Subchapter I. Control of Toxic Substances (Refs & Annos)

15 U.S.C.A. § 2618

§ 2618. Judicial review

Effective: June 22, 2016
Currentness

**(a) In general**

**(1)(A)** Except as otherwise provided in this subchapter, not later than 60 days after the date on which a rule is promulgated under this subchapter, subchapter II, or subchapter IV, or the date on which an order is issued under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,, [1] any person may file a petition for judicial review of such rule or order with the United States Court of Appeals for the District of Columbia Circuit or for the circuit in which such person resides or in which such person's principal place of business is located. Courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of such a rule or order if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

**(B)** Except as otherwise provided in this subchapter, courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of an order issued under this subchapter, other than an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

**(C)(i)** Not later than 60 days after the publication of a designation under section 2605(b)(1)(B)(ii) of this title, any person may commence a civil action to challenge the designation.

**(ii)** The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over a civil action filed under this subparagraph.

**(2)** Copies of any petition filed under paragraph (1)(A) shall be transmitted forthwith to the Administrator and to the Attorney General by the clerk of the court with which such petition was filed. The provisions of section 2112 of Title 28 shall apply to the filing of the record of proceedings on which the Administrator based the rule or order being reviewed under this section and to the transfer of proceedings between United States courts of appeals.

**(b) Additional submissions and presentations; modifications**

If in an action under this section to review a rule, or an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, the petitioner or the Administrator applies to the court for leave to make additional oral submissions or written presentations respecting such rule or order and shows to the satisfaction of the court that such submissions and presentations would be material and that there were reasonable grounds for the submissions and failure to make such submissions and presentations in the proceeding before the Administrator, the court may order the Administrator to provide additional opportunity to make such submissions and presentations. The Administrator may modify or set aside the rule or order being reviewed or make a new rule or order by reason of the additional submissions and presentations and shall file such modified or new rule or order with the return of such submissions and presentations. The court shall thereafter review such new or modified rule or order.

**(c) Standard of review**

**(1)(A)** Upon the filing of a petition under subsection (a)(1) for judicial review of a rule or order, the court shall have jurisdiction (i) to grant appropriate relief, including interim relief, as provided in chapter 7 of Title 5, and (ii) except as otherwise provided in subparagraph (B), to review such rule or order in accordance with chapter 7 of Title 5.

**(B)** Section 706 of Title 5 shall apply to review of a rule or order under this section, except that--

  **(i)** in the case of review of--

    **(I)** a rule under section 2603(a), 2604(b)(4), 2605(a) (including review of the associated determination under section 2605(b)(4)(A)), or 2605(e) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole; and

    **(II)** an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such order if the court finds that the order is not supported by substantial evidence in the record taken as a whole; and

  **(ii)** the court may not review the contents and adequacy of any statement of basis and purpose required by section 553(c) of Title 5 to be incorporated in the rule or order, except as part of the record, taken as a whole.

**(2)** The judgment of the court affirming or setting aside, in whole or in part, any rule or order reviewed in accordance with this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of Title 28.

**(d) Fees and costs**

The decision of the court in an action commenced under subsection (a), or of the Supreme Court of the United States on review of such a decision, may include an award of costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate.

**(e) Other remedies**

The remedies as provided in this section shall be in addition to and not in lieu of any other remedies provided by law.

## CREDIT(S)

(Pub.L. 94-469, Title I, § 19, Oct. 11, 1976, 90 Stat. 2039; renumbered Title I and amended Pub.L. 99-519, § 3(b)(2), (c)(1), Oct. 22, 1986, 100 Stat. 2989; Pub.L. 102-550, Title X, § 1021(b)(8), Oct. 28, 1992, 106 Stat. 3923; Pub.L. 114-182, Title I, §§ 14, 19(m), June 22, 2016, 130 Stat. 498, 508.)

## Footnotes

1      So in original.

15 U.S.C.A. § 2618, 15 USCA § 2618
Current through P.L. 118-41. Some statute sections may be more current, see credits for details.

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# REGULATIONS

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter A. General
            Part 23. Judicial Review Under EPA—Administered Statutes (Refs & Annos)

40 C.F.R. § 23.5

§ 23.5 Timing of Administrator's action under Toxic Substances Control Act.

