## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CHEROKEE CONCERNED CITIZENS,

*Petitioner*,

v.

No. 23-1096

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL
REGAN, Administrator, United States
Environmental Protection Agency,

*Respondents*.

## PETITION FOR REVIEW

Pursuant to the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2618, Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, Cherokee Concerned Citizens ("Petitioner") hereby petitions this Court for review of the attached TSCA Section 5 Order for a New Chemical Substance, signed by Respondent U.S. Environmental Protection Agency on August 11, 2022, authorizing Chevron U.S.A. Inc. to manufacture, process, distribute in commerce, use, or dispose of certain new chemical substances enumerated therein.

DATED:  April 7, 2023                    Respectfully submitted,

/s/Katherine K. O'Brien
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

TOSH SAGAR
Earthjustice
1001 G St., NW, Ste. 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

JONATHAN KALMUSS-KATZ
Earthjustice
48 Wall St., 19th Floor
New York, NY 10005
(212) 823-4989
jkalmusskatz@earthjustice.org

*Counsel for Petitioner*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CHEREKEE CONCERNED CITIZENS,

*Petitioner*,

v.

No. _____

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL
REGAN, Administrator, United States
Environmental Protection Agency,

*Respondents*.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Cherokee Concerned Citizens states that it is a nonprofit corporation based in Pascagoula, MS, that is dedicated to protecting the health and well-being of residents in Pascagoula's Cherokee Forest neighborhood from exposure to industrial pollution. Cherokee Concerned Citizens has no parent corporation and no publicly held corporation owns 10% or more of its stock.

DATED:  April 7, 2023

Respectfully submitted,

/s/Katherine K. O'Brien
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

TOSH SAGAR
Earthjustice
1001 G St., NW, Ste. 1000
Washington, DC 20001
(202) 667-4500
tsagar@earthjustice.org

JONATHAN KALMUSS-KATZ
Earthjustice
48 Wall St., 19th Floor
New York, NY 10005
(212) 823-4989
jkalmusskatz@earthjustice.org

*Counsel for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing and attached documents on this date with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit using the Appellate Electronic Filing system.

I further certify that I served the foregoing and attached documents via certified mail on:

Randy Hill
Associate General Counsel
Pesticides and Toxic Substances Law Office
Office of General Counsel
U.S. Environmental Protection Agency
USEPA Headquarters
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 2333A
Washington, D.C. 20460

Correspondence Control Unit
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Merrick Garland
Attorney General of the United States
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

Chevron USA, Inc.
c/o Prentice-Hall Corporation Inc.
1090 Vermont Ave, NW
Washington, D.C. 20005

DATED:  April 7, 2023

/s/Katherine K. O'Brien
KATHERINE K. O'BRIEN
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

TW 09/01/22
EA 09/01/22
GH 09/13/22
JJB 9/15/22

EPA Sanitized

**United States Environmental Protection Agency**
**Office of Pollution Prevention and Toxics**
**1200 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20460**

## TSCA SECTION 5 ORDER  FOR A NEW CHEMICAL SUBSTANCE

Premanufacture Notice (PMN) Numbers:    Received 08/25/2022
P-21-0144-0147, P-21-0148-0150, P-21-0152-0154, P-21-155-0158 and P-21-0160-0163
Submission Dates: 06/07/2021, 06/07/2021, 06/14/2021, 06/08/2021, and 06/14/2021

In accordance with the provisions of Section 5(e) of the Toxic Substances Control Act (TSCA), 15
U.S.C. § 2604(e),

Chevron U.S.A. Inc.

is authorized to manufacture, process, distribute in commerce, use, or dispose of these New
Chemical Substances in the United States only in accordance with the requirements and
conditions described in this Order.

**MADISON LE**
Digitally signed by MADISON LE
DN: c=US, o=U.S. Government,
ou=Environmental Protection Agency,
cn=MADISON LE,
0.9.2342.19200300.100.1.1=680010036425
09
Date: 2022.08.11 17:38:09 -04'00'

Madison H. Le, Director                                          Date
New Chemicals Division
Office of Pollution Prevention and Toxics
U.S. Environmental Protection Agency

Name  Kristi Mitchum                              8 | 25 | 2022
Title  HSE Manager, Pascagoula Refinery              Date
Company  Chevron USA Inc.

**This document contains CBI**

# Table of Contents

Table of Contents ................................................................................................ii

Jurisdiction and General Provisions ....................................................................... 2

EPA's Determination under Section 5(a)(3)(B) ...................................................... 5

Requirements ...................................................................................................... 5

   I.   Terms of Manufacturing .................................................................... 6

      A.   Conditions of Manufacturing for the Company ........................... 6

      B.   Limit on Manufacture by Others .................................................. 6

   II.   Terms of Processing and Use ............................................................ 7

   III.   Terms of Distribution ....................................................................... 7

      A.   Export Notification ....................................................................... 7

      B.   Written Agreement ....................................................................... 7

      C.   Containers..................................................................................... 8

      D.   Recipient Non-Compliance ........................................................... 8

      E.   Termination of Certain Obligations Through Significant New Use Rule (SNUR) and Final SNUR Required Notification ............................................................... 9

   IV.   Temporary Transport and Storage ................................................... 9

   V.   Protection in the Workplace ............................................................ 10

   VI.   Hazard Communication Program..................................................... 10

   VII.   Risk Notification .............................................................................. 10

   VIII.   Recordkeeping ................................................................................ 11

   IX.   Automatic Sunset of Test Market Exemption ("TME"), Low Volume Exemption ("LVE"), and Low Release and Exposure Exemption ("LoREX")........................... 11

   X.   Exemptions..................................................................................... 12

XI.    Requests for Information ............................................................................ 12

XII.   Successor Liability Upon Transfer of Order ................................................ 13

XIII.  Modification and Revocation of the Order................................................. 13

XIV.   Office of Management and Budget (OMB) Control Number ....................... 13

XV.    Reservation of Rights ................................................................................ 14

XVI.   Effective Date ........................................................................................... 14

XVII.  Potentially Useful Information ................................................................. 14

Appendix 1: Definitions.................................................................................... 17

Appendix 2: Basis for EPA's Determination ...................................................... 21

I.     Health Effects Summary ........................................................................... 23

**Tier 1:** Experimentally-derived information on these New Chemical Substances ...................... 23

**Tier 2:** Experimentally-derived information on an analogous mixture ......................... 24

II.    Environmental Effects .............................................................................. 25

    F.     Environmental Effects Summary ..................................................... 26

III.   Exposure and Risk Summary ..................................................................... 27

Appendix 3: Termination of Certain Obligations through Significant New Use Rule (SNUR) and

SNUR Notification Requirements...................................................................... 31

I.     Termination of Certain Obligations Through a SNUR ................................. 31

II.    Final SNUR Required Notification ............................................................. 31

Appendix 4: Protection in the Workplace.......................................................... 32

Appendix 5: Recordkeeping .............................................................................. 34

I.     Manufacturing Volume ............................................................................. 34

II.    Sites of Manufacture................................................................................ 34

III.   Sales and Transfers .................................................................................. 34

IV.  Protection in the Workplace .................................................................................. 34

    A.  Protection in the Workplace Requirements.................................................. 34

    B.  Demonstration of Imperviousness ............................................................. 34

V.  Compliance with this Order .................................................................................. 35

    A.  Terms of Manufacturing, Processing, Use, Distribution and Disposal ...................... 35

VI.  Exemption Records ............................................................................................. 35

    A.  Research & Development Exemption .......................................................... 35

Appendix 6: Successor Liability Upon Transfer of Order ............................................. 36

Attachment A ............................................................................................................. 40

## Jurisdiction and General Provisions

This Order is issued by the United States Environmental Protection Agency ("EPA" or "the Agency") pursuant to Section 5(e) of the Toxic Substances Control Act ("TSCA"), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, 15 U.S.C. § 2604(e), regarding premanufacture notices (PMNs) P-21-0144-0147, P-21-0148-0150, P-21-0152-0154, P-21-155-0158 and P-21-0160-0163 submitted by Chevron U.S.A. Inc. (the Company) for



(New Chemical Substances). This Order is issued and entered into under the authority vested in the Administrator of the EPA by Section 5(e)(1) of TSCA, 15 U.S.C. § 2604(e)(1). Based upon EPA's assessment of these New Chemical Substances, the administrative record, and determinations made herein, the Company may manufacture, process, distribute in

commerce, use, or dispose of these New Chemical Substances in the United States only in accordance with the requirements and conditions described in this Order.