Currentness

Unless the Administrator otherwise explicitly provides in promulgating a particular rule or issuing a particular order, the time and date of the Administrator's promulgation or issuance for purposes of section 19(a)(1) shall be at 1:00 p.m. eastern time (standard or daylight, as appropriate) on the date that is (a) for a Federal Register document, two weeks after the date when the document is published in the Federal Register, or (b) for any other document, two weeks after it is signed.

SOURCE: 50 FR 7270, Feb. 21, 1985; 53 FR 29322, Aug. 3, 1988; 70 FR 33359, June 8, 2005, unless otherwise noted.

AUTHORITY: Clean Water Act, 33 U.S.C. 1361(a), 1369(b); Clean Air Act, 42 U.S.C. 7601(a)(1), 7607(b); Resource, Conservation and Recovery Act, 42 U.S.C. 6912(a), 6976; Toxic Substances Control Act, 15 U.S.C. 2618; Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. 136n(b), 136w(a); Safe Drinking Water Act, 42 U.S.C. 300j–7(a)(2), 300j–9(a); Atomic Energy Act, 42 U.S.C. 2201, 2239; Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 371(a), 346a, 28 U.S.C. 2112(a), 2343, 2344.

Current through April 29, 2024, 89 FR 34069. Some sections may be more current. See credits for details.

End of Document          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter U. Air Pollution Controls (Refs & Annos)
        Part 1090. Regulation of Fuels, Fuel Additives, and Regulated Blendstocks (Refs & Annos)
          Subpart A. General Provisions

40 C.F.R. § 1090.1

§ 1090.1 Applicability and relationship to other parts.

Effective: December 4, 2020
Currentness

(a) This part specifies fuel quality standards for gasoline and diesel fuel introduced into commerce in the United States. Additional requirements apply for fuel used in certain marine applications, as specified in paragraph (b) of this section.

(1) The regulations include standards for fuel parameters that directly or indirectly affect vehicle, engine, and equipment emissions, air quality, and public health. The regulations also include standards and requirements for fuel additives and regulated blendstocks that are components of the fuels regulated under this part.

(2) This part also specifies requirements for any person that engages in activities associated with the production, distribution, storage, and sale of fuels, fuel additives, and regulated blendstocks, such as collecting and testing samples for regulated parameters, reporting information to EPA to demonstrate compliance with fuel quality requirements, and performing other compliance measures to implement the standards. A party that produces and distributes other related products, such as heating oil, may need to meet certain reporting, recordkeeping, labeling, or other requirements of this part.

(b)(1) The International Convention for the Prevention of Pollution from Ships, 1973 as modified by the Protocol of 1978 Annex VI ("MARPOL Annex VI") is an international treaty that sets maximum sulfur content for fuel used in marine vessels, including separate standards for marine vessels navigating in a designated Emission Control Area (ECA). These standards and related requirements are specified in 40 CFR part 1043. This part also sets corresponding sulfur standards that apply to any person who produces or handles ECA marine fuel.

(2) This part also includes requirements for parties involved in the production and distribution of IMO marine fuel, such as collecting and testing samples of fuels for regulated parameters, reporting information to EPA to demonstrate compliance with fuel quality requirements, and performing other compliance measures to implement the standards.

(c) The requirements for the registration of fuel and fuel additives under 42 U.S.C. 7545(a), (b), and (e) are specified in 40 CFR part 79. A party that must meet the requirements of this part may also need to comply with the requirements for the registration of fuel and fuel additives under 40 CFR part 79.

(d) The requirements for the Renewable Fuel Standard (RFS) are specified in 40 CFR part 80, subpart M. A party that must meet the requirements of this part may also need to comply with the requirements for the RFS program under 40 CFR part 80, subpart M.

(e) Nothing in this part is intended to preempt the ability of state or local governments to control or prohibit any fuel or fuel additive for use in motor vehicles and motor vehicle engines that is not explicitly regulated by this part.

SOURCE: 67 FR 68347, Nov. 8, 2002; 85 FR 78469, Dec. 4, 2020, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7414, 7521, 7522–7525, 7541, 7542, 7543, 7545, 7547, 7550, and 7601.

Current through May 7, 2024, 89 FR 38835. Some sections may be more current. See credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.