The Company must comply with all provisions of this Order, including but not limited to, all appendices to this Order and all documents incorporated by reference. According to Section 15 of TSCA, 15 U.S.C. § 2614, it is unlawful to fail or refuse to comply with any order issued under Section 5(e) of TSCA, 15 U.S.C. § 2604(e). Any person who violates the terms of this Order may be subject to both criminal and civil liabilities pursuant to Section 16 of TSCA, 15 U.S.C. § 2615, and to specific enforcement and seizures pursuant to Section 17 of TSCA, 15 U.S.C. § 2616. Falsifying information provided to EPA or concealing Information from EPA is a violation of this Order and is subject to penalties pursuant to 18 U.S.C. § 1001.

This Order encompasses the entire agreement between the EPA and the Company with regard to these New Chemical Substances and supersedes any previous agreements between the parties whether oral or written.

The Company waives any rights to challenge the basis or validity of this Order or its terms, including both substantive and procedural requirements, such as whether the order was issued 45 days before the end of the PMN Review Period as provided in TSCA § 5(e)(1)(B), 15 U.S.C. § 2604(e)(1)(B).

The Company has reviewed this Order carefully and agrees that all information that is claimed as confidential is correctly identified within brackets and that the Company has previously submitted that information to EPA under a claim of confidentiality in accordance with the requirements of TSCA and applicable regulations. Any information that is not bracketed is not claimed as confidential and/or any previous confidentiality claim is withdrawn.

Nothing in this Order substitutes for or supersedes any statutory and regulatory requirements under TSCA or any other statute. Section 8(e) of TSCA, 15 U.S.C. § 2607(e) requires the Company to immediately notify EPA if it obtains any information which reasonably supports the conclusion that these New Chemical Substances present a substantial risk of injury to health or the environment. The notice must reference the appropriate PMN identification numbers for

these substances and contain a statement that these New Chemical Substances are subject to this Order.

The terms and conditions not otherwise defined in this Order have the meanings assigned to them in TSCA or in regulations promulgated under TSCA. Appendix 1 Definitions shall apply to this Order and its appendices.

## EPA's Determination under Section 5(a)(3)(B)

The following determination constitutes the basis of this Order issued under Section 5(e) of TSCA, 15 U.S.C. § 2604(e):

EPA has determined, pursuant to Sections 5(a)(3)(B)(ii)(I) and 5(e)(1)(A)(ii)(I) of TSCA, 15 U.S.C. §§ 2604(a)(3)(B)(ii)(I) and (e)(1)(A)(ii)(I), that, in the absence of sufficient information to permit the Agency to make a reasoned evaluation of the health and environmental effects of these New Chemical Substances, the manufacture, processing, distribution in commerce, use, or disposal of these New Chemical Substances may present an unreasonable risk of injury to health or the environment.

The basis for EPA's determination is attached as Appendix 2 to this Order.

## Requirements

The Order applies to all commercial manufacturing, processing, distribution in commerce, processing, use and disposal of these New Chemical Substances, P-21-0144-0147, P-21-0148-0150, P-21-0152-0154, P-21-155-0158 and P-21-0160-0163 for

████████ by the Company, as follows:

I.    Terms of Manufacturing

A.    Conditions of Manufacturing for the Company

The Company must refrain from manufacturing these New Chemical Substances other than for use as a fuel, fuel additive, fuel blending stock, or refinery feedstock (including, but not limited to: cracking, coking, hydroprocessing, distillation, or deasphalting) subject to 40 C.F.R. Part 79 or 1090. When used as a fuel these New Chemical Substances are regulated under applicable EPA regulations for fuels, fuel additives, and regulated blendstocks (40 CFR Part 1090), registration of fuels and fuel additives (40 CFR Part 79), and other applicable EPA and OSHA regulations for worker safety, handling, storage, and transport that are intended to mitigate risks from exposure to fuels as listed in Attachment A. (The attachment is not intended to be an exhaustive list of environmental, health, and safety regulations. There may be other federal, state, and/or local regulations that apply to fuel quality, transportation, handling, dispensing and storage.)

B.    Limit on Manufacture by Others

1.    The Company must not cause, encourage, or suggest the manufacture of these New Chemical Substances within the United States by any other person.

2.    Termination of Certain Obligations Through Significant New Use Rule (SNUR) and Final SNUR Required Notification

a.    The prohibition in the above Paragraph 1 expires according to the provisions in Appendix 3.

b.    Once the prohibition in the above Paragraph 1 expires, whenever the Company causes, encourages, or suggests that a person manufacture

these New Chemical Substances, the Company must notify that person once in writing of the existence of the final SNUR, according to the conditions outlined in applicable portions of Appendix 3, and maintain a copy of such notification for 5 years.

## II.    Terms of Processing and Use

The Company must refrain from processing and using these New Chemical Substances other than as a fuel, fuel additive, fuel blending stock, or refinery feedstock (including, but not limited to: cracking, coking, hydroprocessing, distillation, or deasphalting) subject to 40 C.F.R. Part 79 or 1090. When used as a fuel these New Chemical Substances are regulated under applicable EPA regulations for fuels, fuel additives, and regulated blendstocks (40 CFR Part 1090), registration of fuels and fuel additives (40 CFR Part 79), and other applicable EPA and OSHA regulations for worker safety, handling, storage, and transport that are intended to mitigate risks from exposure to fuels as listed in Attachment A. (The attachment is not intended to be an exhaustive list of environmental, health, and safety regulations. There may be other federal, state, and/or local regulations that apply to fuel quality, transportation, handling, dispensing and storage.)

## III.    Terms of Distribution

The Company may distribute these New Chemical Substances to another person only under the following conditions:

### A.  Export Notification

The Company must notify, in writing, any person to whom it distributes these New Chemical Substances that these New Chemical Substances are subject to the notification requirements of TSCA Section 12(b), 5 U.S.C. § 2611(b), and 40 C.F.R. part 707, subpart D.

### B.  Written Agreement

Prior to distributing these New Chemical Substances to any person the Company must obtain from that person a written agreement that the person will:

1.  Comply with the following terms and restrictions of this Order:

    a   Protection in the Workplace (Section V and Appendix 4),

    b   Terms of Processing and Use (Section II)

2.  Not further distribute these New Chemical Substances to any other person except (i) for the purposes of disposal, (ii) according to the terms and conditions for temporary transport and storage, or (iii) unless they have been incorporated into a fuel, fuel additive, fuel blending stock, or used as a refinery feedstock (including, but not limited to: cracking, coking, hydroprocessing, distillation, or deasphalting).

C.  Containers

1.  Containers containing these New Chemical Substances must be labeled according to the applicable requirements in the Occupational Safety and Health Administration (OSHA)'s Hazard Communication Standard set forth at 29 C.F.R. § 1910.1200.

2.  Containers containing these New Chemical Substances are subject to requirements of the Department of Transportation (DOT) and EPA as listed in Attachment A.

D.  Recipient Non-Compliance

If the Company obtains knowledge that a recipient of these New Chemical Substances has failed to comply with any of the required Terms of an agreement required by Section III.B, entered into with the recipient ("Recipient"), the Company must immediately cease to supply the substance to that Recipient, unless the Company is able to document all of the following:

1.  The Company, within 5 working days of obtaining knowledge of non-compliance, notified the Recipient in writing that the Recipient has failed to comply with any of the Terms of Distribution, or has engaged in a significant new use without submitting a significant new use notice (SNUN) to the EPA.

2. The Company, within 15 working days of notifying the Recipient of the noncompliance, received a written statement of assurance that the Recipient is aware of the Terms of Distribution and will comply with those terms or is aware of the terms of the SNUR and will not engage in a significant new use without submitting a SNUN to EPA.

3. The Company, after obtaining knowledge that the Recipient has failed to comply with any Terms of Distribution requirements or has engaged in a significant new use without submitting a SNUN after receiving a written statement of assurance from the Recipient, immediately ceased to supply these New Chemical Substances to the Recipient and notified EPA.

4. The Company received written notification from EPA that permits its distribution of these New Chemical Substances to the Recipient.

E. Termination of Certain Obligations Through Significant New Use Rule (SNUR) and Final SNUR Required Notification

   a. The requirements of paragraphs B, C, and D of this Terms of Distribution Section and the Temporary Storage and Transport Section will terminate in accordance with the conditions of the Appendix titled Termination of Certain Obligations through Significant New Use Rule (SNUR) and SNUR Notification Requirements.

   b. Whenever the Company distributes the New Chemical Substance to another person, the Company must notify that person in writing of the existence of the final SNUR, according to the conditions outlined in the Appendix titled Termination of Certain Obligations through Significant New Use Rule (SNUR) and SNUR Notification Requirements and maintain a copy of such notification for 5 years.

IV. Temporary Transport and Storage

   The Company's transport of these New Chemical Substances for temporary storage must be pursuant to the following limitations:

A. Containers containing these New Chemical Substances are subject to requirements of the Department of Transportation (DOT) and EPA as listed in Attachment A.

B. Containers must be labeled according to the requirements in the OSHA Hazard Communication Standard set forth at 29 C.F.R. § 1910.1200 and should not conflict with the requirements of the Hazardous Materials Transportation Act (49 U.S.C. § 5101 *et seq.*) and its implementing regulations issued by the Department of Transportation.

V. Protection in the Workplace

The Company must establish and implement a program to prevent workplace exposure pursuant to the Protection in the Workplace requirements in Appendix 4 prior to manufacturing, processing, using and/or distributing these New Chemical Substances.

VI. Hazard Communication Program

The Company must establish and implement a hazard communication program consistent with the requirements in 29 C.F.R § 1910.1200 prior to manufacturing, processing, using and/or distributing these New Chemical Substances.

VII. Risk Notification

If EPA finds or determines, that despite the Company's compliance with the terms of this Order, these New Chemical Substances may be contributing to an unreasonable risk or may present an unreasonable risk, or an additional unreasonable risk to human health or the environment:

A. EPA will notify the Company, in writing, of its determination.

B. The Company must cease all manufacturing, processing, distribution, use and disposal of these New Chemical Substances, unless:

1. The Company complies with the specific actions concerning testing, hazard communication and/or limits on manufacturing, processing, distribution, use or disposal of these New Chemical Substances, and

2. The Company incorporates any new risk information and information on methods for protecting against such risk, on the label and into the Safety Data Sheet (SDS), within 90 days and provide the updated SDS to all persons who receive or have received these New Chemical Substances within the last 5 years.

The Company may submit a written report, within 30 days of receipt of EPA's risk notification, refuting EPA's determination and/or the appropriateness of any additional requirements imposed by EPA.

A. The Company's report must be submitted as a support document for these PMNs according to the procedures set out in 40 C.F.R. § 720.40.

B. EPA will respond promptly to the Company's report, in writing.

C. The Company, upon receipt of EPA's response, must comply with any requirements imposed by EPA's response prior to restarting any manufacturing, processing, distribution, use and disposal of these New Chemical Substances.

VIII.   Recordkeeping

The Company must maintain records pursuant to the recordkeeping requirements outlined in Appendix 5 for 5 years (or longer if specified in this Order) after their creation date.

IX.   Automatic Sunset of Test Market Exemption ("TME"), Low Volume Exemption ("LVE"), and Low Release and Exposure Exemption ("LoREX")

The Company is prohibited from the manufacture, processing, distribution in commerce, use, or disposal of these New Chemical Substances pursuant to a TME under 40 C.F.R. § 720.38, or a LVE or LoREX under 40 C.F.R. § 723.50(c)(1) or (2), respectively, as of the effective date of this Order.

X.     Exemptions

The requirements of the Order apply to manufacture, processing, distribution in commerce, use and/or disposal of these New Chemical Substances by the Company at any site under the Company's control. The following exemptions do not apply to these New Chemical substances:

A.  solely for export at 40 C.F.R 720.30(e);

B.  impurity at 720.30(h)(1); and

C.  byproduct at 720.30(h)(2).

The requirements of the Order do not apply to manufacture, processing, distribution in commerce, use, and/or disposal of these New Chemical Substances by the Company at any site under the Company's control for the following:

A.  small quantities manufactured, processed, used or distributed in commerce solely for R&D in accordance with Section 5(h)(3) of TSCA, 15 U.S.C. § 2604(h)(3), as defined at 40 C.F.R. § 720.3(cc), and 40 C.F.R. § 720.36;

B.  when manufactured solely for non-commercial R&D in accordance with 40 C.F.R. § 720.30(i);

C.   when imported as part of an "article" as defined at 40 C.F.R. § 720.3(c) and in compliance with 40 C.F.R. § 720.22(b)(1); or,

D.  when incorporated into a fuel, fuel additive, fuel blending stock, or used as a refinery feedstock (including, but not limited to: cracking, coking, hydroprocessing, distillation, or deasphalting).

Regardless of whether the Company meets any exemption expressly permitted by this section, recordkeeping requirements found in Appendix 5 continue to apply.

XI.    Requests for Information

This Order does not affect EPA's ability to seek information regarding TSCA regulated chemicals, including these New Chemical Substances. In order to ensure

continuing compliance with the terms of this Order, EPA may issue a request for information to the Company at any time after the effective date of this Order. Failure to respond to such a request shall be a violation of this Order.

XII.     Successor Liability Upon Transfer of Order

The Company may transfer its interest in these New Chemical Substances, including its ability to manufacture these New Chemical Substances conferred by this Order, to a Successor in Interest pursuant to the Successor Liability Upon Transfer of Order requirements in Appendix 6.

XIII.    Modification and Revocation of the Order

The Company may request at any time, in writing and based upon new information, that EPA modify or revoke provisions of this Order.

EPA may modify or revoke provisions of this Order if EPA determines that specific requirements of this Order are no longer necessary to protect against a previously identified risk, or upon consideration of any information, new or existing, that these New Chemical Substances are not likely to present an unreasonable risk of injury to health or the environment.

EPA may, at any time, upon the receipt or evaluation of any information, new or existing, determine that these New Chemical Substances presents or may present an unreasonable risk of injury to health or the environment, and may issue a rule to regulate the substance or modify this Order to address any risks.

XIV.     Office of Management and Budget (OMB) Control Number

Under the Paperwork Reduction Act and its regulations at 5 C.F.R. part 1320, the Company is not required to respond to this collection of information unless this Order displays a currently valid control number from OMB. The collection of information required in this Order has been approved under the currently valid OMB Control Number 2070-0012.

XV.   Reservation of Rights

Except as specifically provided in this Order, nothing in this Order shall limit EPA's authority to take, direct, or order any action necessary to protect public health, welfare, or the environment. This Order does not prevent EPA from seeking legal or equitable relief to enforce the terms of this Order, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring the Company in the future to perform additional activities pursuant to TSCA or any other applicable law.

EPA may use any information submitted under this Order in an administrative, civil judicial or criminal action.

XVI.   Effective Date

This Order is effective upon expiration of the applicable review period.

XVII.   Potentially Useful Information

"Potentially Useful Information" (Table 1, definition in Appendix 1) would assist in evaluating the potential effects caused by these New Chemical Substances.

| Information | Effects |
|---|---|
| Skin irritation | Human Health |
| Eye irritation | Human Health |
| Respiratory depression/irritation | Human Health |
| Hydrocarbon pneumonia/aspiration hazard | Human Health |
| Reproductive developmental toxicity | Human Health |
| Systemic toxicity | Human Health |
| Genetic toxicity | Human Health |
| Carcinogenicity | Human Health |
| Aquatic Toxicity | Ecotoxicity |
| Consumer inhalation exposures at gas station | Human Health |

The Company is not required to submit the "Potentially Useful Information."

NOTE: Any required testing and/or potentially useful information described in this Consent Order was based on EPA's consideration of available screening-level data, if

any, as well as other available information on appropriate testing for the PMN substance. Further, any such testing/information identified by EPA that includes testing on vertebrates reflects the consideration of available toxicity information, computational toxicology and bioinformatics, and high-throughput screening methods and their prediction models. Pursuant to TSCA section 4(h), which pertains to reduction of testing in vertebrate animals, EPA encourages consultation with the Agency on the use of alternative test methods and strategies (also called New Approach Methodologies, or NAMs), if available, to generate the potentially useful information.

## Appendix 1: Definitions

"Chemical protective clothing" means items of clothing that provide a barrier to prevent dermal contact with chemical substances of concern (e.g., clothing that covers the entire body, boots, coveralls, gloves, jackets, and pants).

"Commercial" means the use of a chemical substance or a mixture containing the chemical substance in a commercial enterprise providing saleable goods or a service to consumers (e.g., a commercial dry-cleaning establishment or painting contractor).

"Consumer" means a private individual who uses a chemical substance or any product containing the chemical substance in or around a permanent or temporary household or residence, during recreation, or for any personal use or enjoyment.

"Consumer product" means a chemical substance that is directly, or as part of a mixture, sold or made available to consumers for their use in or around a permanent or temporary household or residence, in or around a school, or in recreation.

"Container" means any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or the like that contains the New Chemical Substance that is the subject of this Order. For purposes of this Order, pipes or piping systems, and engines, fuel tanks, or other operating systems in a vehicle, are not considered to be containers.

"Contract Manufacturer" means a person, outside the Company, who is authorized to manufacture the New Chemical Substance under the conditions specified in an Appendix to the Order.

"Enclosed Process" means a system of equipment directly connected to the production process that is designed, constructed, and operated in a manner which prevents emissions, or the release of any chemical substance into the facility or environment during the production process. Such emissions, including fugitive emissions, could lead to exposures to workers, the

public, or the environment. For an enclosed process, exposure and release could only occur due to loss of integrity or failure of the manufacturing process equipment or control systems.

"Equivocal data" means data which, although developed in apparent conformity with the Good Laboratory Practice Standards and EPA-reviewed protocols, are inconclusive, internally inconsistent, or otherwise insufficient to support a reasoned evaluation of the potential risk of injury to human health or the environment of the New Chemical Substance.

"Immediate use" means a use of a chemical substance that is under the control of, and used only by, a person who transferred it from a labeled container and will only be used by that person within the work shift in which it is transferred from the labeled container.

"Intermediate" means any chemical substance that is consumed, in whole or in part, in chemical reactions used for the intentional manufacture of another chemical substance(s) or mixture(s), or that is intentionally present for the purpose of altering the rates of such chemical reactions.

"Manufacture" means to produce or manufacture in the United States or import into the customs territory of the United States. This definition also applies to related noun and verb forms of "manufacture."

"New Chemical Substance" means the chemical substance described in the premanufacture notice submitted by the Company relevant to this Order

"NIOSH" means the National Institute for Occupational Safety and Health of the U.S. Department of Health and Human Services.

"Open process" is any method of manufacture using equipment (such as a reactor, storage tank, or mixing vessel) causing the new chemical substance to be direct contact with the atmosphere.

"Personal protective equipment" means any protective clothing or device placed on the body to prevent contact with, and exposure to, an identified chemical substance or substances in the

work area. Examples include, but are not limited to, clothing, aprons, hoods, chemical goggles, face splash shields, or equivalent eye protection, and respirators. Barrier creams are not included in this definition.

"Potentially Useful Information" means data, or independent studies that may help EPA better characterize the potential risks associated with the restrictions on manufacturing, processing, use, distribution in commerce, and disposal detailed in this Consent Order. PUI can be submitted to EPA as part of a request to modify or rescind restrictions to this Order and can be submitted using alternative test methods and strategies to generate data to inform risk assessment. EPA encourages dialogue with Agency representatives to help determine how best the submitter can meet both the data needs and the objective of TSCA section 4(h).

"Results in inhalation exposure" means any manufacturing, processing, use or disposal activity/operation that generates a dust, mist, vapor or aerosol to which a worker is reasonably likely to be exposed.

"Scientifically invalid" means departing in any significant way from the EPA-reviewed protocol or the Good Laboratory Practice Standards at 40 C.F.R. part 792 such that the data do not support a reasoned evaluation of the health or environmental effects of the New Chemical Substance.

"SDS" means safety data sheet, the written listing of data for the chemical substance.

"Sealed" means a closed container that is physically and chemically suitable for long-term containment of the New Chemical Substance, and from which there will be no human exposure to, nor environmental release of, the New Chemical Substance during transport and storage.

"Site-limited intermediate" means an intermediate manufactured, processed, and used only within a site and not distributed in commerce other than as an impurity or for disposal. Imported intermediates cannot be "site-limited."

"Successor in Interest" means a person outside the Company who has acquired the Company's full interest in the rights to manufacture the New Chemical Substance, including all ownership

rights and legal liabilities, through a Transfer Document signed by the Company, as transferor, and the Successor in Interest, as transferee. The term excludes persons who acquire less than the full interest of the Company in the New Chemical Substance, such as a licensee who has acquired a limited license to the patent or manufacturing rights associated with the New Chemical Substance. A Successor in Interest must be incorporated, licensed, or doing business in the United States in accordance with 40 C.F.R. § 720.22(a)(3) and 40 C.F.R. § 720.3(z).

"Transfer Document" means the legal instrument(s) used to convey the interests in the New Chemical Substance, including the right to manufacture the New Chemical Substance, from the Company to the Successor in Interest.

"Work area" means a room or defined space in a workplace where the New Chemical Substance is manufactured, processed, or used and where employees are present.

"Workplace" means an establishment at one geographic location containing one or more work areas.

## Appendix 2: Basis for EPA's Determination

**Chemical Name:**

Specific: ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

Generic: Naphtha, heavy catalytic cracked (P-21-0144), Naphtha, heavy alkylate (P-21-0145), Naphtha, full range alkylate, butane-contg. (P-21-0146), Naphtha, hydrotreated heavy (P-21-0147), Naphtha, light catalytic cracked (P-21-148), Naphtha, light alkylate (P-21-0149), Naphtha, hydrotreated light (P-21-0150), Clarified oils, catalytic cracked P-21-0152), Distillates, hydroteated heavy (P-21-0153), Gas Oils hydrotreated vacuum (P-21-0154), Distillates, light catalytic cracked (P-21-0155), Distillates, clay-treated middle (P21-0156), Distillates, hydrotreated middle (P-21-157), Distillates, hydrotreated light P-21-0158), Gases, C4-rich (P-21-0160), Gases, catalytic cracking (P-21-0161), Residues, butane splitter bottoms P-21-0162), and Tail gas, saturate gas plant mixed stream, C4-rich (P-21-0163)

**Conditions of Use (intended, known, or reasonably foreseen)[1]:**

Intended conditions of use (specific): Manufacture and process for use as and use as a fuel, fuel additive, fuel blending stock, refinery feedstock (including, but not limited to: cracking, coking, hydroprocessing, distillation, or deasphalting) consistent with the manufacturing, processing, use, distribution, and disposal information described in these PMNs.

Known conditions of use: Applying such factors as described in footnote 1, EPA evaluated whether there are known conditions of use and found none.

Reasonably foreseen conditions of use: Applying such factors as described in footnote 1, EPA evaluated whether there are reasonably foreseen conditions of use and found the following: Use as a chemical intermediate, carrier for herbicides and pesticides, paint and ink formulations, indoor heating oil, and solvent blend for cleaning, feedstock for ethylene cracker and gasoline reformer, refinery feed to catalytic reformer and heavy naphtha sales, marine diesel fuels, anti-wear additive for greases, solvent/diluent for coatings, inks, adhesives, strippers and waxes, component of fuel oil, extraction solvent for metal recovery; cutting fluids; odorless mineral spirits, olefin manufacturing feedstock, specialty solvents, alcohol denaturant, and fuel blendstock based on analogues.

EPA has determined that in the absence of sufficient information to permit the Agency to make a reasoned evaluation of the health and environmental effects of the manufacture, processing, distribution in commerce, use, or disposal of these New Chemical Substances, for ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] Under TSCA § 3(4), the term "conditions of use" means "the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." In general, EPA considers the intended conditions of use of a new chemical substance to be those identified in the section 5(a) notification. Known conditions of use include activities within the United States that result from manufacture that is exempt from PMN submission requirements. Reasonably foreseen conditions of use are future circumstances, distinct from known or intended conditions of use, under which the chemical substance may be manufactured, processed, distributed, used, or disposed of. EPA expects that the identification of "reasonably foreseen" conditions of use will be made on a fact-specific, case-by-case basis. EPA will apply its professional judgment and experience when considering factors such as evidence of current use of the new chemical substance outside the United States, information about known or intended uses of chemical substances that are structurally analogous to the new chemical substance, and conditions of use identified in an initial PMN submission that the submitter omits in a revised PMN. The sources EPA uses to identify reasonably foreseen conditions of use include searches of internal confidential EPA PMN databases (containing use information on analogue chemicals), other U.S. government public sources, the National Library of Medicine's Hazardous Substances Data Bank (HSDB), the Chemical Abstract Service STN Platform, REACH Dossiers, technical encyclopedias (e.g., Kirk-Othmer and Ullmann), and Internet searches.



]may present an unreasonable risk of injury to health or the environment, without consideration of costs or other non-risk factors, (including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator) under the conditions of use, based on the risk assessment summarized below.

I.    Health Effects Summary

Human health hazard is relevant to whether a New Chemical Substance is likely to present an unreasonable risk because the significance of the risk is dependent upon both the hazard (or toxicity) of the chemical substance and the extent of exposure to the substance.

EPA estimated the human health hazard of these chemical substances using a tiered approach for information that incorporated whole fuel-stream and hydrocarbon constituent data used as a fuel blend under the Toxic Substances Control Act (TSCA).

**Tier 1:** Experimentally-derived information on these New Chemical Substances

**Tier 2:** Experimentally-derived information on an analogous mixture

**Tier 3:** Experimentally-derived information on the most prevalent and/or most toxic constituents of these New Chemical Substance mixture

**Tier 4a:** Predicted (*in silico*) data on most prevalent constituents if no experimentally-derived data are available. Predictive tools (*e.g.,* EPISuite) will be used to fill data gaps for physical-chemical and environmental fate properties and other tools (e.g., OECD QSAR Toolbox) will be used for human health hazard.

**Tier 4b:** Use of the most toxic individual constituents, based on either experimental data and/or predictions (*i.e.,* ECOSAR) and conservative assumptions in a screening-level assessment when mixture characterization is inadequate for higher tiered assessment (environmental hazard).

There were no experimentally derived hazard data for these New Chemical Substances (Tier 1). EPA estimated the human health hazard of these chemical substances based on its estimated physical/chemical properties, by comparing it to compositionally analogous mixtures (Tier 2) for which there are information on human health hazard, using available human hazard information on representative constituents (Tier 3) of these New Chemical Substances, and other structural information.

Absorption of these New Chemical Substances through the skin, gastrointestinal tract, and lungs was estimated based on physical/chemical properties (form, molecular weight, water solubility, log P partition coefficient, and vapor pressure).

For these New Chemical Substances, EPA identified skin and eye irritation; acute toxicity; systemic toxicity (neurotoxicity, body weight effects, and liver, kidney, blood, spleen, and other organ effects); reproductive and developmental toxicity; oral and inhalation portal of entry effects; genetic toxicity; and carcinogenicity as hazards of these New Chemical Substances based on Tier 2 analogous mixtures and Tier 3 constituents of these New Chemical Substances. EPA identified hydrocarbon pneumonia/ aspiration hazard based

on the chemical composition (petroleum). EPA assumes that respiratory tract irritation is possible when exposed to these New Chemical Substances.

II.   Environmental Effects

Environmental fate is the determination of which environmental compartment(s) a chemical moves to, the expected residence time in the environmental compartment(s), and the known or expected removal and degradation processes. Environmental fate is an important factor in determining exposure and risk. U.S. EPA has a Persistent, Bioaccumulative and Toxicity (PBT) policy established in 1999 that uses a simple scoring system for persistence, bioaccumulation and toxicity. Persistence is important because chemicals that are not degraded in the environment will persist and may buildup in the environment, and thus increase potential for exposure. Persistence scores are, going from low to high persistence, identified as P1, P2, or P3. Bioaccumulation is important because substances that bioaccumulate in aquatic and/or terrestrial species pose the potential for elevated exposures to humans and other organisms via the food chain. Bioaccumulation scores are, going from low to high bioaccumulation, identified as B1, B2, or B3. The toxicity score (T) is usually only used when the P and B scores are both a value of 2 or 3; in which case the chronic toxicity (to environmental organisms or human health) is assigned a value as described in the 1999 policy.

The environmental fate assessment utilized a similar tiered approach as the environmental hazard and human health teams to evaluate environmental persistence and bioaccumulation potential. However, a conservative-based weight of evidence approach was also utilized for persistence.

EPA acknowledges that biodegradation is not the only fate endpoint used to evaluate persistence. Likewise, experimentally-derived data were not always available (Tiers 1, 2 and 3) on all of the fate endpoints, and, as a result, Tier 4 data (predicted data for the constituents) were also used to evaluate environmental fate. The added weight of evidence approach was also utilized to ensure that the experimentally-derived constituent biodegradation data (Tier 3) were weighted higher than the experimentally-derived data on a sufficiently similar fuel mixture (Tier 2) if one or more of the individual

constituents (Tier 3) did not show ready biodegradation. In other words, if the experimentally-derived constituent data (Tier 3) were more conservative than the experimentally-derived data on a sufficiently similar fuel mixture (Tier 2), those constituent data were weighted higher than Tier 2 data. Additionally, EPA relied on experimental and predicted bioaccumulation and bioconcentration data on the dominant constituents (Tiers 3 and 4) in the assessment of bioaccumulation potential because Tiers 1 and 2 contained no data to assess bioaccumulation potential.

EPA estimated that these New Chemical Substances could have limited persistence or be very persistent ("P1-P3") based on the aerobic and anaerobic biodegradation half-lives of the constituents (Tiers 3 and 4). EPA estimated that these New Chemical Substances could have limited persistence ("P1") or limited persistence to being very persistent ("P1-P3") and low potential for bioaccumulation ("B1"), low to moderate potential for bioaccumulation ("B1-B2"), or low to high potential for bioaccumulation ("B1-B3") depending on the data for the constituents. P-21-0162 and P-21-0163 received a P1 and B1, and P-21-0146, P-21-0160, and P-21-0161 received a P1-P3 and B1. P-21-0147, P-21-0148 and P-21-0150 received a P1-P3 and B1-B2. The remaining cases received a P1-P3 and B1-B3. Overall, these New Chemical Substances have the potential to bioaccumulate and be persistent in the environment, such that repeated exposures may cause food-chain effects via accumulation in exposed organisms.


F.  Environmental Effects Summary

Environmental hazard is relevant to whether a new chemical substance is likely to present unreasonable risk because the significance of the risk is dependent upon both the hazard (or toxicity) of the chemical substance and the extent of exposure to the substance. EPA estimated environmental hazard of these New Chemical Substances (NCS) using a four-tier approach that incorporated whole fuel-stream and hydrocarbon constituent data. Nine of the NCSs, P-21-0145, P-21-0146, P-21-0147, P-21-0148, P-21-0149, P-21-0150, P-21-0155, P-21-0156, and P-21-0158, were evaluated using acceptable hazard data from four analogous fuel streams (Tier 2). The other nine used individual constituent hazard information and

combined them using the toxic unit approach, which predicts ecotoxicity endpoints for a mixture by combining the toxic contributions from each constituent. The lowest acute and chronic toxicity endpoints for each NCS were used to determine the environmental hazard and calculate the acute and chronic COCs. The lowest estimated acute toxicity endpoints for each NCS were all between 0.005 and 16.76 ppm, while chronic toxicity endpoints were all between 0.0003 and 1.77 ppm. As per established EPA/OPPT methods, the application of assessment factors of 4 (algae) or 5 (fish and aquatic invertebrates) to the acute toxicity values results in acute COCs between 0.002 ppm (2 ppb) and 3.352 ppm (3352 ppb). As per established EPA/OPPT methods, application of an assessment factor of 10 to chronic toxicity values (*i.e.,* ChV) results in chronic COCs between 0.00003 ppm (0.03 ppb) and 0.177 ppm (177 ppb). Seven NCSs (P-21-0147, P-21-0148, P-21-0150, P-21-0160, P-21-0161, P-21-0162, and P-21-0163) were classified as a moderate environmental hazard. Eleven NCSs (P-21-0144, P-21-0145, P-21-0146, P-21-0149, P-21-0152, P-21-0153, P-21-0154, P-21-0155, P-21-0156, P-21-0157, and P-21-0158) were classified as a high environmental hazard.

III.    Exposure and Risk Summary

EPA estimates occupational exposure and environmental release under the intended conditions of use described in these PMNs using ChemSTEER (Chemical Screening Tool for Exposures and Environmental Releases; https://www.epa.gov/tsca-screening-tools/chemsteer-chemical-screening-tool-exposures-and-environmental-releases). EPA uses EFAST (the Exposure and Fate Assessment Screening Tool; https://www.epa.gov/tsca-screening-tools/e-fast-exposure-and-fate-assessment-screening-tool-version-2014) to estimate general population, consumer, and environmental exposures.

**Risks to Workers**

Human health risks for systemic effects were identified for worker inhalation exposures to P-21-0144, P-21-0146, P-21-0148, P-21-0152, P-21-0154, P-21-0155, P-21-0156, and P-21-

0157. Risks were identified workers for systemic effects via dermal contact to P-21-0152, P-21-0153, P-21-0154, P-21-0155, and P-21-0156. For workers, cancer risk estimates from inhalation exposure ranged between 5.1E-08 and 7.1E-03. Hazards for irritation to the respiratory tract (all cases), skin (all cases except P-21-0152, P-21-0162, and P-21-0163), and eye (all except P-21-0154) via inhalation and dermal contact were also identified for workers. Risks for these endpoints were not quantified due to a lack of dose-response for these hazards.

### Risk to General Population

For P-21-0144, 0148, 0149, 0150, 0152, and 0157, risks were identified for the general population (infants) for systemic and/or oral portal-of-entry effects via drinking water. Risks to adults for this exposure route were identified for P-21-0152. For P-21-0145, 0146, 0147, 0155, 0156, and 0158, risks were not identified for the general population for systemic and/or oral portal-of-entry effects via drinking water (adults or infants). For P-21-0153, 0154, 0160, 0161, 0162, and 0163, risks to the general population via drinking water were not evaluated because releases to surface water are not expected.

For P-21-0144, 0148, 0149, 0150, 0152, 0155, 0156, 0157, and 0158, risks were identified for the general population for systemic and/or oral portal-of-entry effects via fish ingestion.

For P-21-0146 and 0147, risks were not identified for the general population for systemic and/or oral portal-of-entry effects via fish ingestion. For P-21-0153, 0154, 0160, 0161, 0162, and 0163, risks to the general population via fish ingestion were not evaluated because releases to surface water are not expected.

For P-21-0144, 0145, 0146, 0147, 0148, 0149, 0150, 0156, 0157, and 0158, risks were not identified for the general population for systemic and/or oral portal-of-entry effects via intake of groundwater impacted by landfill leachate. For P-21-0152, 0153, 0154, 0155, 0160, 0161, 0162, and 0163, risks to the general population via groundwater impacted by landfill leachate were not evaluated because releases to landfill were expected to be negligible (below modeling thresholds) or no releases are expected.

For P-21-0148, 0152, 0154, 0155, 0156, 0157 and 0158, risks were identified for the general population for systemic and/or inhalation portal-of-entry effects via fugitive air inhalation. For P-21-0144, 0145, 0146, 0147, 0149, 0150, 0160, 0161, 0162, and 0163, risks were not identified for the general population for systemic and/or inhalation portal-of-entry effects via fugitive air inhalation. For P-21-0153, there is insufficient information to assess hazard because of a lack of suitable Tier 2 mixtures or representative constituents with inhalation PODs. Therefore, EPA cannot make a risk determination for the general population exposed via fugitive air inhalation.

For P-21-0149, 0152, 0155, 0156, 0157 and 0158, risks were identified for the general population for systemic and/or inhalation portal-of-entry effects via stack air inhalation. For the remaining cases, risks to the general population via stack air inhalation were not evaluated because no releases are expected.

For the general population, cancer risk estimates for drinking water ranged between 1.3 E-10 (P-21-0146) and 1.7E-08 (P-21-0148). The cancer risk estimates for fish ingestion ranged between 7.8E-10 (P-21-0146) and 3.3E-05 (P-21-0158). The cancer risk estimates for consumption of groundwater impacted by landfill ranged between 2.7E-09 (P-21-0144) and 1.8E-07 (P-21-0148). The cancer risk estimates for inhalation of fugitive air ranged between 8.3E-8 (P-21-0144) and 1.2E-04 (P-21-0150). The cancer risk estimate for inhalation of stack air for P-21-0158 was 2.5E-01.

### Risk to Consumers

Consumer uses were identified for P-21-0144, 0145, 0146, 0147, 0148, 0149, 0150, 0155, 0156, 0157, and 0158. Consumer uses were not identified for the remaining cases. Non-cancer risks to consumers via dermal contact were identified for P-21-0155 and not identified for any of the remaining cases. Hazards for respiratory, dermal, and eye irritation via dermal contact were identified for consumers. Risks for these endpoints were not quantified due to a lack of dose-response for these hazards.

### Environmental Risks

There were no environmental risks to aquatic organisms from the manufacturing of the 18 NCSs as there were no expected releases to water. Environmental risks to aquatic organisms from acute exposures during processing were identified for P-21-0144, 0145, 0146, 0147, 0149, and 0150 because the estimated surface water concentrations exceeded the acute concentrations of concern. Environmental risks to aquatic organisms from acute exposures during use were identified for P-21-0155, 0156, 0157, and 0158 because the estimated surface water concentrations exceeded the acute concentrations of concern. Environmental risks to aquatic organisms from acute exposures during both processing and use were identified for P-21-0148 and 0152 because the estimated surface water concentrations exceeded the acute concentrations of concern. Environmental risks to aquatic organisms from acute exposures were not identified for P-21-0153, 0154, 0160, 0161, 0162, or 0163 as there were no expected releases to water. Environmental risks to aquatic organisms from chronic exposure were not identified.

# Appendix 3: Termination of Certain Obligations through Significant New Use Rule (SNUR) and SNUR Notification Requirements

I.     Termination of Certain Obligations Through a SNUR

> The requirement in Section I.B.1 in this Order (Limit on Manufacture by Others) and Section III.B, C, and D (Terms of Distribution) and Section IV (Temporary Storage and Transport) expire 75 days after publication of a final SNUR corresponding to this Order under Sections 15 U.S.C. §§ 2604(a)(2) and 2604(f)(4) of TSCA, unless the Company is notified by EPA of an action in a Federal Court seeking judicial review of the SNUR. In that case, the Prohibition will remain in effect until EPA notifies the Company that all Federal Court Actions have been resolved and the validity of the SNUR has been affirmed.

II.    Final SNUR Required Notification

> A.  Whenever the Company causes, encourages or suggests the manufacture, processing, use or distribution of the New Chemical Substance by a person, the Company must notify each recipient once, in writing, of the existence of the final SNUR.
>
> B.  The required notification must reference the publication of the SNUR in the Federal Register or Code of Federal Regulations; and must specify all significant new uses under the SNUR that would require significant new use notice to EPA.
>
> C.  Records documenting the written notification must be maintained for 5 years from the date of their creation.

## Appendix 4: Protection in the Workplace

The Company is prohibited from manufacturing, processing or using the New Chemical Substance without establishing the following: Engineering and Administrative Controls

The Company must implement engineering control measures (e.g., enclosure or confinement of the operation(s), general and local ventilation) or administrative control measures (e.g., workplace policies and procedures), where feasible, to prevent exposure to these New Chemical Substances in the work area.

Dermal Personal Protective Equipment

A. The Company must ensure that each employee reasonably likely to be dermally exposed in the work area through direct handling or contact with equipment or surfaces containing or contaminated with these New Chemical Substances are provided with, and is required to wear, personal protective equipment ("PPE") that provides a barrier to prevent dermal exposure to the NCS in the specific work area where it is selected for use.

B. PPE must be selected and used in accordance with the Occupational Safety and Health Administration (OSHA)'s requirements at 29 C.F.R. §§ 1910.132, 1910.133, and 1910.138.

C. Gloves must be replaced at the end of each work shift during which they are exposed to the New Chemical Substance. If permeation testing was used to establish impermeability, gloves may not be used for longer than for which they were tested.

D. Demonstration of Imperviousness

The Company must demonstrate that the PPE selected provides an impervious barrier to prevent dermal exposure during expected duration and conditions of exposure. The Company may make this demonstration by any one or a combination of the following:

## Appendix 5: Recordkeeping

The Company shall maintain the following records for 5 years after the date they are created (or longer if required in this Order) and must produce them for inspection, copying or as otherwise required under Section 11 of TSCA, 15 U.S.C. § 2610:

I.   Manufacturing Volume

   Records documenting the manufacturing volume (including import) of these New Chemical Substances and the corresponding dates of manufacture (import).

II.  Sites of Manufacture

   Records documenting the address of all sites of manufacture, import, processing and use.

III. Sales and Transfers

   Records documenting the date of all sales or transfers, the quantity of these New Chemical Substances sold or transferred, and the names and addresses (including shipping address, if different) outside the site of manufacture to whom the Company directly sells or transfers these New Chemical Substances.

IV.  Protection in the Workplace

   A.  Protection in the Workplace Requirements

   Records documenting establishment and implementation of a program pursuant to the requirements in Protection in the Workplace Section and Appendix. Records used to demonstrate compliance under 29 C.F.R. § 1910.1200(e) may be used to satisfy this record keeping obligation if such records fulfill the requirements in Protection in the Workplace Section and Appendix.

   B.  Demonstration of Imperviousness

   Records documenting the determinations that chemical protective clothing is impervious to these New Chemical Substances.

V.   Compliance with this Order

A.  Terms of Manufacturing, Processing, Use, Distribution and Disposal

Records documenting compliance with the applicable manufacturing, processing, use, distribution and disposal requirements in this Order.

VI.   Exemption Records

Records documenting compliance to the requirements of any exemption specifically included in this Order.

A.  Research & Development Exemption

For any amounts or batches of these New Chemical Substances eligible for the Research and Development Exemption, the Company must maintain, for 5 years from the date of their creation, the records required by 40 C.F.R. § 720.78(b).

## Appendix 6: Successor Liability Upon Transfer of Order

The Company may transfer its interest in these New Chemical Substances, after the New Chemical Substances have been placed on the TSCA Inventory. The terms of this Order apply to a Successor in Interest, pursuant to the following requirements:

The Notice of Transfer of Toxic Substances Control Act Section 5(e) Order (Notice of Transfer) must be fully executed before the Successor in Interest manufactures these New Chemical Substances.

The Notice of Transfer shall clearly state the effective date of the transfer of interest in these New Chemical Substances and must contain provisions which expressly transfer liability for these New Chemical Substances under the terms of this Order from the Company to the Successor in Interest.

Copies of the Notice of Transfer must be maintained by the Successor in Interest at its principal place of business, and at all sites where these New Chemical Substances are manufactured.

The Notice of Transfer when fully executed shall be incorporated as, and become an enforceable part, of this Order.

The Successor in Interest is liable for compliance with the requirements and obligations of the Order as of the date of the transfer of interest in these New Chemical Substances.

The Notice of Transfer shall be submitted as a support document for these PMNs, using the procedures set out in 40 C.F.R. § 720.40, within 10 days of the effective date of the transfer.

Any new confidentiality claims asserted in the Notice of Transfer must be substantiated at the time of the submission in accordance with TSCA Section 14(c)(3), 15 U.S.C. § 2613(c)(3). Guidance on substantiating CBI claims may be found at https://www.epa.gov/tsca-cbi/substantiating-cbi-claims-under-tsca-time-initial-submission. A Notice of Transfer cannot modify a CBI claim made by the PMN Submitter to assert a claim of confidentiality for information which has been released to the public by EPA because (1) PMN Submitter did not

assert a CBI claim for that information, or (2) notwithstanding such a claim, EPA disclosed the information to the public in accordance with its authority under TSCA or applicable regulations.

NOTICE OF TRANSFER OF TOXIC SUBSTANCES CONTROL ACT

SECTION 5(e) ORDER

Transferor:

Name of New Chemical Substance:

PMN Number:

1. Transfer of Interest in New Chemical Substance Pursuant to Terms of the Order. Effective on _____, the Company did sell or otherwise transfer to _____, ("Successor in Interest") its interests in the above-referenced New Chemical Substance, which was the subject of a premanufacture notice ("PMN") and the manufacture of which is governed by an Order issued by the U.S. Environmental Protection Agency ("EPA") under the authority of Section 5(e) of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §2604(e).

2. Assumption of Liability. The Successor in Interest hereby certifies that, as of the effective date of transfer, it has assumed all obligations conferred under the Order. The Successor in Interest also certifies that it is incorporated, licensed, or doing business in the United States in accordance with 40 C.F.R. § 720.22(a)(3).

3. Confidential Business Information. The Successor in Interest hereby (check one):
___ Reasserts
___ Relinquishes
___ Modifies
all Confidential Business Information ("CBI") claims made by the Company, pursuant to Section 14 of TSCA, 15 U.S.C. § 2613, and 40 C.F.R. part 2, for the New Chemical Substance(s). Where "reasserts" or "relinquishes" is indicated, that designation will be deemed to apply to all such claims. Where "modifies" is indicated, such modification will be explained in detail in an attachment to this Notice of Transfer.
I certify that it is true and accurate that the Successor in Interest has:
(a)    Taken reasonable measures to protect the confidentiality of the information;

(b)     Determined that the information is not required to be disclosed or otherwise made available to the public under any other Federal law;

(c)     A reasonable basis to conclude that the disclosure of the information is likely to cause substantial harm to the competitive position of the Successor in Interest; and

(d)     A reasonable basis to believe that the information is not readily discoverable through reverse engineering.

CBI claims for chemical identity must be accompanied by a generic chemical identity, which may be that used for the PMN.

| | |
|---|---|
| _____ | _____ |
| Company (Transferor) | PMN Number |
| _____ | _____ |
| Signature of Authorized Official | Date |
| _____ | |
| Printed name of Authorized Official | |
| _____ | |
| Title of Authorized Official | |
| _____ | _____ |
| Successor in Interest | Date |
| _____ | _____ |
| Signature of Authorized Official | Successor's Technical Contact |
| _____ | _____ |
| Printed Name of Authorized Official | Phone |
| _____ | _____ |
| Title of Authorized Official | Address |
| _____ | _____ |
| Address | City, State, Zip Code |
| _____ | |
| City, State, Zip Code | |

Attachment A


**Federal Regulations Potentially Applicable to Fuel Stored, Transported, Dispensed
and Used Within the United States**

This list is not intended to be an exhaustive list of environmental, health and safety regulations. There may be other federal, state, and/or local regulations that apply to fuel quality, transportation, handling, dispensing and storage. EPA expects that companies are complying with these and other applicable regulations.

| Agency | Rule Name | Purpose | Regulatory Citation | Applicability |
|---|---|---|---|---|
| EPA | Regulation of Fuels, Fuel Additives, and Regulated Blendstocks | Standards for fuel parameters that directly or indirectly affect vehicle, engine, and equipment emissions, air quality, and public health. Standards and requirements for fuel additives and regulated blendstocks. Requirements for demonstrating compliance. | 40 CFR Part 1090 | Refiners and importers<br><br>*See 40 CFR 1090.1 through 1090.1850.* |
| EPA | Fuel Registration Requirements | Requires registration of fuels and fuel additives | 40 CFR Part 79 | Manufacturers of fuel and fuel additives<br><br>*See 40 CFR 79.1, & 79.4(a) and (b).* |

| EPA | NSPS for tanks | Requires controls on storage tanks that store higher vapor pressure petroleum products such as gasoline | 40 CFR Part 60, Subpart K, Ka, & Kb | Applies to each storage vessel for petroleum liquids in excess of 40,000 gallons. Specific applicability of K or Ka or Kb is determined by date of tank construction, modification, or reconstruction.<br><br>*See 40 CFR 60.110, 60.110a, and 60.110b.* |
| --- | --- | --- | --- | --- |
| EPA | Standard for Bulk Gasoline Terminals | Requires controls for loading racks used to deliver gasoline into tank trucks | 40 CFR Part 60, Subpart XX | The affected facility to which the provisions of this subpart apply is the total of all the loading racks at a bulk gasoline terminal which deliver liquid product into gasoline tank trucks, the construction or modification of which commenced after 12-17-80.<br><br>*See 40 CFR 60.500(a).* |
| EPA | MACT for large Gasoline Distribution Facilities (Bulk Gasoline Terminals and Pipeline Breakout Stations) | Establishes requirements for Gasoline Distribution Bulk Terminals, Bulk Plants, and pipeline facilities | 40 CFR Part 63, Subpart R | The affected sources to which the provisions of this subpart apply are each bulk gasoline terminal and each pipeline breakout station, except those otherwise excluded or exempted as specified in § 63.420.<br><br>*See 40 CFR 63.420.* |
| EPA | Smaller bulk gasoline terminals | Establishes requirements for smaller Gasoline Distribution Bulk Terminals, Bulk Plants, and pipeline facilities | 40 CFR Part 63, Subpart BBBBBB | The affected sources to which this subpart applies are each area source bulk gasoline terminal (not subject to 40 CFR Part 63, Subpart R), each pipeline breakout station (not subject to 40 CFR Part 63, Subpart R), pipeline pumping station, and bulk gasoline plant identified in paragraphs (a)(1) through (4) of this section. |

| | | | | |
|---|---|---|---|---|
| | | | | *See 40 CFR 63.11081.* |
| EPA | Gasoline Dispensing Facilities | Establishes requirements for gasoline dispensing facilities (GDF) to limit air emissions | 40 CFR Part 63, Subpart CCCCCC | Each GDF that is located at an area source. The affected source includes each gasoline cargo tank during the delivery of product to a GDF and also includes each storage tank. *See 40 CFR 63.11110 and 11111(a).* |
| OSHA | Fuel handling at marine terminals | Protect workers handling fuels at marine terminals | 29 CFR § 1917.156 | Handling of fuels at a marine terminal |
| OSHA | Hazard Communication Standard | Informing employees of risks of the chemicals with which they work | 29 CFR § 1910.1200 | Manufacturers, employers and distributors |
| OSHA | Permissible Exposure Limits | Limit inhalation occupational exposures | 29 CFR § 1910.1000 (Z tables) or 29 CFR 1910.1028 for benzene | Employers subject to OSHA standards *See 29 CFR 1910.5(a).* |
| OSHA | Flammable Liquids | Provides worker protections for workers handling specific quantities of flammable liquids | 29 CFR § 1910.106 | Employers subject to OSHA standards *See 29 CFR 1910.5(a).* |
| OSHA | Process Safety Management Standards | Provides worker protections for workers handling specific quantities of highly hazardous substances | 29 CFR § 1910.119 | Applicability depends upon whether gasoline is being stored purely for the purpose of delivery to consumers and if not, on what types of tanks are used to store the gasoline. General criteria: Employers who operate a process |

| | | | | (including storage) which involves a chemical at or above the specified threshold quantities listed in appendix A to this section; and, a process which involves a Category 1 flammable gas (as defined in 1910.1200(c)) or a flammable liquid with a flashpoint below 100 °F (37.8 °C) on site in one location, in a quantity of 10,000 pounds (4535.9 kg) or more.<br><br>Gasoline stored for consumer use is not covered.<br><br>*See 29 CFR 1910.5(a) and See 29 CFR 1910.119.* |
|---|---|---|---|---|
| EPA | Risk Management Program | Provides community protections for workers handling specific quantities of highly hazardous substances – includes gasoline | 40 CFR Part 68, Subpart G | An owner or operator of a stationary source that has more than a threshold quantity of a regulated substance in a process; however, gasoline intended for consumer use is exempt.<br><br>*See 40 CFR 68.10.* |
| DOT Hazard Materials Regula-tions | Hazard Materials Transportation | Provides standards for labeling, storing and transporting hazardous materials, including gasoline | 49 CFR Parts 100-180 | The hazardous materials regulations are applicable to the transportation of hazardous materials in commerce and their offering to:<br>1. Interstate, intrastate, and foreign carriers by rail car, aircraft, motor vehicle and vessel.<br>2. The representation that a hazardous material is present in a package, container, rail car, aircraft, motor vehicle or vessel.<br>3. The manufacture, fabrication, marking, maintenance, reconditioning, repairing or testing of a package or container which is represented, marked, certified or sold for use in |

| | | | | |
|---|---|---|---|---|
| | | | | the transportation of hazardous materials.<br><br>*See 49 CFR 171.1(a).* |
| Coast Guard | Marine Occupational Safety and Health Standards | Provides standard for ships and barges carrying benzene or benzene containing liquids in bulk | 46 CFR Part 197, Subpart C | This subpart applies to all Coast Guard inspected vessels, including tank ships and barges, that are carrying benzene or benzene containing liquids in bulk as cargo. This subpart does not apply to vessels that are carrying only liquid cargoes containing less than 0.5% benzene by volume.<br><br>NOTE: Most gasoline contains < 5% benzene.<br><br>*See 46 CFR 197.501.* |